IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| UNITED STATES OF AMERICA, | ) | CR-15-00065-BLF |
|---|---|---|
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | MAY 21, 2018 |
| | ) | |
| LIN, ET AL, | ) | VOLUME 10 |
| | ) | |
| DEFENDANT. | ) | PAGES 1-163 |
| | ) | |
| _____ | ) | *PARTIAL TRANSCRIPT* |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S


FOR THE PLAINTIFF:        **BY:  MICHAEL G. PITMAN**
                          UNITED STATES ATTORNEY'S OFFICE
                          150 ALMADEN BLVD., SUITE 900
                          SAN JOSE, CA 95113


FOR THE DEFENDANT:        **BY:  RANDY SUE POLLOCK**
LIN                       ATTORNEY AT LAW
                          286 SANTA CLARA AVENUE
                          OAKLAND, CA 94610


APPEARANCES CONTINUED ON NEXT PAGE

OFFICIAL COURT REPORTER:        SUMMER FISHER, CSR, CRR
                                CERTIFICATE NUMBER 13185


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

1    A P P E A R A N C E S (CONTINUED)

2    FOR THE PLAINTIFF:      **BY:  CHRISTOPHER MAGNANI**
                             U.S. DEPARTMENT OF JUSTICE
3                            TAX DIVISION
                             BEN FRANKLIN STATION
4                            PO BOX 972
                             WASHINGTON, DC 20044
5

6    FOR THE DEFENDANT:      **BY:  CHRISTOPHER J. CANNON**
     HORNG                   SUGARMAN & CANNON
7                            737 TEHAMA STREET, UNIT #3
                             SAN FRANCISCO, CA 94103
8

9    INTERPRETERS:           SHAN TSAN
                             CHEN-HAO HSU
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF PROCEEDINGS

PLAINTIFF'S

**MEILI LIN**
DIRECT EXAM BY MS. POLLOCK                    P. 5

1                          INDEX OF EXHIBITS

2                                        IDENT.        EVIDENCE

3           DEFENDANT'S

4              1016                                       13
               1017                                       14
5              1018                                       15
               1019                                       16
6              1020                                       24
               1021                                       31
7              1022                                       55
               1028                                       80
8              1029                                       81
               1038                                       93
9              1039                                       96
               1040                                      101
10             1011                                      124
               1052                                      134
11             1053                                      135, 137
               1093                     141              144
12             1055                                      150

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        SAN JOSE, CALIFORNIA                    MAY 21, 2018

 2                    P R O C E E D I N G S

 3        (COURT CONVENED AT 9:02 A.M.)

 4            THE COURT:  WE ARE BACK ON THE RECORD.  ALL OF OUR

 5    COUNSEL AND PARTIES ARE PRESENT, AND ALL OF OUR JURORS AND

 6    ALTERNATES.  GOOD MORNING, EVERYONE.

 7            ALL RIGHT.  LET'S GET RIGHT BACK DOWN TO WORK.  WE ARE

 8    RIGHT ON SCHEDULE, AND IT'S NICE TO STAY THAT WAY.

 9            ON FRIDAY, WE COMPLETED THE TESTIMONY OF MR. LIN.

10            MS. POLLOCK, ARE YOU READY TO CALL YOUR NEXT WITNESS?

11            MS. POLLOCK:  YES, YOUR HONOR.

12        I CALL MEILI LIN TO THE STAND.

13            THE COURT:  ALL RIGHT.

14        MS. LIN, IF YOU WOULD COME FORWARD TO THE WITNESS STAND,

15    PLEASE, AND STAND TO BE SWORN.

16        (**DEFENSE WITNESS, MEILI LIN, WAS SWORN.**)

17            THE WITNESS:  YES.

18                    **DIRECT EXAMINATION**

19    BY MS. POLLOCK:

20    Q.   MS. LIN, DO YOU GO BY ANY OTHER NAMES?

21    A.   ALI LIN.

22    Q.   AND WHERE WERE YOU BORN?

23    A.   TAIWAN.

24            THE COURT:  IF THE INTERPRETER IS TRANSLATING, THEN

25    HE MUST GIVE THE ANSWER.  I CAN'T HAVE HALF AND HALF.
```

1            DO YOU WANT THE INTERPRETER NOT TO BE INTERPRETING UNTIL

2     HE'S ASKED?

3            MS. POLLOCK:  WELL, HE SHOULD BE INTERPRETING

4     EVERYTHING THAT'S SAID.

5            THE COURT:  I'M GETTING THE ANSWERS IN ENGLISH, AND I

6     CAN'T DO THAT.  IT'S ALL OR NOTHING.

7            THE WITNESS:  OKAY.

8            THE COURT:  I'M GLAD TO START OUT ONE WAY AND SWITCH

9     THOUGH, WHATEVER YOU LIKE ON THAT, BUT NOT HALF AND HALF.

10           MS. POLLOCK:  NO, I UNDERSTAND, YOUR HONOR.

11           DO YOU UNDERSTAND, MEILI?  OKAY.

12     Q.   ARE YOU A UNITED STATES CITIZEN?

13     A.   YES.

14     Q.   AND WHEN DID YOU BECOME A CITIZEN?

15     A.   2004.

16     Q.   ARE YOUR PARENTS STILL ALIVE?

17     A.   MY MOTHER PASSED AWAY LAST YEAR.  MY FATHER IS STILL IN

18     TAIWAN.

19     Q.   HOW OLD WAS YOUR MOTHER WHEN SHE PASSED AWAY?

20     A.   88 YEARS OLD.

21     Q.   HOW WOULD YOU DESCRIBE THE RELATIONSHIP THAT YOU HAD WITH

22     YOUR MOTHER?

23     A.   WELL, BASICALLY I WOULD TALK TO MY MOM OVER THE PHONE

24     EVERY DAY.

25     Q.   WERE YOU CLOSE TO HER?

```
 1      A.    VERY CLOSE.

 2      Q.    AND HOW WOULD YOU DESCRIBE YOUR RELATIONSHIP WITH YOUR

 3   FATHER?

 4      A.    MY FATHER, HE WAS ALWAYS OUT OF TOWN ON BUSINESS, BUT HE

 5   WAS VERY GOOD TO ME.

 6      Q.    HOW MANY SIBLINGS DO YOU HAVE?

 7      A.    THREE OLDER SISTERS, ONE OLDER BROTHER.

 8      Q.    AND WHAT ARE THE NAMES AND AGES OF YOUR SISTERS, STARTING

 9   FROM THE OLDEST?

10      A.    MY OLDEST SISTER IS MEI XU LIN.  SHE'S CLOSE TO 59 -- 58.

11      Q.    IS SHE THE SISTER WHO LIVES IN TAIWAN?

12      A.    YES, IN TAIWAN.

13      Q.    AND WHO IS YOUR NEXT SISTER?

14      A.    PING KUANG LIN.

15      Q.    OKAY.  HOW OLD IS THAT SISTER?

16      A.    OLDER BROTHER.

17      Q.    OKAY.  AND THE SISTER THAT'S JUST ABOVE YOU IN ORDER?

18      A.    NO, I STILL HAVE TWO OTHER OLDER SISTERS.

19      Q.    OKAY.  WHAT ARE THEIR NAMES AND AGES, PLEASE?

20      A.    MEI LIN.  SHE PASSED AWAY WHEN SHE WAS 39 YEARS OLD.

21      Q.    OKAY.  AND YOUR NEXT SISTER?

22      A.    CLOSE TO 53.

23      Q.    AND WHAT IS HER NAME?

24      A.    MEI-RU LIN.

25      Q.    AND WHERE DOES MEI-RU LIVE?
```

DIRECT EXAM BY MS. POLLOCK

```
 1     A.   SHE LIVES NEXT DOOR TO MY OLDER BROTHER IN CHINA.

 2     Q.   AND LAST WEEK WE HEARD YOUR BROTHER, PING KUANG LIN,

 3     TESTIFY.  DID YOU EVER HAVE ANOTHER BROTHER IN YOUR FAMILY?

 4     A.   NO.

 5     Q.   DID YOUR FATHER HAVE ANOTHER SON FROM A PRIOR MARRIAGE?

 6     A.   YES.

 7     Q.   DID YOU GROW UP WITH THAT PERSON?

 8     A.   NO.

 9     Q.   NOW, IS HENRY HORNG YOUR HUSBAND?

10     A.   YES.

11     Q.   MS. LIN, SHOWING YOU WHAT'S MARKED AS DEFENSE

12     EXHIBIT 1090; DO YOU RECOGNIZE THAT?

13     A.   THIS IS MY HOME WHERE I WAS BORN.

14     Q.   IN TAIWAN?

15     A.   YES.

16     Q.   IS THAT WHERE YOU GREW UP?

17     A.   YES.

18     Q.   IS THAT WHERE YOUR FATHER IS NOW LIVING?

19     A.   PRESENTLY, YES.

20     Q.   IS IT A HOUSE THAT'S -- HOW MANY STORIES IS THAT HOME?

21     A.   FIVE.

22     Q.   AND DO YOU RECALL HOW MANY BEDROOMS THERE ARE IN THAT

23     HOME?

24     A.   EIGHT ROOMS.  AND IN EACH ROOM, THERE'S A RESTROOM.

25     Q.   AND WOULD YOU DESCRIBE THAT HOME AS A VERY LARGE HOME?
```

1    A.  IF YOU ADD THE FIVE STORIES ALL TOGETHER, IT'S BIGGER THAN

2    THE HOUSE THAT I'M LIVING AT RIGHT NOW.

3    Q.  AND IT'S BIGGER THAN THE HOME THAT YOUR BROTHER, MR. LIN,

4    HAS IN CHINA?

5    A.  YES, BECAUSE THIS IS FIVE STORIES.

6    Q.  IS IT FAIR TO SAY THAT WHEN YOU WERE GROWING UP, YOUR

7    PARENTS WERE VERY WELL TO DO FINANCIALLY?

8    A.  I HEARD THAT THIS HOUSE WAS PURCHASED ABOUT THREE TO

9    FOUR YEARS AFTER I WAS BORN, SO I WOULD SAY AROUND 1962.

10   Q.  OKAY.  BUT WAS YOUR FAMILY WELL TO DO WHEN YOU WERE

11   GROWING UP?  DID THEY HAVE -- WERE THEY FINANCIALLY WELL TO DO?

12   A.  YEAH, SHOULD BE.  MY FATHER, HE WAS THE HEAD OF THE PTS

13   SCHOOL, SO A LOT OF MONEY, HAD TO DONATE A LOT OF MONEY.

14   Q.  OKAY.  WHAT'S THE PTS FOR --

15        THE INTERPRETER:  PTA.

16   Q.  WHAT'S THE PTA FOR?

17   A.  BECAUSE A LOT OF TIMES, SCHOOLS HAVE ACTIVITIES AND THEY

18   HAVE STRICT NEEDS, AND THEY WOULD NEED DONATIONS FROM FAMILIES

19   THAT ARE MORE WELL OFF.  THINGS LIKE, SOMETIMES SCHOOL WILL

20   NEED AIR CONDITIONER INSTALLED, SOMETIMES SCHOOL WILL NEED NEW

21   FACILITIES BE BUILT, THINGS LIKE THAT.

22   Q.  I BELIEVE I FORGOT TO ASK YOU, HOW OLD ARE YOU?

23   A.  51 YEARS OLD.

24   Q.  AND DO YOU HAVE ANY CHILDREN?

25   A.  TWO DAUGHTERS.

DIRECT EXAM BY MS. POLLOCK

1    Q.   AND WHAT ARE THEIR AGES?

2    A.   THE OLDER ONE IS 17.  THE YOUNGER ONE IS 14.

3    Q.   OKAY.  I WOULD LIKE TO ASK YOU A LITTLE BIT ABOUT YOUR

4    LANGUAGE.

5         AT SOME POINT, YOU CAME TO THE UNITED STATES TO STUDY,

6    CORRECT?

7    A.   YES.

8    Q.   PRIOR TO COMING TO THE UNITED STATES, WHEN YOU WERE IN

9    SECONDARY SCHOOL IN TAIWAN, DID YOU STUDY ENGLISH?

10   A.   YES.

11   Q.   HOW MANY HOURS -- WAS THERE A SPECIFIC LANGUAGE CLASS IN

12   ENGLISH, OR HOW MANY HOURS DID YOU STUDY ENGLISH?

13   A.   SO, BECAUSE WHEN I STARTED SCHOOL WHEN I WAS YOUNG, I WENT

14   TO MUSIC SCHOOL.  SO WHEN I STARTED HIGH SCHOOL, THEN I LEARN

15   ENGLISH WHEN I WAS IN NINTH GRADE.

16   Q.   HOW MANY HOURS A WEEK WAS THE ENGLISH CLASS THAT YOU TOOK?

17   A.   I WOULD SAY LESS THAN TWO HOURS, BECAUSE EACH SESSION WAS

18   50 MINUTES.

19   Q.   OKAY.  NOW, DID YOUR PARENTS SPEAK ANY ENGLISH?

20   A.   NO, THEY DON'T.

21   Q.   AND DO ANY OF YOUR SISTERS OR YOUR BROTHER SPEAK ENGLISH?

22   A.   THEY DON'T SPEAK IT.

23   Q.   WHEN YOU CAME OVER TO THE UNITED STATES TO ATTEND COLLEGE,

24   DID YOU TAKE ANY ENGLISH CLASSES BEFORE YOUR COLLEGE STARTED?

25   A.   SO PRIOR TO THE SCHOOL YEAR BEING STARTED, I TOOK FOUR

1    WEEKS OF ESL CLASSES.

2    Q.   FOUR WHAT?

3    A.   FOUR WEEKS OF ESL.

4    Q.   ENGLISH AS A SECOND LANGUAGE?

5    A.   YES.

6    Q.   WHAT WAS YOUR MAJOR -- WELL, HOW WOULD YOU DESCRIBE YOUR

7    ABILITY TO SPEAK ENGLISH?

8    A.   I FEEL THAT MY ENGLISH IS NOT FLUENT AND I HAD TO THINK

9    ABOUT IT BEFORE I SPEAK.  IT'S NOT AS COMFORTABLE FOR ME AS I

10   WOULD BE SPEAKING USING MANDARIN OR TAIWANESE.

11   Q.   OKAY.  WHAT LANGUAGE DO YOU SPEAK IN YOUR DAILY LIFE?

12   A.   I WILL SPEAK TAIWANESE WITH MY HUSBAND, AND I WILL SPEAK

13   MANDARIN CHINESE WITH MY DAUGHTERS.

14   Q.   AND WHAT LANGUAGE DO YOUR CHILDREN SPEAK?

15   A.   AT SCHOOL SHE STUDIES FRENCH AND ENGLISH, AT HOME SHE WILL

16   SPEAK MANDARIN WITH US.

17   Q.   WHAT LANGUAGE DO YOU SPEAK WITH YOUR FRIENDS OUTSIDE OF

18   YOUR HOME?

19   A.   MANDARIN AND TAIWANESE.

20   Q.   WHEN YOU SPEAK TO ME, DO YOU SPEAK IN ENGLISH?

21   A.   YES, BUT I HAVE TO THINK FOR A LONG TIME.

22   Q.   IN OUR CONVERSATIONS, HAVE I ASKED YOU TO REPEAT CERTAIN

23   WORDS?

24   A.   YES, THAT'S WHY I FELT EMBARRASSED, YEAH.

25   Q.   NOW, WHEN YOU -- WHEN DO YOU RECALL COMING TO THE

1    UNITED STATES?

2           THE INTERPRETER:  SORRY, COULD I HAVE THE QUESTION

3    AGAIN?  MAY THE INTERPRETER HAVE THE QUESTION AGAIN?

4           MS. POLLOCK:  OH, SORRY.

5    Q.   WHAT YEAR DO YOU RECALL COMING TO THE UNITED STATES?

6    A.   1989.

7    Q.   AND WHAT WAS THE PURPOSE OF COMING HERE?

8    A.   TO VISIT SCHOOLS.

9    Q.   WHAT SCHOOLS DID YOU VISIT?

10   A.   JULIARD SCHOOL.  MANHATTAN SCHOOL OF MUSIC.

11   Q.   OKAY.  JULIARD IS A SCHOOL OF MUSIC?

12   A.   YES.

13   Q.   WHAT DID YOU INTEND TO BE YOUR MAJOR IN COLLEGE?

14   A.   PIANO PERFORMANCE.

15   Q.   HAD YOU BEEN PLAYING A PIANO FOR MANY YEARS PRIOR TO

16   COMING TO THE UNITED STATES?

17   A.   YES, I STARTED LEARNING THE PIANO WHEN I WAS FOUR YEARS

18   OLD.

19   Q.   AND DID YOU PERFORM AT ALL IN TAIWAN AS A PIANIST PRIOR TO

20   COMING HERE TO ATTEND COLLEGE?

21   A.   SO I STARTED GOING TO COMPETITIONS STARTING AT SEVEN YEARS

22   OLD.  AND THEN THAT CONTINUED UNTIL I WAS -- WENT TO HIGH

23   SCHOOL.  AND I WENT TO PROFESSIONAL SCHOOL FOR PIANO FOR FIVE

24   YEARS FOR HIGH SCHOOL.

25   Q.   NOW DIRECTING YOUR ATTENTION TO EXHIBIT 1016, WHICH IS IN

1    THE BINDER RIGHT BEFORE YOU, DO YOU RECOGNIZE WHAT IS

2    IDENTIFIED AS DEFENSE EXHIBIT 116 -- 1016?

3    A.   YES, I RECOGNIZE IT.

4    Q.   WHAT IS THIS?

5    A.   SO I REPRESENTED THE MANHATTAN SCHOOL OF MUSIC AND GOING

6    TO LONDON AND ATTENDED A FESTIVAL FOR ONE MONTH.

7    Q.   AND WHERE WAS THE FESTIVAL?

8    A.   IN LONDON, ENGLAND.

9    Q.   OKAY.

10        MS. POLLOCK:  YOUR HONOR, I WOULD ASK THAT

11   EXHIBIT 1016 BE MOVED INTO EVIDENCE.

12        THE COURT:  ANY OBJECTION?

13        MR. MAGNANI:  NO OBJECTION.

14        THE COURT:  IT WILL BE ADMITTED.

15       (DEFENDANT'S EXHIBIT 1016 WAS ADMITTED INTO EVIDENCE.)

16   BY MS. POLLOCK:

17   Q.   MS. LIN, WERE YOU SELECTED TO GO TO THIS PROGRAM IN

18   LONDON?

19   A.   YEAH, I REPRESENT MY SCHOOL.  AND MY SCHOOL CHOSE TWO TO

20   THREE PEOPLE TO REPRESENT THE SCHOOL IN ATTENDING THAT

21   FESTIVAL.  I FORGOT NOW, IT SHOULD HAVE BEEN BETWEEN TWO TO

22   THREE.

23   Q.   TURNING TO DEFENSE EXHIBIT 1017, DO YOU RECOGNIZE THIS

24   DOCUMENT?

25   A.   THIS IS MY GRADATION DIPLOMA THAT I RECEIVED FROM THE

```
 1        MANHATTAN SCHOOL OF MUSIC FOR MY BACHELOR'S OF MUSIC DEGREE.

 2                MS. POLLOCK:  YOUR HONOR, I WOULD MOVE THIS EXHIBIT

 3        INTO EVIDENCE.

 4                THE COURT:  ANY OBJECTION?

 5                MR. MAGNANI:  NO, YOUR HONOR.

 6                THE COURT:  IT WILL BE ADMITTED.

 7            (DEFENDANT'S EXHIBIT 1017 WAS ADMITTED INTO EVIDENCE.)

 8        BY MS. POLLOCK:

 9        Q.   MS. LIN, WHAT IS THE DATE ON THIS DIPLOMA?

10        A.   1995.

11        Q.   AND THIS IS YOUR DEGREE FOR A BACHELOR OF MUSIC?

12        A.   YES.

13        Q.   WAS THIS A FOUR-YEAR COLLEGE THAT YOU ATTENDED IN ORDER TO

14        GET THIS BACHELOR DEGREE?

15        A.   YES.

16        Q.   NOW DIRECTING YOU TO DEFENSE EXHIBIT 1018.  DO YOU

17        RECOGNIZE THIS DOCUMENT?

18        A.   YES.

19        Q.   WHAT IS THIS?

20        A.   THIS IS MY GRADATION DIPLOMA FOR RECEIVING MY MASTER'S

21        DEGREE.

22                MS. POLLOCK:  YOUR HONOR, I WOULD MOVE THIS EXHIBIT

23        INTO EVIDENCE.

24                THE COURT:  ANY OBJECTION?

25                MR. MAGNANI:  NO, YOUR HONOR.
```

1              THE COURT:  IT WILL BE ADMITTED.

2          (DEFENDANT'S EXHIBIT 1018 WAS ADMITTED INTO EVIDENCE.)

3     BY MS. POLLOCK:

4     Q.   MS. LIN, LOOKING AT THIS DOCUMENT, WHAT DEGREE DOES IT SAY

5     THAT YOU RECEIVED?

6     A.   MASTER OF MUSIC.

7     Q.   AND WHAT YEAR DID YOU RECEIVE THIS?

8     A.   1999.

9     Q.   HOW LONG WAS YOUR COURSE OF STUDIES TO GET YOUR MASTER'S

10    DEGREE?

11    A.   TWO YEARS.

12    Q.   AND IN ORDER TO GET YOUR FINAL DIPLOMA IN A MASTERS, DID

13    YOU HAVE TO GIVE ANY TYPE OF SPECIAL PERFORMANCE AT THE SCHOOL?

14    A.   YES.  I HAD TO BOTH FOR THE COLLEGE DEGREE AND FOR MY

15    MASTER'S DEGREE.

16    Q.   DIRECTING YOU TO DEFENSE EXHIBIT 1019.  DO YOU RECOGNIZE

17    THAT?

18    A.   YES.

19    Q.   AND WHAT IS THIS?

20    A.   THIS IS A PROGRAM FOR MY SOLO PIANO RECITAL THAT I HAD AT

21    THE SCHOOL.

22    Q.   OKAY.

23              MS. POLLOCK:  YOUR HONOR, I WOULD MOVE DEFENSE

24    EXHIBIT 1019 INTO EVIDENCE.

25              THE COURT:  ANY OBJECTION?

1          MR. MAGNANI:  NO OBJECTION.

2          THE COURT:  IT WILL BE ADMITTED.

3          (DEFENDANT'S EXHIBIT 1019 WAS ADMITTED INTO EVIDENCE.)

4     BY MS. POLLOCK:

5     Q.   MS. LIN, SHOWING YOU WHAT'S MARKED HERE AS DEFENSE

6     EXHIBIT 1019.  WHAT IS THE DATE ON THIS DOCUMENT?

7     A.   APRIL 18TH, 1999.

8     Q.   AND AT THE VERY BOTTOM PORTION, DO YOU SEE WHERE YOUR NAME

9     IS LISTED?

10    A.   YES, I SEE IT, MEILI LIN.

11    Q.   AND WHAT DOES IT SAY THAT YOU ARE A CANDIDATE TO RECEIVE?

12    A.   MASTER OF MUSIC DEGREE.

13    Q.   WAS THIS THE PROGRAM THAT YOU HAD TO PERFORM IN ORDER --

14    AS A FINAL PERFORMANCE, IN ORDER TO RECEIVE YOUR MASTER'S

15    DEGREE?

16    A.   YES, BUT THERE WAS ALSO ANOTHER CONCERTO.

17    Q.   THAT'S NOT SHOWN HERE?

18    A.   WELL, THIS PROGRAM TOOK ALREADY AN HOUR AND A HALF, AND

19    THE CONCERTO, THAT HAD TO BE DONE WITH THE ORCHESTRA, SO THAT

20    HAS TO BE -- THAT ARRANGEMENT HAD TO BE MADE SEPARATELY WITH

21    THE ORCHESTRA.

22    Q.   OKAY.  AND THIS PERFORMANCE WAS JUST A SOLO OF YOU AND THE

23    PIANO?

24    A.   YES.

25    Q.   AND BASED ON THE SOLO PERFORMANCE AND WITH THE ORCHESTRA,

DIRECT EXAM BY MS. POLLOCK

```
 1      THEN YOU RECEIVED YOUR MASTER'S DEGREE?

 2      A.   YES.

 3      Q.   NOW FOLLOWING THE GRADATION FROM THE MANHATTAN SCHOOL OF

 4      MUSIC, WHAT WAS YOUR PLAN TO DO AS FAR AS YOUR CAREER?

 5      A.   I WANTED TO GO BACK TO TAIWAN, LIKE MOST OF MY FRIENDS.

 6      Q.   AND WHAT DID YOU PLAN -- WHAT WERE YOUR PLANS IF YOU WENT

 7      BACK TO TAIWAN?

 8      A.   I WANTED TO FORM A TOUR GROUP WITH MY FRIENDS, AND THEN WE

 9      COULD ATTEND FESTIVALS, AND WE COULD DO MUSIC PERFORMANCES, WE

10      COULD DO SOLOS, RECITALS, THINGS LIKE THAT.

11      Q.   SO YOUR INTENTION WAS TO RETURN TO TAIWAN AND CONTINUE

12      PLAYING PIANO?

13      A.   YES.

14      Q.   AND DID YOU ALSO HAVE ANY OTHER PLANS, AS FAR AS PIANO,

15      THAT YOU WERE GOING TO DO WITH THE PIANO IN TAIWAN?

16      A.   YES.  I WANTED TO FIND OR IDENTIFY SEVERAL TALENTED KIDS

17      JUST LIKE WHEN I WAS LITTLE, AND THEN I WOULD TRAIN THEM AND

18      ORGANIZE THEM TO GO TO CONTESTS OR COMPETITION.

19      Q.   WHY DID YOU -- DID YOU RETURN TO TAIWAN AFTER YOUR

20      GRADATION FROM COLLEGE?

21      A.   YES.

22      Q.   DID THERE COME A POINT IN TIME WHEN YOUR PARENTS REQUESTED

23      THAT YOU STAY IN NEW YORK?

24      A.   YES.  AFTER GRADATION, I WENT BACK TO TAIWAN AND I

25      ORGANIZED TWO SOLO PIANO PERFORMANCES IN TAIWAN.
```

DIRECT EXAM BY MS. POLLOCK

1    Q.   DID YOU THEN RETURN TO NEW YORK?

2    A.   YES.

3    Q.   WHAT WAS THE REASON THAT YOU RETURNED TO NEW YORK?

4    A.   MY MOTHER TOLD ME THAT I HAD JUST GRADUATED FROM COLLEGE

5    ONLY, I NEEDED TO GO BACK TO SCHOOL AND GET A MASTER'S DEGREE.

6    Q.   OKAY.  AFTER YOU COMPLETED THE SIX YEARS OF COLLEGE FOR

7    YOUR BACHELOR'S DEGREE AND YOUR MASTER'S DEGREE, DID YOU THEN

8    STAY IN NEW YORK?

9    A.   THE THING WAS THAT MY MOTHER TOLD ME THAT SHE WANTED ME TO

10   STAY IN NEW YORK.

11   Q.   AND WHAT WAS THE REASON THAT YOUR MOTHER WANTED YOU TO

12   STAY IN NEW YORK?

13   A.   SHE TOLD ME THAT THEY WERE ALL IN CHINA, AND THEN SHE

14   HOPED THAT I COULD HELP THE FAMILY BY STAYING IN THE

15   UNITED STATES.

16   Q.   AND WHEN YOU SAY THEY WERE ALL IN CHINA, WHAT DO YOU MEAN

17   BY THAT?

18   A.   BECAUSE THEY WERE DOING BUSINESS IN CHINA.  SHE HOPED THAT

19   THERE WOULD BE A BROKER IN THE UNITED STATES THAT COULD HELP

20   THEM COMMUNICATE AND MAKE ARRANGEMENTS.

21   Q.   AND DID YOUR MOTHER REQUEST THAT YOU BE THE BROKER FOR THE

22   FAMILY?

23   A.   SHE WOULD ASK ME, SHE WANTED ME TO STAY IN THE

24   UNITED STATES TO DEAL WITH THE FAMILY BUSINESS, AND ALSO SERVE

25   AS THEIR BROKER TO DEAL WITH THEIR PRIVATE MATTERS AS WELL AS

```
1      THE BUSINESS MATTERS.

2      Q.   WAS THIS YOUR MOTHER'S REQUEST OF YOU OR WAS IT YOUR

3      PARENTS' REQUEST, IF YOU CAN REMEMBER?

4      A.   BOTH MY MOM AND DAD, ON A VERY SERIOUS NOTE, THEY ASKED ME

5      TO DO SO.

6      Q.   AND WHAT WAS YOUR REACTION TO YOUR PARENTS' REQUEST THAT

7      YOU STAY IN THE UNITED STATES?

8      A.   I WAS VERY HESITANT AND I FELT IT VERY HARD TO DO.

9      Q.   WHY WERE YOU HESITANT?

10     A.   BECAUSE I DID NOT KNOW ANYTHING ELSE OTHER THAN PLAYING

11     PIANO AND CELLO.

12     Q.   YOU ALSO PLAYED CELLO?

13     A.   YES, I ALSO STARTED TO LEARN TO PLAY CELLO WHEN I WAS

14     EIGHT YEARS OLD.

15     Q.   DID YOU HAVE ANY BACKGROUND IN BUSINESS OR IN ACCOUNTING?

16     A.   NO.  PLAYING PIANO BASICALLY TOOK SIX OR EIGHT HOURS OF MY

17     DAY.

18     Q.   COULD YOU HAVE SAID NO TO YOUR PARENTS ABOUT STAYING IN

19     NEW YORK?

20     A.   I DID NOT.

21     Q.   COULD YOU HAVE SAID NO TO YOUR PARENTS?

22     A.   BECAUSE I KNEW FROM THE VERY -- WHEN I WAS VERY LITTLE, I

23     KNEW THAT MY PARENTS WERE WORKING REALLY HARD.  SO BECAUSE WHEN

24     I WAS LITTLE, STARTING FROM WHEN I WAS VERY LITTLE, THEY

25     PROVIDED ME WITH A VERY WEALTHY LIFE.  SO I FELT THAT IF I WERE
```

DIRECT EXAM BY MS. POLLOCK

```
 1      TO REFUSE THEM, THEN THAT WOULD NOT BE PERMITTED BY MY OWN
 2      CONSCIENCE.
 3      Q.   OKAY.  THEY PROVIDED YOU WITH A GOOD LIFE WHEN YOU WERE
 4      GROWING UP IN TAIWAN, CORRECT?
 5      A.   YES.
 6      Q.   WOULD YOU CHARACTERIZE YOURSELF AS AN OBEDIENT DAUGHTER?
 7      A.   I THINK SO.
 8      Q.   WAS THAT EXPECTED OF YOU BY YOUR PARENTS?
 9      A.   WHAT DO YOU MEAN?
10      Q.   DID YOUR PARENTS EXPECT YOU TO BE -- TO LISTEN TO THEM,
11      AND WHEN THEY ASKED YOU SOMETHING, DO WHAT THEY ASKED?
12      A.   THEY KNEW I WOULD BE, YEAH.
13      Q.   THEY KNEW THAT'S HOW YOU WOULD RESPOND?
14      A.   YES.
15      Q.   NOW WHEN DID YOU FIRST MEET HENRY HORNG?
16      A.   APPROXIMATELY, EITHER IN '88 OR '89, BEFORE I WENT TO --
17      BEFORE I LEFT TO THE TAIWAN.
18      Q.   DID YOU ATTEND THE SAME SCHOOLS IN TAIWAN?
19      A.   NO, I WENT TO A MUSIC PROGRAM.
20      Q.   DID YOU SEE HIM SOME TIME WHEN YOU WERE ATTENDING COLLEGE
21      IN NEW YORK?
22      A.   YES.  HE TOLD ME THAT THE REASON FOR HIM TO GO TO NEW YORK
23      WAS BECAUSE I WAS ATTENDING COLLEGE IN NEW YORK.
24      Q.   DO YOU KNOW WHAT HENRY WAS STUDYING IN NEW YORK?
25      A.   YES.
```

DIRECT EXAM BY MS. POLLOCK

```
1    Q.   WHAT WAS HE STUDYING?

2    A.   ELECTRONIC MACHINERY.  ELECTRIC ENGINEERING.

3    Q.   DID YOU START DATING HENRY WHEN YOU WERE GOING TO SCHOOL

4    IN NEW YORK?

5    A.   HE OFTEN ACCOMPANIED ME TO GO TO CONCERTS.

6    Q.   DID THERE COME A TIME WHEN YOU BOTH GOT MARRIED?

7    A.   WHEN WE GOT MARRIED, IT WAS 1997.

8    Q.   AND WHERE DID YOU GET MARRIED?

9    A.   WE HAD TWO WEDDINGS, ONE IN NEW YORK, AND THE OTHER ONE IS

10   IN TAIWAN.

11   Q.   AND AT THE WEDDING IN NEW YORK, WAS THAT A LARGE WEDDING?

12   A.   ABOUT 40 PEOPLE, I WOULD SAY.

13   Q.   AND WHEN MANY OF THOSE YOUR FAMILY?

14   A.   YES, EVERYBODY FROM OUR TWO FAMILIES, PARENTS, ALL OF THE

15   SIBLINGS, ALL OF THEM CAME, EXCEPT MY ELDER BROTHER.

16   Q.   WHY DID YOU HAVE A SECOND WEDDING IN TAIWAN?

17   A.   BECAUSE MY MOTHER TOOK WEDDINGS VERY SERIOUSLY.  SHE WOULD

18   NOT LET ME GO IF ONLY THERE WAS ONLY ONE WEDDING IN NEW YORK.

19   AND SHE INSISTED THAT WE HAVE ANOTHER EVEN BIGGER WEDDING IN

20   TAIWAN.

21   Q.   WAS THE WEDDING IN NEW YORK A CIVIL CEREMONY OR A

22   RELIGIOUS CEREMONY?

23   A.   YOU MEAN IN NEW YORK?

24   Q.   CORRECT.

25   A.   IT'S A CIVIL.
```

DIRECT EXAM BY MS. POLLOCK

1    Q.   AND WHAT TYPE OF A WEDDING DID YOU HAVE IN TAIWAN?

2    A.   IT WAS VERY COMPLICATED.

3    Q.   IN WHAT WAY WAS IT COMPLICATED?

4    A.   BECAUSE MY MOTHER WAS VERY PARTICULAR ABOUT THINGS.  WE

5    PREPARED FOR ABOUT A MONTH FOR THE WEDDING.

6    Q.   WAS IT A TRADITIONAL TAIWANESE WEDDING?

7    A.   YES.

8    Q.   HOW LONG WAS THE WEDDING IN TAIWAN?

9    A.   TWO TO THREE DAYS.

10   Q.   WOULD YOU SAY THAT YOUR FAMILY, YOUR PARENTS WERE VERY

11   TRADITIONAL, OR SORT OF FROM AN OLD SCHOOL?

12   A.   YES.

13   Q.   AND WAS YOUR MOTHER IN HER EARLY SIXTIES WHEN YOU GOT

14   MARRIED?

15   A.   MY MOTHER WAS 36 YEARS OLD WHEN SHE GAVE BIRTH TO ME.  SO

16   I GOT MARRIED WHEN I WAS 30, SO WHEN THE WEDDING WAS GOING ON,

17   SHE WAS 66.

18   Q.   WHILE YOU WERE IN COLLEGE, WHERE DID YOU LIVE?

19   A.   I LIVED IN MY FATHER'S HOUSE.

20   Q.   AND DO YOU RECALL WHAT STREET THAT WAS IN NEW YORK?

21   A.   IT WAS ON INGRAM STREET IN QUEENS.

22   Q.   WOULD THIS ALSO BE INGRAM STREET?

23   A.   INGRAM.

24   Q.   INGRAM.  OKAY.

25        DID YOUR PARENTS OWN A HOME IN NEW YORK BEFORE YOU CAME

DIRECT EXAM BY MS. POLLOCK

1    OVER TO ATTEND COLLEGE?

2    A.   THE HOUSE WAS BOUGHT ONE YEAR AFTER I WAS THERE.

3    Q.   AND WHO LIVED IN THE HOME ONCE YOUR PARENTS BOUGHT IT?

4    A.   THEY BOUGHT THE HOUSE FOR ME.

5    Q.   DID YOUR PARENTS LIVE IN THE HOME WHILE YOU ATTENDED

6    SCHOOL?

7    A.   YES, THEY STAYED WHEN THEY CAME TO THE UNITED STATES ON

8    BUSINESS TRIPS.

9    Q.   SO THEY WEREN'T STAYING THERE ALL THE TIME, IT WAS ONLY

10   WHEN THEY WOULD COME FOR BUSINESS?

11   A.   CORRECT.

12   Q.   WHERE WAS THIS HOME LOCATED IN NEW YORK?  DO YOU RECALL

13   WHAT SECTION OR WHAT BUREAU IT WAS IN?

14   A.   YOU MEAN THE FIRST HOUSE?

15   Q.   INGRAM, YES.

16   A.   IT WAS IN NEW YORK CITY.  THE QUEENSBORO, IN THE FOREST

17   HILL ON INGRAM STREET.

18   Q.   WAS YOUR FATHER -- YOU MENTIONED YOUR FATHER WOULD COME

19   OVER FOR BUSINESS, WHAT BUSINESS WAS YOUR FATHER IN WHILE YOU

20   WERE IN COLLEGE?

21   A.   HE CAME HERE TO BUY STUFF, TO BUY MERCHANDISE.

22   Q.   OKAY.  WHAT TYPE OF MERCHANDISE?

23   A.   SCRAP METALS.

24   Q.   ARE YOU FAMILIAR WITH THE NAME FLORENCE TRADING COMPANY?

25   A.   THAT WAS THE OLD COMPANY INCORPORATED BY MY FATHER.

DIRECT EXAM BY MS. POLLOCK

1    Q.   MS. LIN, IF YOU COULD PLEASE LOOK AT EXHIBIT 1020.  THIS

2    IS A TWO-PAGE DOCUMENT.  DO YOU RECOGNIZE IT?

3    A.   IT HAS MY FATHER'S SIGNATURE.

4    Q.   ON BOTH PIECES OF PAPER?  AND DO YOU SEE WHAT THE DOCUMENT

5    IS ENTITLED?

6    A.   BUSINESS CERTIFICATE.

7    Q.   AND IS THERE A NAME OF A -- ON THE FIRST DOCUMENT, WHICH

8    IS -- THE BATES NUMBER ON THE LOWER RIGHT-HAND CORNER IS

9    202181.  DO YOU SEE THAT?

10   A.   NO.

11   Q.   NO?  202181.

12   A.   YES.

13   Q.   IS THAT THE SECOND PAGE?

14   A.   YES.

15   Q.   AND ON THE FIRST PAGE, DO YOU SEE YOUR FATHER'S NAME ON

16   THAT DOCUMENT, WHICH IS -- ON THAT DOCUMENT?

17   A.   YES.

18          MS. POLLOCK:  YOUR HONOR, I MOVE THE TWO-PAGE

19   DOCUMENT THAT'S IDENTIFIED AS 1020 INTO EVIDENCE.

20          THE COURT:  ANY OBJECTION?

21          MR. MAGNANI:  NO OBJECTION.

22          THE COURT:  IT WILL BE ADMITTED.

23     (DEFENDANT'S EXHIBIT 1020 WAS ADMITTED INTO EVIDENCE.)

24   BY MS. POLLOCK:

25   Q.   MS. LIN, SHOWING YOU WHAT'S IDENTIFIED AS 1020, THIS IS A

DIRECT EXAM BY MS. POLLOCK

1    DOCUMENT THAT YOU'VE JUST IDENTIFIED.

2        DO YOU SEE YOUR FATHER'S NAME HERE?

3    A.   YES.

4    Q.   AND IS THAT TIEN-FU LIN?

5    A.   YES.

6    Q.   AND THE ADDRESS OF 6746 INGRAM, IS THAT THE HOME WHERE YOU

7    WERE LIVING WHILE YOU WENT TO SCHOOL?

8    A.   YES.

9    Q.   AND IT WAS LOCATED IN FOREST HILLS?

10   A.   YES.

11   Q.   WHICH IS PART OF QUEENS?

12   A.   YES.

13   Q.   NOW IS THERE A NAME OF THIS COMPANY ON THE UPPER PORTION

14   OF THE BUSINESS CERTIFICATE?

15   A.   YES.

16   Q.   AND WHAT IS THE DATE OF THIS DOCUMENT?

17   A.   OCTOBER 13TH, 1994.

18   Q.   AND SHOWING YOU THE VERY BOTTOM PORTION, DO YOU SEE THAT

19   THERE WAS A NOTARY STAMP HERE?

20   A.   YES.

21   Q.   AND DO YOU RECOGNIZE THE NAME THAT IS LISTED THERE?

22   A.   THIS IS THE NAME OF THE ACCOUNTANT HIRED, USED BY MY

23   MOTHER.

24   Q.   THAT'S KAREN YOH, WHO YOU SAW HER IN COURT AROUND A WEEK

25   AGO?

DIRECT EXAM BY MS. POLLOCK

1    A.   YES.

2    Q.   NOW DO YOU KNOW WHAT THE NAME RUEY-ZEE WAS?

3    A.   THIS IS THE COMPANY INCORPORATED BY MY FATHER.

4    Q.   AND THAT WAS WHILE YOU WERE HERE IN SCHOOL ATTENDING THE

5    MANHATTAN SCHOOL OF MUSIC?

6    A.   YES.

7    Q.   NOW SHOWING YOU THE SECOND PAGE OF EXHIBIT 1020, DO YOU

8    RECOGNIZE THIS DOCUMENT?

9    A.   YES, I DO.

10   Q.   WHAT IS THE NAME OF THE COMPANIES THAT NAMED IN THIS

11   BUSINESS CERTIFICATE?

12   A.   FLORENCE TRADING COMPANY.

13   Q.   AND IS THE ADDRESS THE SAME ADDRESS AS WHERE YOU WERE

14   LIVING OF 67-46 INGRAM STREET?

15   A.   YES.

16   Q.   AND WHAT IS THE DATE ON THIS DOCUMENT?

17   A.   DECEMBER 4TH, 2003.

18   Q.   AND THEN GOING TO THE VERY BOTTOM PORTION, DO YOU SEE THE

19   NAME OF A NOTARY PUBLIC HERE?

20   A.   SAME THING, THAT WAS THE NAME OF THE ACCOUNTANT USED BY MY

21   MOTHER.

22   Q.   KAREN YOH?

23   A.   YES.

24   Q.   THANK YOU.

25        NOW DO YOU KNOW WHAT TYPE OF BUSINESS FLORENCE TRADING WAS

DIRECT EXAM BY MS. POLLOCK

1    INVOLVED IN?

2    A.    NO.  NO, I DON'T KNOW.

3    Q.    OKAY.  DID YOUR FATHER TELL YOU ANYTHING ABOUT WHAT

4    FLORENCE TRADING DID?

5    A.    THAT WAS IN 2003.  I WAS ONLY A STUDENT BACK THEN.  HE

6    VERY RARELY TOLD ME ANYTHING ABOUT BUSINESS.

7    Q.    NOW WHEN YOUR PARENTS ASKED YOU TO STAY IN NEW YORK CITY

8    TO ASSIST THEM IN THEIR BUSINESS, DID THEY SPECIFY WHAT THEY

9    WANTED YOU TO DO?

10   A.    BECAUSE BACK THEN I WAS VERY HESITANT, AND I DIDN'T KNOW

11   ANYTHING ABOUT THE BUSINESS, SO I TOLD THEM THAT IT WOULD BE

12   VERY HARD FOR ME TO DO THINGS LIKE THIS.  BUT THEY TOLD ME THAT

13   IT WILL BE FINE, ONLY AS LONG AS YOU CAN MAKE SOME PHONE CALLS

14   AND RECEIVE FAXES.

15   Q.    DID THEY GIVE YOU ANY SPECIFIC INSTRUCTIONS THAT WERE

16   MAYBE WRITTEN DOWN, OR DID THEY SPEND TIME TALKING TO YOU ABOUT

17   WHAT YOU WOULD NEED TO DO FOR THEM?

18   A.    HE SAID THAT HE WILL TAKE, LIKE, TWO GREEN BOOKS FROM

19   TAIWAN, AND THEN HE SAID, YOU CANNOT DO THIS -- IF YOU CANNOT

20   DO THIS AT ANY TIME, JUST GIVE ME A PHONE CALL, IF I'M NOT IN

21   THE UNITED STATES, JUST CALL ME.

22   Q.    AND ARE YOU TALKING ABOUT YOUR FATHER OR YOUR MOTHER?

23   A.    MY MOTHER.

24   Q.    WHAT ROLE DID YOUR MOTHER HAVE IN THE FAMILY BUSINESS AT

25   THE TIME THAT YOU GRADUATED FROM THE MANHATTAN SCHOOL OF MUSIC?

DIRECT EXAM BY MS. POLLOCK

```
 1    A.   SHE WAS THE ULTIMATE DECISION MAKER.

 2    Q.   INSTEAD OF YOUR FATHER?

 3    A.   NO -- YES.  MY MOTHER, YES.

 4    Q.   SOME TIME IN THE 1990'S?

 5         THE COURT:  I'M -- I NEED THAT ANSWER AGAIN, I NEED

 6    THE ANSWER REPEATED.  MAYBE YOU HAVE TO REPEAT THE QUESTION.

 7    BY MS. POLLOCK:

 8    Q.   WHAT ROLE DID YOUR MOTHER HAVE IN THE FAMILY BUSINESS WHEN

 9    YOU GRADUATED FROM COLLEGE?

10    A.   BOTH OF THEM WERE DOING BUSINESS TOGETHER; HOWEVER, AS TO

11    THE FINAL, MAKING FINAL DECISION, THE ULTIMATE DECISION, MY

12    FATHER ALWAYS RESPECTED MY MOTHER'S IDEA, AND SHE WOULD BE THE

13    ONE THAT MADE THE ULTIMATE DECISION.

14    Q.   DO YOU KNOW IF THIS WAS THE NORMAL WAY A FAMILY CONDUCTED

15    THEMSELVES IN TAIWAN?

16    A.   IT DEPENDS ON THE CAPABILITY.

17    Q.   IS IT FAIR TO SAY THAT IN YOUR FAMILY UNIT, YOUR FATHER

18    DEFERRED TO YOUR MOTHER?

19    A.   BECAUSE HE ALWAYS WENT ON BUSINESS TRIPS.  SO IN OUR

20    HOUSE, OR IN THE FAMILY AND ALSO IN TERMS OF THE ACCOUNTING, MY

21    MOTHER WAS THE ONE THAT MAKES ALL THE DECISIONS.

22    Q.   NOW SOME TIME IN THE 1990'S, DID YOU EVER VISIT ANY

23    SUPPLIERS OF SCRAP METAL HERE IN THE UNITED STATES WITH YOUR

24    PARENTS?

25    A.   1990?
```

1    Q.   SOME TIME AFTER -- SOME TIME DURING YOUR COLLEGE STUDIES

2    OR THEREAFTER, DID YOU EVER TRAVEL WITH YOUR PARENTS TO VISIT

3    SUPPLIERS OF SCRAP METAL?

4    A.   I THINK THE FIRST TIME THAT I WENT, THAT WAS IN 1999,

5    2000, AROUND THAT TIME.

6    Q.   OKAY.  AND WHERE DID YOU GO WITH YOUR PARENTS?

7    A.   WE WENT TO INDIANA, WE ALSO WENT TO MICHIGAN, AND ANOTHER

8    PLACE CALLED OHIO.

9    Q.   ON ONE OF THESE TRIPS, DO YOU REMEMBER MEETING

10   MR. HEITMEIER, WHO WAS THE FIRST WITNESS IN THIS CASE, A VERY

11   BIG MAN FROM LOUIS PADNOS COMPANY?

12   A.   YES, I REMEMBER.

13   Q.   WHY DID YOU -- WHAT WAS THE PURPOSE OF THESE TRIPS WITH

14   YOUR PARENTS?

15   A.   WELL, MY MOM AND MY DAD WANTED ME TO TRANSLATE FOR THEM,

16   AND THEY FELT THAT SINCE I HAD NEVER SEEN WHETHER A METAL SCRAP

17   WAS, AND THERE WERE SOME SUPPLIERS THAT THEY WERE ALREADY

18   FAMILIAR WITH BEFOREHAND.  SO THEY WANTED TO COMMUNICATE TO

19   THEM THAT I WAS THEIR DAUGHTER.

20   Q.   SO IT WAS A MEANS OF INTRODUCING YOU TO THE SUPPLIERS?

21   A.   YES.

22   Q.   NOW PRIOR TO YOU TAKING OVER AS THE BROKER FOR YOUR

23   PARENTS AFTER YOUR GRADUATION, DID YOU KNOW THAT -- DID YOU

24   KNOW WHETHER OR NOT YOUR FAMILY HAD ANY PRIOR BROKERS WHO WERE

25   HELPING THEM WITH THEIR BUSINESS?

DIRECT EXAM BY MS. POLLOCK

1    A.   YES.

2    Q.   DO YOU KNOW -- DO YOU REMEMBER THE NAMES OF ANYONE WHO HAD

3    BEEN ASSISTING YOUR FAMILY HERE IN THE UNITED STATES?

4    A.   I REMEMBER THERE WAS A MR. TU THAT WAS IN NEW YORK.  THAT

5    WAS HELPING THEM.  AND IN SEATTLE THERE WAS A MR. LIN.

6    Q.   OKAY.  DID YOU EVER MEET MR. LIN OR MR. TU?

7    A.   SO THE FIRST TRIP THAT CAME TO THE U.S. IN 1989, I MET HIM

8    SEVERAL TIMES THAT YEAR.

9    Q.   WHO WAS THAT?

10   A.   THAT PERSON, MR. TU, THAT LIVED IN NEW JERSEY.

11   Q.   AND WERE YOUR PARENTS WITH YOU WHEN YOU MET MR. TU?

12   A.   YEAH, OF COURSE THEY WERE.

13   Q.   WAS IT MORE OF A SOCIAL VISIT FOR YOU?

14   A.   JUST HAD A MEAL TOGETHER, THAT'S IT.

15   Q.   DID MR. TU TELL YOU WHAT HIS RESPONSIBILITIES WERE AS A

16   BROKER FOR YOUR PARENTS DURING THAT VISIT?

17   A.   BACK THEN I HAD YET TO ENTER COLLEGE, I WAS STILL

18   CONSIDERED A CHILD.

19   Q.   NOW IF YOU COULD LOOK AT DEFENSE EXHIBIT 1021.  DO YOU

20   RECOGNIZE THIS EXHIBIT?

21   A.   YES, I RECOGNIZE IT.

22   Q.   AND HOW DO YOU RECOGNIZE IT?

23   A.   MY SIGNATURE.

24        MS. POLLOCK:  YOUR HONOR, I WOULD MOVE EXHIBIT 1021

25   INTO EVIDENCE.

DIRECT EXAM BY MS. POLLOCK

```
 1              THE COURT:  ANY OBJECTION?

 2              MR. MAGNANI:  NO OBJECTION.

 3              THE COURT:  IT WILL BE ADMITTED.

 4         (DEFENDANT'S EXHIBIT 1021 WAS ADMITTED INTO EVIDENCE.)

 5    BY MS. POLLOCK:

 6    Q.   MS. LIN, WHAT IS THE TITLE OF THIS DOCUMENT?

 7    A.   BUSINESS CERTIFICATE.

 8    Q.   AND DO YOU SEE YOUR NAME ON THIS DOCUMENT, YOUR PRINTED

 9    NAME?

10    A.   YES.

11    Q.   AND WHAT IS THE ADDRESS THAT'S LISTED ON THIS DOCUMENT?

12    A.   THIS WAS THE FIRST HOUSE THAT MY FATHER HAD PURCHASED IN

13    THE U.S., AND IT'S A HOUSE ON INGRAM.

14    Q.   AND THIS IS WHERE YOU WERE LIVING?

15    A.   YES.

16    Q.   WHAT IS THE DATE OF THIS DOCUMENT?

17    A.   JULY 22ND, 1998.

18    Q.   AND IS THERE -- IS THAT THE DATE ON WHICH THIS WAS

19    NOTARIZED (SHOWING)?

20    A.   YES.

21    Q.   AND ONCE AGAIN, WHAT IS THE NAME OF THE NOTARY WHO WOULD

22    NOTARIZE THIS DOCUMENT?

23    A.   MY MOTHER'S ACCOUNTANT.

24    Q.   KAREN YOH?

25    A.   YES.
```

DIRECT EXAM BY MS. POLLOCK

1    Q.   NOW LOOKING AT THE DOCUMENT, WHAT IS THIS A BUSINESS

2    CERTIFICATE FOR?

3    A.   I DON'T KNOW WHAT YOU MEAN.

4    Q.   THIS IS A CERTIFICATE FOR A COMPANY TO DO BUSINESS,

5    CORRECT?

6    A.   YES.

7    Q.   WHAT IS THE NAME OF THE BUSINESS THAT'S GOING -- THE NAME

8    OF THE BUSINESS?

9    A.   REIJIN INTERNATIONAL COMPANY.

10   Q.   AND THAT'S RIGHT UP HERE?

11   A.   YES.

12   Q.   AND IS THAT THE NAME OF THE BUSINESS THAT YOUR PARENTS

13   WANTED YOU TO BE ASSISTING THEM WITH?

14   A.   WHICH COMPANY?

15   Q.   PARDON ME?

16   A.   WHICH COMPANY?

17   Q.   REIJIN INTERNATIONAL.

18   A.   YES.

19   Q.   WHO TOLD YOU TO HAVE THIS BUSINESS CERTIFICATE DONE?

20   A.   MY MOTHER WANTED THE -- TOLD THE ACCOUNTANT TO HAVE THIS

21   DONE.

22   Q.   BECAUSE YOU WERE TRYING TO --

23   A.   MY MOTHER TOLD THE ACCOUNTANT TO HAVE THIS DONE.

24   Q.   WHO TOLD YOU TO NAME THE COMPANY REIJIN INTERNATIONAL?

25   A.   MOTHER WAS THE ONE THAT GAVE THE NAME OF THAT COMPANY.

DIRECT EXAM BY MS. POLLOCK

1    Q.   AND DOES REIJIN STAND FOR ANYTHING?

2    A.   REI, ITSELF, STANDS FOR BEAUTIFUL FORTUNE.  AND THE JIN IS

3    THE SAME CITY AS TIANJIN.  SO AT THAT TIME, THAT WAS THE CITY

4    THAT MY MOM AND DAD LIVED AT BACK THEN IN CHINA.

5    Q.   AND THE JIN IS WHAT REFERS TO TIANJIN?

6    A.   YES.

7    Q.   NOW WHAT WAS YOUR UNDERSTANDING OF WHAT THE PURPOSE OF

8    REIJIN INTERNATIONAL WAS GOING TO BE?

9    A.   SO THE PURPOSE WAS TO ACT AS THE BROKER, THAT THIS REIJIN

10   COMPANY WOULD BE A BROKER FOR THE COMPANY THAT WE HAD IN CHINA

11   CALLED REIJIN.

12   Q.   DID THERE COME A TIME WHEN YOU RECEIVED MORE INSTRUCTIONS

13   FROM YOUR PARENTS AS FAR AS WHAT YOU WERE SUPPOSED TO DO FOR

14   REIJIN INTERNATIONAL?

15   A.   SO THEY JUST TOLD ME THAT WHENEVER ISSUES COME UP OR, SAY,

16   THE SUPPLIERS, WHEN THEY HAD FAXES, I HAD TO --

17          THE INTERPRETER:  THE INTERPRETER NEEDS A MOMENT TO

18   CLARIFY.

19          THE WITNESS:  I HAVE TO CALL MY MOM AND REPORT TO HER

20   FOR THESE THINGS TO HAPPEN.

21       SO SOMETIMES I HAD TO CALL HER IN THE MORNING AND

22   SOMETIMES I HAD TO CALL HER IN THE EVENINGS.

23   Q.   OKAY.  DID YOU TALK TO ANYONE ELSE IN THE FAMILY BACK IN

24   CHINA REGARDING THE WORK THAT YOU WERE GOING TO BE DOING FOR

25   REIJIN?

DIRECT EXAM BY MS. POLLOCK

1    A.   THE PERSON I REPORTED TO PRIMARILY WAS MY MOM.

2    Q.   DID THERE COME A TIME YEARS LATER WHEN YOU WOULD REPORT TO

3    SOMEONE ELSE IN THE FAMILY?

4    A.   IN THE FIRST FEW YEARS, IT WAS MAINLY MY MOM, AND THEN

5    LATER, I STARTED HAVING TO REPORT TO MY OLDER BROTHER, TOO.

6    Q.   YOUR OLDER BROTHER, PING KUANG?

7    A.   YEAH, BECAUSE MY MOM TOLD ME THE PERSON WHO WILL BE

8    SELLING OUTSIDE WAS MY OLDER BROTHER.  SO MY MOTHER TOLD ME

9    THAT I HAD TO REPORT TO MY OLDER BROTHER TOO.

10   Q.   OKAY.  NOW, DID YOUR MOTHER GIVE YOU INSTRUCTIONS ON HOW

11   YOU WERE TO GO ABOUT ARRANGING FOR PURCHASES OF SCRAP METAL BY

12   THE FAMILY?

13   A.   SHE TOLD ME IF PEOPLE, THEY PROVIDE A QUOTE, I HAVE TO FAX

14   IT TO THEM SO THEY CAN LOOK AT IT.

15   Q.   OKAY.  DID THEY CONTACT YOU AND ASK YOU TO MAKE INQUIRIES

16   ABOUT THE AVAILABILITY OF SCRAP METAL IN THE UNITED STATES?

17   A.   WELL, ALL MY INFORMATION CAME FROM THEM, IN TERMS OF WHICH

18   PEOPLE I SHOULD CONTACT.

19   Q.   WHAT WERE YOUR DAILY FUNCTIONS WHEN YOU WERE WORKING FOR

20   REIJIN?

21   A.   USUALLY WHEN I GET UP IN THE MORNING, I WILL FIRST MAKE A

22   CALL TO MY MOM.  AND I WILL ASK HER, WHAT DO YOU NEED ME TO DO

23   FOR YOU TODAY.  AND THEN AFTER SHE TELLS ME, I WILL COMPLETE

24   THE TASK.

25        BUT SOMETIMES, IT WILL BE VERY DIFFICULT, SO I WOULD TELL

1    HER THE DIFFICULTIES, AND THEN SHE WILL GIVE ME FURTHER

2    INSTRUCTIONS.

3    Q.   WHAT WOULD BE DIFFICULT?

4    A.   BECAUSE SOMETIMES THE PRICE THAT THEY GIVE ME, THE OTHER

5    SIDE WAS NOT WANTING TO SELL IT AT THAT PRICE.

6    Q.   WHEN YOU SAY THE PRICE THEY GAVE YOU, WHO ARE YOU TALKING

7    ABOUT?

8    A.   I'M TALKING ABOUT THE PRICES THE SUPPLIER IS GIVING ME.

9    AND MY MOTHER WOULD WANT ME TO GO AND NEGOTIATE THE PRICES WITH

10   THE SUPPLIERS, AND I FELT THAT WAS DIFFICULT FOR ME.

11   Q.   AND SO WHAT?

12   A.   I FELT THAT WAS DIFFICULT FOR ME.

13   Q.   OKAY.  WERE YOU ABLE TO NEGOTIATE THE PRICE OR DID YOU

14   RELY ON YOUR FAMILY?

15   A.   I DIDN'T KNOW HOW TO NEGOTIATE PRICES.  I DIDN'T KNOW WHAT

16   TO DO.  SO THAT'S WHY I FELT IT WAS DIFFICULT FOR ME.

17   Q.   OKAY.  HOW MANY TIMES A DAY WOULD YOU TALK TO YOUR MOTHER

18   OR YOUR BROTHER LATER ON ABOUT THE PRICE FOR THE PURCHASE OF

19   SCRAP METAL?

20   A.   IT WAS TOO LONG AGO.  I JUST FELT THAT BACK THEN, THEY

21   WANTED ME TO MAKE COUNTER OFFERS FOR THE PRICES OF THE SCRAP

22   METAL.  IT WAS VERY DIFFICULT FOR ME TO DO.

23   Q.   DID YOU EVER MAKE A DECISION, YOURSELF, TO ACCEPT AN OFFER

24   THAT THE SUPPLIER WAS GIVING YOU, OR DID YOU CONTACT YOUR

25   FAMILY?

DIRECT EXAM BY MS. POLLOCK

1    A.   I CAN ONLY PURCHASE THE SCRAP METAL AFTER MY FAMILY HAD

2    AGREED TO THE PRICE.

3    Q.   NOW, YOU WERE LIVING AT INGRAM WHEN YOU GRADUATED FROM

4    COLLEGE, CORRECT?

5    A.   YES.

6    Q.   WHAT WAS THE NEXT HOME THAT YOU MOVED TO?

7    A.   I MOVED AWAY AFTER MY HUSBAND SWITCHED JOBS AND GOT A JOB

8    IN NEW JERSEY.

9    Q.   AND WHAT TYPE OF A JOB DID YOUR HUSBAND GET?

10   A.   AT MITSUBISHI.

11   Q.   AND WHAT WAS HE DOING FOR MITSUBISHI?

12   A.   I'M NOT CLEAR.

13   Q.   WHERE DID YOU MOVE TO IN NEW JERSEY?

14   A.   WARREN, NEW JERSEY.  MOVED THERE IN 1999.

15   Q.   AND DO YOU RECALL THE STREET WHERE THIS HOME WAS?

16   A.   26 BROOKSIDE DRIVE IN WARREN, NEW JERSEY.

17   Q.   HOW LONG DID YOU LIVE AT BROOKSIDE?

18   A.   ABOUT FIVE YEARS, FIVE YEARS.

19   Q.   WHO PAID FOR THE PURCHASE OF THE HOME IN NEW JERSEY?

20   A.   I PAID IT.

21   Q.   WHERE DID YOU GET THE MONEY TO BUY THE HOME ON BROOKSIDE?

22   A.   THE YEAR PRIOR TO ME GETTING MARRIED, MY MOTHER PURCHASED

23   A HOUSE FOR ME.

24   Q.   PURCHASED WHICH HOUSE?

25   A.   ANOTHER HOUSE THAT'S CLOSE TO THE INGRAM HOUSE.  IF YOU

DIRECT EXAM BY MS. POLLOCK

1    TAKE A WALK, IT'S ABOUT SIX TO SEVEN MINUTES AWAY.  ANOTHER

2    HOUSE IN THAT NEIGHBORHOOD.

3    Q.   IN THE NEIGHBORHOOD OF QUEENS?

4    A.   FOREST HILLS.

5    Q.   FOREST HILLS, I'M SORRY.

6        DO YOU RECALL THE STREET THAT YOUR MOTHER HAD -- WHERE THE

7    HOUSE WAS LOCATED THAT YOUR MOTHER HAD BOUGHT BEFORE YOU MOVED

8    TO NEW JERSEY?

9    A.   CLYDE STREET.

10   Q.   DID YOU EVER LIVE AT CLYDE STREET?

11   A.   IT WAS A TWO-FAMILY HOME, IT WAS ALL LEASED OUT.

12   Q.   WHEN YOU SAY A TWO-FAMILY HOME, DO YOU MEAN A DUPLEX?

13   A.   IT'S THREE STORIES.  TWO STORIES PLUS A BASEMENT.

14   Q.   OKAY.  AND DID YOU EVER LIVE AT CLYDE?

15   A.   I NEVER LIVED THERE.

16   Q.   AND THAT WAS PURCHASED SOLELY BY YOUR MOTHER?

17   A.   YES.  BACK THEN I WAS STILL A STUDENT.

18   Q.   OKAY.  WHEN YOU MOVED TO NEW JERSEY, WHERE DID YOU GET THE

19   MONEY TO BUY THAT HOME?

20   A.   MY MOTHER WAS THE ONE THAT HELPED OUT.  MY MOTHER GAVE ME

21   $95,000.  AND AT THE TIME I WAS STILL COLLECTING MY RENTAL

22   INCOME.  I'M TALKING ABOUT MY MOTHER WAS COLLECTING THE INCOME.

23   Q.   YOUR MOTHER WAS GETTING RENTAL INCOME?

24   A.   YES.  SO SHE WAS GETTING RENTAL INCOMES AND SHE GAVE ME ON

25   TOP OF THAT, $95,000.

DIRECT EXAM BY MS. POLLOCK

1    Q.   OKAY.  LET ME MOVE BACK.  WHEN YOU MOVED TO NEW JERSEY,

2    WHAT HAPPENED IN THE HOME THAT YOU HAD BEEN LIVING IN AT INGRAM

3    WHEN YOU WENT TO SCHOOL?

4    A.   ALSO RENTED OUT.

5    Q.   AND THEN YOUR MOTHER RENTED OUT THE HOME THAT SHE

6    PURCHASED ON CLYDE STREET IN NEW YORK?

7    A.   SO MY MOTHER HAD SOMEONE WHO WAS TAKING CARE OF HER

8    PROPERTIES FOR HER.

9    Q.   OKAY.  NOW YOU MENTIONED THAT YOU RECEIVED $95,000 A YEAR,

10   I THINK YOU SAID A YEAR, FROM YOUR PARENTS.  WHEN DID YOU FIRST

11   START TO RECEIVE A GIFT FROM YOUR PARENTS IN THE NEIGHBORHOOD

12   OF 95,000?

13   A.   EVER SINCE MY PARENTS, WHEN THEY BOUGHT THE FIRST HOUSE.

14   Q.   SO EVER SINCE YOU STARTED LIVING IN INGRAM?

15   A.   YES, GIVING ME $95,000 A YEAR.

16   Q.   IN INGRAM, WAS THAT IN THE YEAR -- I'M SORRY, 1992?

17   A.   YES.

18   Q.   NOW THIS $95,000, WAS THAT GIVEN TO YOU EVERY YEAR IN, AT

19   ONE TIME OR WOULD IT BE A COUPLE OF TIMES A YEAR?

20   A.   SOMETIMES IT'S JUST ONE LUMP SUM A YEAR, SOMETIMES THEY

21   SPLIT IT INTO TWO SEPARATE AMOUNTS.  IT'S BEEN TOO LONG, I

22   DON'T REMEMBER.

23   Q.   OKAY.  AT THE TIME YOU MOVED INTO THE HOME IN NEW JERSEY,

24   DID YOU USE ANY OF THE MONEY THAT YOU HAD BEEN GETTING FOR MANY

25   YEARS FROM YOUR PARENTS AS A GIFT OF $95,000 TO PURCHASE THAT

1    HOME?

2    A.   YEAH.  I SAVED ALL THAT IN A SAVINGS ACCOUNT AT A BANK, SO

3    I HAD A SAVINGS ACCOUNT.

4    Q.   AND THAT WAS MONEY THEN THAT YOU USED TO BUY YOUR HOME IN

5    NEW JERSEY?

6    A.   YES.

7    Q.   AND THAT WAS IN 1999 THAT YOU MOVED TO NEW JERSEY?

8    A.   YES.

9    Q.   HOW MANY YEARS DID YOU LIVE IN NEW JERSEY?

10   A.   ALMOST FIVE YEARS.

11   Q.   DID YOU LIKE LIVING THERE?

12   A.   YES.

13   Q.   WHAT WAS IT THAT YOU LIKED ABOUT LIVING IN NEW JERSEY?

14   A.   BECAUSE WHEN I WAS LIVING THERE, WHEN I WANTED TO GO

15   ATTEND A CONCERT, IT WAS ONLY ABOUT HALF AN HOUR DRIVE AWAY.

16   AND HOUSES IN NEW YORK, THEY WERE OLDER AND SMALLER, AND WHAT I

17   GOT IN NEW JERSEY, THE LOT WAS BIG, THE HOUSES, THEY WERE

18   BIGGER, AND SO -- AND THE COST OF LIVING WAS LOW, SO I REALLY

19   ENJOY LIVING THERE.

20   Q.   DID THERE COME A TIME WHEN YOU MADE A DECISION TO MOVE TO

21   CALIFORNIA?

22   A.   I DON'T UNDERSTAND WHAT YOU MEAN.

23   Q.   OKAY.  YOU HAD BEEN LIVING IN NEW JERSEY SINCE 1999 --

24   A.   YES.

25   Q.   DID THERE COME A TIME WHEN YOU AND YOUR FAMILY, YOU AND

DIRECT EXAM BY MS. POLLOCK

1   HENRY, MOVED TO CALIFORNIA?

2   A.   THE FIRST TIME THAT WE HAD A CHANCE WAS WHEN MY HUSBAND

3   HAD A CHANCE TO COME TO WORK HERE AT SAMSUNG.  AND THAT'S THE

4   SECONDARY REASON.  THE PRIMARY REASON WAS MY MOTHER LIKED

5   SAN FRANCISCO, SAN JOSE, THIS AREA.

6          THE COURT:  WOULD THIS BE A GOOD TIME TO TAKE OUR

7   BREAK?

8          MS. POLLOCK:  IT IS, YOUR HONOR.

9          THE COURT:  ALL RIGHT.  LET'S TAKE A 15-MINUTE BREAK

10  AND COME BACK AT A QUARTER TO 11.

11      (RECESS FROM 10:30 A.M. UNTIL 10:46 A.M.)

12         THE COURT:  WE ARE BACK ON THE RECORD.  ALL COUNSEL

13  AND PARTIES ARE PRESENT AND OUR JURORS AND ALTERNATE ARE HERE.

14      MS. LIN, PLEASE COME BACK TO THE WITNESS STAND.

15      THANK YOU.

16  BY MS. POLLOCK:

17  Q.   MEILI, YOU MAY NOT HAVE UNDERSTOOD A QUESTION I ASKED SOME

18  TIME BEFORE THE BREAK.

19      WHEN YOU WERE WORKING AS A BROKER HERE IN THE

20  UNITED STATES TO HELP YOUR PARENTS, WHAT WAS YOUR DAILY ROUTINE

21  AS FAR AS HELPING YOUR PARENTS?

22  A.   ON A DAILY BASIS, WHAT I WOULD DO IS TO CONFIRM THE

23  MERCHANDISE THEY WOULD LIKE TO BUY.  AND THEN I WOULD MAKE SURE

24  THE MONEY IS WIRED OUT.  AND ALSO I HAVE TO MAKE SURE THE MONEY

25  WILL COME IN, AND THEN I WILL DO THE LEDGER.

1          SO BASICALLY, I WAS DOING -- I WAS CONFIRMING THE MONEY

2     THAT CAME IN, AND THE MONEY THAT WILL GO OUT.  AND AFTER THAT,

3     I WILL MAKE SURE THE TIME FOR US TO GO AND PICK UP THE

4     MERCHANDISE AND THEN LOAD ON TO THE TRUCK, AND THEN I WILL CALL

5     THE CUSTOM BROKER THAT MY MOTHER DESIGNATED, AND THEN THEY WILL

6     ARRANGE IT FOR THE TRUCK TO GO AND PICK UP FROM THE FACTORY.

7     Q.   OKAY.  NOW LET ME GO THROUGH SOME OF THAT.  YOU SAID THAT

8     YOU HAD TO CHECK ON THE WIRE OUT AND THE WIRE IN.  WHAT DO YOU

9     MEAN BY THAT?

10    A.   BECAUSE WHEN YOU PURCHASE MERCHANDISE IN THE UNITED

11    STATES, THEY REQUIRE PREPAYMENT.  SO ONLY AFTER THE MONEY COMES

12    IN, THEN WILL THEY RELEASE THE PRODUCT.

13    Q.   AND WHEN YOU ARE TALKING ABOUT THE MONEY COMING IN, YOU

14    MEAN THAT THE -- DID THE SCRAP METAL SUPPLIER REQUIRE CASH

15    IMMEDIATELY IN ORDER TO CONFIRM THE PURCHASE?

16    A.   CORRECT.

17    Q.   AND WHEN YOU SAID WIRE OUT, WHAT DO YOU MEAN BY THAT?

18    A.   SO THE MONEY WILL BE WIRED OUT TO THE MERCHANT WHO ORDERED

19    THE PRODUCT.

20    Q.   WHO ARE THE MERCHANTS?

21    A.   THERE WERE SEVERAL MERCHANTS.  LIKE ONE OF THEM FOR

22    EXAMPLE IS LUIS PADNOS, AND THEN, AND SEVERAL OTHER MERCHANTS.

23    Q.   SO WHEN YOU USE THE WORD MERCHANTS WHAT YOU MEAN IS THE

24    SUPPLIERS OF THE SCRAP METAL?

25    A.   YES, YES, THAT'S WHAT WE DO.

1    Q.   AND I BELIEVE YOU JUST SAID THAT YOU HAD TO MAKE SURE THAT

2    IT WAS LOADED.  DID THAT MEAN THAT YOU HAD TO PROVIDE FOR

3    SHIPPERS TO TRANSPORT THE SCRAP METAL ONCE IT WAS PURCHASED?

4    A.   THOSE ACTUALLY WAS TAKEN CARE OF BY THE CUSTOMS BROKER.

5    MY JOB WAS TO CONTACT THE CUSTOMS BROKER.

6    Q.   BUT WHO ARRANGED FOR GETTING A CARRIER TO SHIP THE SCRAP

7    METAL?

8    A.   THAT WAS DONE BY THE CUSTOMS BROKER.

9    Q.   OKAY.  BEFORE THE CUSTOMS BROKER GOT INVOLVED, DID YOU

10   MAKE ANY PHONE CALLS TO LOCATE A SHIPPER TO HAVE THE SCRAP

11   METAL PICKED UP FROM, LET'S SAY FROM MICHIGAN?

12   A.   THAT WAS NOT MY JOB.

13   Q.   WHERE DID THE MONEY COME TO PURCHASE THE SCRAP METAL?

14   A.   THE MONEY CAME FROM MY FATHER, MY MOTHER AND MY ELDER

15   BROTHER'S COMPANY.

16   Q.   AND THE NAME OF THAT COMPANY?

17   A.   BEFORE 2006, THE COMPANY WAS REIJIN.

18        THE INTERPRETER:  RUI SHENG.  AND AFTER THAT IT WAS

19   RUIYU.

20        THE WITNESS:  SOMETIMES THERE WAS NOT ENOUGH TIME TO

21   GET THE MONEY IN, AND WHEN THAT HAPPENED, MY ELDER BROTHER AND

22   MY MOTHER WOULD HAVE TO GO AND BORROW MONEY.

23   BY MS. POLLOCK:

24   Q.   DID YOU EVER USE YOUR PERSONAL FUNDS TO PURCHASE SCRAP

25   METAL?

DIRECT EXAM BY MS. POLLOCK

1    A.    NO.

2    Q.    WAS THE NAME OF THE COMPANY TIANJIN RUIYU METAL PRODUCTS?

3    A.    YOU MEAN YOU WERE ASKING ABOUT MY PARENTS'S COMPANY.

4    Q.    YES.

5    A.    YES.

6    Q.    DID YOU EVER VISIT THE COMPANY THAT YOUR BROTHER TESTIFIED

7    ABOUT THAT'S IN TIANJIN, HIS COMPANY, TIANJIN RUIYU METAL

8    PRODUCTS?

9    A.    I WENT THERE A COUPLE OF TIMES AFTER THAT COMPANY BECAME

10   TIANJIN RUIYU.  AND AFTER THE OPENING CEREMONY, I WENT TO

11   TIANJIN TO SEE MY PARENTS, I'VE BEEN THERE A COUPLE OF TIMES.

12        CORRECTION.  IT'S NOT AFTER THE OPENING CEREMONY, IT WAS

13   WHEN THEY WERE BUILDING THE FACILITIES.  I WENT THERE TO SEE A

14   COUPLE OF TIMES.

15   Q.    AND WHEN YOU TALK WITH THE OPENING CEREMONY, WAS THIS WHEN

16   THE COMPANY WAS MOVED, THE NEW PART OF TIANJIN WHERE ALL OF THE

17   SCRAP METAL COMPANIES WERE LOCATED?

18   A.    YES.

19   Q.    NOW I WOULD LIKE TO GO BACK TO APPROXIMATELY 2004 WHEN YOU

20   WERE MAKING THE DECISION TO MOVE TO CALIFORNIA.  WHAT WAS THE

21   MAIN REASON THAT THERE WAS A DECISION TO MOVE TO CALIFORNIA?

22   A.    IT WAS MAINLY BECAUSE MY PARENTS LIKE IT HERE, ESPECIALLY

23   MY MOM.

24   Q.    YOU MEAN IN CALIFORNIA?

25   A.    YES.

44

1    Q.   WHY DID YOUR MOTHER WANT TO MOVE TO CALIFORNIA?

2    A.   SHE COMPLAINED THAT IT TOOK TOO LONG TO FLY FROM THE HOME

3    IN TAIWAN TO THE HOME IN THE UNITED STATES.  AND ACTUALLY TOOK

4    ABOUT 24 HOURS.  AND ALSO, IN NEW YORK, THE WEATHER WAS REALLY

5    COLD, AND THE WINTER WAS LONG.

6    Q.   AND AT THE TIME THAT YOUR -- SO WAS IT YOUR MOTHER WHO

7    MADE THE DECISION THAT YOU SHOULD MOVE TO CALIFORNIA?

8    A.   YES, AND MY FATHER CONCURRED WITH THE DECISION.  AND HE

9    LIKED SAN FRANCISCO, SAN JOSE, AND ALSO THE BAY AREA.

10   Q.   WERE YOU PART OF THE DISCUSSION?  DID YOU HAVE ANY SAY ON

11   WHETHER OR NOT YOU WANTED TO MOVE OUT HERE?

12   A.   I MAKE SOME SUGGESTIONS TO THEM, BECAUSE THERE WAS A BIG

13   DIFFERENCE BETWEEN THE HOUSING PRICES.  I SAID I WANTED TO STAY

14   HERE.

15   Q.   MEANING, WHO SAID I WANT YOU TO STAY HERE?

16   A.   ME.

17   Q.   I'M SORRY, YOU WANTED TO STAY WHERE?

18   A.   NEW JERSEY.

19   Q.   OKAY.  AT THE TIME THAT YOU -- THE DECISION WAS MADE TO

20   MOVE -- I'M SORRY.  WHEN YOU WERE LIVING IN NEW JERSEY, HOW

21   OFTEN WERE YOUR PARENTS VISITING YOU?

22   A.   APPROXIMATELY ONCE A YEAR.

23   Q.   AND HOW LONG WOULD THEY COME OVER FROM CHINA?

24   A.   FOUR WEEKS.

25   Q.   NOW WHEN THE DECISION WAS MADE TO MOVE TO CALIFORNIA, DID

DIRECT EXAM BY MS. POLLOCK

```
1     HENRY HAVE A JOB OUT HERE?

2     A.   YES, HE DID.

3     Q.   OKAY.  WHERE DID HE GET A JOB?

4     A.   IN NEW JERSEY.  AND THE COMPANY ALSO ASKED HIM TO GO TO

5     BOSTON TO HELP OUT FOR ANOTHER DEPARTMENT.

6     Q.   BUT WHEN THE DECISION OF THE FAMILY WAS MADE THAT YOU

7     SHOULD MOVE TO CALIFORNIA, DID HENRY HAVE A JOB OUT HERE?

8     A.   YES, HE DID HAVE A JOB.  WHEN THE DECISION WAS MADE, HE

9     WAS ALREADY WORKING AT SAMSUNG.  BUT NEITHER OF US DECIDED TO

10    TAKE THE JOB OFFER AT SAMSUNG BECAUSE WE ALREADY HAD A JOB.  HE

11    ALREADY HAD A JOB.

12    Q.   WHEN HENRY MOVED OUT TO CALIFORNIA, DID HE HAVE A JOB IN

13    THE FIELD OF ENGINEERING OUT HERE?

14    A.   YES.

15    Q.   WHERE WAS THE JOB?

16    A.   YOU MEAN NEW JERSEY?

17    Q.   NO, NO, NO.  YOUR FAMILY HAS MADE A DECISION TO MOVE OUT

18    TO THE BAY AREA.  DID HENRY SECURE A JOB OUT HERE?

19    A.   IT WAS BECAUSE MY PARENTS MADE A DECISION TO MOVE, AND

20    THAT'S WHEN HENRY DECIDED TO TAKE THE JOB AT SAMSUNG.

21    Q.   AND WHERE IS THE JOB?

22    A.   SAMSUNG.

23    Q.   SAMSUNG.

24    A.   YES.

25    Q.   NOW, DO YOU RECALL WHAT THE PURCHASE PRICE WAS FOR YOUR
```

1    HOME IN NEW JERSEY WHEN YOU FIRST BOUGHT IT IN 1999?

2    A.   APPROXIMATELY $520,000.

3    Q.   AND THAT WAS -- THE MONEY THAT WAS USED TO PURCHASE THAT

4    HOME WAS YOUR PERSONAL MONEY?

5    A.   YES.

6    Q.   DID YOU SELL THAT HOME PRIOR TO YOUR MOVE OUT TO

7    CALIFORNIA IN 2004 OR AFTER YOU HAD ARRIVED HERE?

8    A.   AFTER THAT, AFTER I MOVED, IT WAS SOLD.

9    Q.   AND DO YOU RECALL WHAT THE SELLING PRICE WAS?

10   A.   $990,000.

11   Q.   DID ANY OF THE PROCEEDS OF THE SALE OF YOUR NEW JERSEY

12   HOME BELONG TO YOUR FAMILY?

13   A.   NO.

14   Q.   WHAT DID YOU DO WITH THE SALE PROCEEDS OF $990,000?

15   A.   I DEPOSITED APPROXIMATELY $800,000 INTO THE BANK, BECAUSE

16   AFTER THE HOUSE WAS SOLD, WHEN THE MORTGAGE WAS DEDUCTED, AND

17   THERE WAS ABOUT $800,000 LEFT.

18   Q.   OKAY.  NOW WHEN YOU CAME OUT, WHEN THE DECISION WAS MADE

19   TO MOVE TO CALIFORNIA, DID YOU COME OUT HERE TO LOOK FOR A

20   HOME?

21   A.   YES.  I ASKED MY FATHER AND MY MOTHER, ME AND ALSO HENRY,

22   THE FOUR OF US CAME TO SEE HOUSES.

23   Q.   AND WHERE DID YOU LOOK FOR A HOME?

24   A.   INITIALLY, IN PALO ALTO, AND ALSO LOS ALTOS HILLS, AND

25   THEN MY PARENTS SAID THERE WAS SUCH A PLACE CALLED ATHERTON,

```
 1    AND THEN THEY WOULD LIKE TO GO AND SEE HOUSES IN ATHERTON.

 2    Q.   DID YOU LOOK AT HOMES IN ATHERTON AND LOS ALTOS HILLS AND

 3    PALO ALTO?

 4    A.   SARATOGA.

 5    Q.   OKAY.  WHAT TYPE OF A HOME WAS YOUR MOTHER LOOKING FOR?

 6    A.   SHE SAID HER FEET WERE NOT THAT GOOD, SO SHE WAS ONLY

 7    LOOKING FOR ONE-STORY HOUSES.

 8    Q.   OKAY.  AND BACK IN 2004 WHEN YOU WERE MOVING TO

 9    CALIFORNIA, WAS YOUR MOTHER STILL USING A CANE?

10    A.   YES.

11    Q.   WERE YOU IN AGREEMENT WITH YOUR MOTHER THAT A ONE STORY

12    HOME WOULD BE BEST?

13    A.   OF COURSE, BECAUSE THAT WAS MY MOTHER'S CHOICE, SO IT

14    WOULD BE THE BEST TO BUY THE ONE STORY HOUSE.

15    Q.   DID YOUR MOTHER AND YOUR FATHER AND HENRY GO AND LOOK AT

16    THE HOME ON SPERRY LANE IN SARATOGA?

17    A.   BACK THEN WE SAW THE HOUSE TOGETHER.

18    Q.   WAS THERE ANY REASON TO PURCHASE A LARGE HOME?

19    A.   MOTHER SAID WHEN SHE REACH THAT AGE, SHE WOULD HOPE THAT

20    SHE COULD SPEND TIME WITH THE THIRD GENERATION, THE GRANDSONS

21    AND GRANDDAUGHTERS.

22    Q.   YOU ONLY HAVE DAUGHTERS, RIGHT?

23    A.   ME?

24    Q.   YOU.

25    A.   I HAVE TWO DAUGHTERS.
```

1    Q.   OKAY.  WHEN YOUR MOM WAS TALKING ABOUT WHEN SHE REACHED AN

2    AGE, WHAT WAS SHE REFERRING TO?

3    A.   SHE WAS REFERRING TO HER AGE.  AND SHE WAS THINKING THAT

4    SHE WANTED TO STAY WITH HER GRANDCHILDREN, AND WHEN MY ELDER

5    BROTHER'S KIDS COME TO THE UNITED STATES, AND SHE NEEDS A

6    BIGGER ENOUGH HOUSE FOR EVERYBODY.

7    Q.   OKAY.  WERE YOUR PARENTS AT ANY TIME BEFORE YOU PURCHASED

8    THE HOME ON SPERRY, THINKING OF RETIRING TO THE UNITED STATES?

9    A.   YES.

10   Q.   AND WAS THE HOME ON SPERRY LANE IN SARATOGA LARGE ENOUGH

11   TO HAVE YOUR PARENTS LIVE THERE AS WELL AS YOUR BROTHER'S

12   CHILDREN?

13   A.   YES, IT WAS BIG ENOUGH.

14   Q.   AND AT THAT TIME IN 2004, WHO WERE YOUR PARENTS RESIDING

15   WITH IN CHINA?

16   A.   MY ELDER BROTHER.

17   Q.   IS THERE A TRADITION IN THE TAIWANESE CULTURE THAT PARENTS

18   RESIDE WITH THEIR CHILDREN?

19   A.   YES, THE OLDER GENERATION ALL HOPE THAT THEY CAN DO SO,

20   AND AS A YOUNGER GENERATION, WE ALWAYS CONFORM TO THE PARENT'S

21   HOPES AND WISHES.

22   Q.   AND WAS YOUR MOTHER IN HER LATE SIXTIES WHEN THE HOME WAS

23   PURCHASED IN 2004?

24   A.   APPROXIMATELY 73.

25   Q.   DO YOU RECALL WHAT THE HOME COST ON SPERRY LANE IN

DIRECT EXAM BY MS. POLLOCK

1     SARATOGA?

2     A.   3.76 MILLION.

3     Q.   WHERE DID THE MONEY COME FOR THE DOWN PAYMENT ON THAT

4     HOME?

5     A.   FROM MY MOTHER.

6     Q.   AND WHO WAS LISTED ON THE TITLE DOCUMENTS TO THAT HOME?

7     A.   MOTHER, ME, AND MY HUSBAND.

8     Q.   IS THE TITLE STILL IN YOUR MOTHER'S NAME ON THE HOME?

9     A.   RIGHT NOW ON THE TITLE, I'M NOT TOO SURE BECAUSE I ALREADY

10    PROVIDED THE DEATH CERTIFICATE OF MY MOTHER'S.  I DON'T KNOW IF

11    EVERYTHING WAS TAKEN CARE OF.

12    Q.   WHAT INTEREST DID YOUR MOTHER HAVE IN THE HOME?  WHAT

13    PERCENTAGE INTEREST DID SHE HAVE IN THE HOME ON SPERRY LANE?

14    A.   HALF.

15    Q.   AND SINCE YOUR MOTHER HAS PASSED AWAY, HAS YOUR FATHER

16    INDICATED THAT HE WANTS TO TAKE OVER HER PERCENTAGE?

17    A.   MY FATHER ONCE TALKED ABOUT THIS.  HE SAID HE HAS

18    DISTRIBUTED ALL HIS STUFF, ALL HIS BELONGINGS, TO MY ELDER

19    BROTHER.  BUT HE SAID HE NEEDED CASH, AND HE SAID WHENEVER I

20    SELL THE HOUSE, IF I SELL THE HOUSE, I WAS TO GIVE HIM THE

21    PORTION THAT BELONGED TO MY MOTHER TO HIM.

22    Q.   AND THAT PORTION --

23    A.   THAT'S HALF.

24    Q.   I'M SORRY?

25    A.   THAT'S HALF.

DIRECT EXAM BY MS. POLLOCK

```
 1    Q.   THANK YOU.

 2         DID YOUR PARENTS MOVE -- ASSIST YOU IN MOVING OUT TO THE

 3    BAY AREA IN 2004?

 4    A.   YES.  HE CAME, AND THEN HE SAID WHEN YOU MOVE, THEN YOU

 5    HAVE TO ABIDE BY THE TRADITION FROM TAIWAN.  YOU HAVE TO DO

 6    SOMETHING.  SO HE CAME.

 7    Q.   WHO ARE YOU REFERRING TO WITH "HE?"

 8    A.   MY MOTHER.

 9    Q.   YOUR MOM.  WHAT IS THE TRADITION THAT YOUR MOTHER WAS

10    REFERRING TO?

11    A.   I DON'T QUITE KNOW ABOUT THE SPECIFICS, BUT ANYWAYS, SHE

12    BROUGHT A LOT OF STUFF.  SOME OF THEM WERE FOR FORTUNE, SOME OF

13    THEM WERE FOR LUCK, AND THINGS LIKE THAT.  I'M NOT TOO CLEAR

14    ABOUT THAT.

15    Q.   SO SHE BROUGHT ITEMS INTO THE HOME THAT REPRESENTED GOOD

16    FORTUNE AND GOOD LUCK, ACCORDING TO TAIWANESE CULTURE?

17    A.   YES, SHE HOPED THAT I COULD HAVE GOOD LUCK.

18    Q.   AND IF YOU COULD LOOK, PLEASE, AT DEFENSE EXHIBIT 1080.

19              THE INTERPRETER:  IS THAT THIS PICTURE?

20              THE COURT:  YES.

21    Q.   MS. LIN, LOOKING AT WHAT'S MARKED AS DEFENSE EXHIBIT 1080.

22    DO YOU RECOGNIZE THIS PHOTOGRAPH?

23    A.   YES.

24    Q.   DO YOU RECALL WHERE IT WAS TAKEN?

25    A.   IN SAN FRANCISCO.
```

DIRECT EXAM BY MS. POLLOCK

1    Q.   DO YOU REMEMBER WHEN THIS WAS TAKEN AFTER YOUR HOME WAS

2    PURCHASED IN APRIL OF 2004?

3    A.   I DON'T KNOW FOR SURE, I WOULD SAY EITHER MAY OR JUNE.

4    Q.   CAN YOU RECALL, WAS YOUR MOTHER HERE TO CELEBRATE MOTHER'S

5    DAY WITH YOU IN 2004?

6    A.   YES.

7    Q.   NOW, DID THEY GENERALLY, WHEN YOUR PARENTS CAME TO VISIT

8    YOU, DID THEY GENERALLY STAY FOR ONLY A MONTH?

9    A.   THREE WEEKS TO SIX WEEKS, POSSIBLY.

10   Q.   AND IS IT FAIR TO SAY THAT SOME TIME IN THE 2015, YOUR

11   MOTHER BECAME TOO ILL TO TRAVEL, OR WAS IT AT AN EARLIER POINT?

12   A.   MY MOTHER PASSED AWAY IN 2017, HOWEVER, FOR NINE YEARS

13   BEFORE HER PASSING, SHE WAS BASICALLY BEDRIDDEN, SHE COULD NOT

14   MOVE.

15   Q.   SO IS IT FAIR TO SAY THAT 2009, OR THEREABOUTS, WAS THE

16   LAST TIME YOUR PARENTS VISITED YOU HERE IN THE BAY AREA --

17   2008?

18   A.   IN 2008.

19   Q.   OKAY.  AND DO YOU RECALL HOW OFT EBB THEY VISITED YOU

20   BETWEEN 2004 AND 2008?

21   A.   AT LEAST ONCE, SOMETIMES TWICE.

22   Q.   AND AFTER 2008, HOW OFTEN WOULD YOU SAY YOU VISITED YOUR

23   PARENTS IN CHINA?

24   A.   VERY OFTEN, BECAUSE THEY WERE NO LONGER ABLE TO MAKE IT

25   HERE, SO I HAD TO VISIT THEM MORE TIMES.

DIRECT EXAM BY MS. POLLOCK

1    Q.   AND DID YOU TAKE YOUR CHILDREN ON SEVERAL OF THESE TRIPS

2    TO SEE THEIR GRANDPARENTS?

3    A.   BACK THEN BOTH OF MY KIDS WERE SMALL, SO I WOULD ALWAYS

4    TAKE THEM TO SEE MY PARENTS TO MAKE THEM HAPPY.

5    Q.   NOW WHEN YOU MOVED OUT TO CALIFORNIA, WERE YOU STILL

6    WORKING AS A BROKER FOR YOUR PARENTS WITH THE REIJIN

7    INTERNATIONAL COMPANY?

8    A.   YES.

9    Q.   DID YOUR WORK OUT HERE IN THE BAY AREA FOR YOUR PARENTS

10   CHANGE IN ANY WAY FROM WHAT YOU HAD BEEN DOING IN NEW YORK AND

11   NEW JERSEY?

12   A.   NOT MUCH DIFFERENCE.  EVEN WHEN MY MOTHER'S FEET WERE NOT

13   THAT HEALTHY, BUT HER MIND WAS STILL VERY CLEAR.

14   Q.   SO IS IT FAIR TO SAY THAT YOUR MOTHER WAS STILL RUNNING

15   THE BUSINESS UNTIL, SAY, 2010, OR WAS IT LATER?

16        MR. MAGNANI:  OBJECTION.  LEADING.

17        THE COURT:  SUSTAINED.

18        THE INTERPRETER:  YOUR HONOR, THIS INTERPRETER WOULD

19   LIKE TO MAKE A CLARIFICATION.

20   THIS MORNING WHEN I DID AN INTERPRETATION ON TWO SEPARATE

21   OCCASIONS, I USED "HE."  THAT'S BECAUSE IN THE CHINESE

22   LANGUAGE, THE PRONUNCIATION FOR "SHE" AND "HE" ARE THE SAME.

23        SO WHENEVER WITNESS SAYS "HE," THEN AS AN INTERPRETER, I

24   HAVE TO MAKE A CHOICE TO USE EITHER "HE" OR "SHE."  IN THE

25   CHINESE LANGUAGE, THE DEFAULT IS "HE" FIRST.  SO THAT'S WHY I

DIRECT EXAM BY MS. POLLOCK

```
1    USED THE "HE."

2              THE COURT:  THANK YOU.

3              MS. POLLOCK:  SO SOMETIMES WHEN YOU SAY "HE," IT

4    REALLY COULD BE "SHE?"

5              THE INTERPRETER:  YEAH.  IT DEPENDS ON THE CONTEXT,

6    OTHERWISE I HAVE TO CLARIFY WITH THE WITNESS, DO YOU MEAN "SHE"

7    OR "HE."

8              THE COURT:  AND THEN I WILL ASK COUNSEL TO CLARIFY OR

9    TO NOT USE "HE" AND "SHE" AND ONLY USE "MOTHER," "FATHER," OR

10   OTHER NAMES.  THAT WOULD BE COUNSEL'S RESPONSIBILITY, NOT THE

11   INTERPRETER.

12             THE INTERPRETER:  RIGHT.  SO THAT'S WHY YOU INQUIRE.

13   I JUST USE THE DEFAULT.

14   BY MS. POLLOCK:

15   Q.   MEILI, DO YOU RECALL WHAT YEAR YOUR MOTHER STOPPED WORKING

16   FOR THE TIANJIN RUIYU BUSINESS?

17   A.   IN TERMS OF WHEN SHE ACTUALLY STOPPED, WELL, SHE PASSED

18   AWAY IN 2017, SO I WOULD SAY 2015, 2016, THAT'S WHEN SHE

19   STOPPED LOOKING AT THE BOOKS.

20   Q.   OKAY.  AND DO YOU RECALL IF SHE MOVED TO TAIWAN IN 2015 OR

21   2016?

22   A.   APRIL OF 2016.

23   Q.   AND AFTER YOU MOVED TO THE SAN FRANCISCO BAY AREA IN 2004,

24   WHO WERE YOU REPORTING TO AT THE FAMILY BUSINESS?

25   A.   PRIMARILY MY MOTHER.
```

DIRECT EXAM BY MS. POLLOCK

```
1    Q.   AND DID THERE COME A TIME WHEN IT CHANGED AND YOU REPORTED

2    TO YOUR BROTHER?

3    A.   TALKING ABOUT WHEN, OR ASKING WHEN?

4    Q.   YES.

5    A.   SO MOTHER COULD STILL LOOK AT THE BOOKS AND MY OLDER

6    BROTHER, HE COULD ALSO LOOK AT THE BOOKS TOO.

7    Q.   WHAT WAS THE RELATIONSHIP BETWEEN TIANJIN RUIYU METAL

8    PRODUCTS AND REIJIN INTERNATIONAL?

9    A.   BOTH ARE MY PARENTS' COMPANIES -- FAMILY COMPANIES.

10   Q.   IF YOU COULD LOOK, PLEASE, AT EXHIBIT 1022.  DO YOU

11   RECOGNIZE THIS DOCUMENT?

12   A.   YES.

13   Q.   OKAY.  THIS IS A DOCUMENT WRITTEN IN BOTH CHINESE AND

14   ENGLISH, CORRECT?

15   A.   YES.

16   Q.   IS THERE AN ADDRESS ON THIS DOCUMENT WHERE IT SAYS ADDRESS

17   OF ENTERPRISE?

18   A.   YES.

19   Q.   AND WHAT IS THE ADDRESS?

20   A.   15024 SPERRY LANE, SARATOGA.

21   Q.   AND IS THAT YOUR HOME?

22   A.   YES.

23   Q.   AND UNDER NAME OF ENTERPRISE, WHAT IS THE NAME OF THE

24   ENTERPRISE OR COMPANY?

25   A.   REIJIN INTERNATIONAL COMPANY.
```

1    Q.   IS THIS A DOCUMENT THAT YOU OBTAINED WHILE YOU WERE

2    WORKING FOR YOUR PARENTS' COMPANY?

3    A.   WELL, THEIR OFFICE HAD IT DONE AND THEN THEY SENT IT TO

4    ME.

5    Q.   WHEN YOU SAY THEIR OFFICE, ARE YOU TALKING ABOUT -- WHAT

6    OFFICE ARE YOU TALKING ABOUT?

7    A.   TIANJIN RUIYU.

8    Q.   OKAY.  THERE'S A SEAL AT THE VERY BOTTOM.  IS THAT A SEAL

9    OF THE CHINESE GOVERNMENT OR A SEAL OF YOUR FAMILY'S BUSINESS?

10   A.   IT'S A SEAL OF THE CHINESE GOVERNMENT.

11        MS. POLLOCK:  YOUR HONOR, I WOULD MOVE THIS DOCUMENT

12   INTO EVIDENCE.

13        THE COURT:  ANY OBJECTION?

14        MR. MAGNANI:  NO.

15        THE COURT:  IT WILL BE ADMITTED.

16   (DEFENDANT'S EXHIBIT 1022 WAS ADMITTED INTO EVIDENCE.)

17   BY MS. POLLOCK:

18   Q.   MEILI, SHOWING YOU WHAT'S MARKED AS DEFENSE EXHIBIT 1022.

19   WHAT IS THIS DOCUMENT?

20   A.   THIS IS REQUIRED BY THE CHINESE GOVERNMENT THAT IF YOU ARE

21   GOING TO BUY THINGS IN THE U.S., THEN YOU HAD TO HAVE SOMEONE

22   THAT'S APPROVED BY THEM TO COME TO THE U.S. TO INSPECT THE

23   MATERIAL.

24   Q.   SO IS IT FAIR SO SAY THAT THIS DOCUMENT ALLOWS REIJIN TO

25   DO BUSINESS HERE IN THE UNITED STATES?

1    A.   ALLOWS REIJIN TO BE ABLE TO BUY SCRAP METAL, AND EXPORT

2    THE MATERIAL TO CHINA.  BUT IT MUST BE APPROVED BY THE CHINESE

3    GOVERNMENT TO GO THERE TO INSPECT THE MATERIAL FIRST.

4    Q.   AND THE DATE ON THIS DOCUMENT IS WHAT?

5    A.   JANUARY 1ST, 2005, TO DECEMBER 31ST, 2007.

6    Q.   DID ANYONE TELL YOU TO GET THIS DOCUMENT FROM THE CHINESE

7    GOVERNMENT?

8    A.   I ONLY KNOW THAT THIS WAS A DOCUMENT THAT WAS PREPARED AND

9    DONE BY RUIYU AND THEN THEY SENT TO ME, AND THEN I THEN SENT IT

10   TO THE CUSTOMS BROKER AND THE CUSTOMS BROKER WOULD TAKE CARE OF

11   IT.

12   Q.   AND WHEN YOU SAY THIS WAS A DOCUMENT PREPARED BY RUIYU,

13   YOU MEAN THE COMPANY TIANJIN RUIYU?

14   A.   YES.

15   Q.   AND WHAT DO YOU MEAN BY DEALING WITH THE CUSTOMS BROKER?

16   A.   BECAUSE THE CUSTOMS BROKER WILL BE THE ONE THAT WOULD GET

17   IN TOUCH WITH THE SHIPPING COMPANIES FOR ME, AND THEN MAKE

18   ARRANGEMENTS TO SHIP THE MATERIAL.

19   Q.   NOW MS. MEILI, YOU WOULD LIKE YOU TO LOOK AT WHAT'S MARKED

20   FOR IDENTIFICATION AS EXHIBIT 1024.  AND THE BATES RANGE FOR

21   THE RECORD IS 02359 TO 02364.

22        DO YOU RECOGNIZE THE HANDWRITING ON THIS DOCUMENT?

23   A.   WHAT PAGE IS IT, AGAIN?

24   Q.   EXHIBIT 1023?

25             THE COURT:  YOU SAID 1024.

1          MS. POLLOCK:  I'M SORRY, 1023.  MAY I APPROACH FOR A

2     MOMENT?

3          THE COURT:  YES.

4     Q.   LOOKING AT WHAT'S MARKED FOR IDENTIFICATION AS

5     EXHIBIT 1023, WHOSE WRITING IS ON THIS DOCUMENT?

6     A.   MINE.

7     Q.   AND LOOKING AT ALL OF THE PAGES OF THIS DOCUMENT, WHICH IS

8     A SIX-PAGE DOCUMENT, IS THAT YOUR HANDWRITING ON ALL THE PAGES?

9     A.   YES.

10    Q.   DO YOU RECOGNIZE WHAT THIS DOCUMENT IS?

11    A.   THIS WAS TO CALCULATE THE MERCHANTS, AND IN TERMS OF THE

12    MATERIAL THAT THEY WERE SUPPLYING AT THAT TIME.

13    Q.   IS THIS A RECORD OF HOW MANY -- WHAT YOU WERE PURCHASING

14    FROM EACH SCRAP METAL SUPPLIER?

15    A.   YES.

16    Q.   AND AS YOU LOOK AT THESE DOCUMENTS ON THE FIRST PAGE, IS

17    THERE A YEAR THAT'S INDICATED ON THE TOP LEFT-HAND CORNER?

18    A.   YES.

19    Q.   AND WHAT YEAR IS THAT?

20         MR. MAGNANI:  OBJECTION, AS TO READING FROM THE

21    CONTENTS OF A DOCUMENT NOT IN EVIDENCE.

22         MS. POLLOCK:  YOUR HONOR, I WOULD ASK THAT THIS BE

23    MOVED INTO EVIDENCE.

24         THE COURT:  IS THERE AN OBJECTION TO THE DOCUMENT

25    BEING ADMITTED?

1        MR. MAGNANI:  YES, YOUR HONOR, ON RELEVANCE GROUNDS

2    BECAUSE THE DATES.  ON HEARSAY GROUNDS, AND BECAUSE OF THE

3    COURT'S PRIOR ORDER.

4        THE COURT:  LET'S ESTABLISH A LITTLE BIT MORE ABOUT

5    WHAT THIS DOCUMENT IS BEFORE I CAN ADMIT IT.

6        MS. POLLOCK:  OKAY.

7    Q.  MEILI, WHAT IS THIS DOCUMENT, THIS SIX-PAGE DOCUMENT?

8    A.  THIS WAS A RECORD OF HOW MANY CONTAINERS OF MATERIAL THAT

9    WE HAD PURCHASED FROM DIFFERENT SUPPLIERS.

10   Q.  WHEN YOU SAY WE HAD PURCHASED, WAS THIS WHAT YOU HAD

11   PURCHASED FOR YOUR FAMILY'S BUSINESS?

12   A.  YES.

13   Q.  NOW LOOKING AT THE TOP PORTION OF THIS DOCUMENT, WE SEE

14   SEVERAL NAMES.  WHO IS OMNI?

15   A.  IT'S THE NAME OF A COMPANY, OMNISOURCE.

16   Q.  OKAY.  WHAT KIND OF A COMPANY IS OMNI?

17   A.  IT'S A VERY BIG COMPANY THAT SELLS METAL SCRAPS AND MAKES

18   CABLES.

19   Q.  OKAY.  AND DO YOU KNOW WHERE OMNI WAS LOCATED?

20   A.  INDIANA.

21   Q.  AND THE NEXT NAME THAT'S LISTED THERE IS MINKIN.  DO YOU

22   KNOW WHAT TYPE OF A COMPANY -- IS THAT A COMPANY?

23   A.  YES.

24   Q.  WHAT TYPE OF A COMPANY IS MIN KEN?

25   A.  ALSO A METAL SCRAP COMPANY.

1     Q.   SO DO YOU KNOW WHERE MIN KEN IS LOCATED?

2     A.   MICHIGAN.

3     Q.   THE NEXT NAME IS CONSUMER, DO YOU KNOW WHAT CONSUMER WAS?

4     A.   CONSUMER WAS A COMPANY THAT MY FATHER HAD DONE BUSINESS

5     WITH FOR A PRETTY LONG TIME, AND MIN KEN ALSO.

6     Q.   THERE ARE TWO INITIALS IN THE NEXT COLUMN FOR LP.  DID YOU

7     PUT THOSE INITIALS DOWN THERE?

8              MR. MAGNANI:  OBJECTION.

9              THE COURT:  OVERRULED.

10             THE WITNESS:  YES.

11    BY MS. POLLOCK:

12    Q.   WHAT DID LP STAND FOR?

13    A.   LOSE PADNOS.

14    Q.   OKAY.  AND THIS IS THE COMPANY FROM MICHIGAN THAT

15    MR. HEITMEIER REPRESENTED?

16    A.   YES.

17    Q.   AND THE NEXT COMPANY OR NEXT INITIALS NEXT TO LP ARE GW.

18    DO YOU KNOW WHAT THAT STOOD FOR?

19    A.   YES.

20    Q.   WHAT DID GW STAND FOR?

21    A.   GREAT WESTERN.

22    Q.   WHAT DID GREAT WESTERN SELL, WHAT TYPE OF A COMPANY WAS

23    GREAT WESTERN?

24    A.   BASICALLY I NEVER BEEN THERE, BUT MY FATHER DID TELL ME TO

25    GET IN TOUCH WITH THEM.

DIRECT EXAM BY MS. POLLOCK

1    Q.   IN ORDER TO DO WHAT?

2    A.   TO BUY MERCHANDISE.  AND THAT COMPANY ALSO KNOWS WHAT MY

3    FATHER WANTED BECAUSE THEY HAD BEEN DOING BUSINESS TOGETHER FOR

4    A VERY LONG TIME.

5    Q.   NOW THE NEXT COMPANY THAT'S LISTED IS AMERITECH.  WHAT

6    TYPE OF A COMPANY WAS AMERITECH?

7    A.   IT SHOULD BE A VERY BIG TELEPHONE COMPANY IN THE U.S.

8    Q.   AND WHAT TYPE OF MERCHANDISE DID THEY CARRY?

9    A.   THEY SELL THEIR MERCHANDISE THROUGH A BIDDING PROCESS.

10   Q.   AND THE NEXT COMPANY IS NAMED GLOBAL.  WHAT DID GLOBAL DO?

11   A.   GLOBAL DOES MOTORS, ENGINE, LOW GRADE.

12   Q.   DID THEY SELL SCRAP METAL?

13   A.   THEY DO, BUT I'M NOT REALLY SURE, I DON'T REALLY KNOW THAT

14   WELL ABOUT THEIR MERCHANDISE.  I WAS DOING BUSINESS WITH THE

15   COMPANY, JUST PRETTY MUCH IN TERMS OF MAKING PAYMENTS TO THEM.

16   Q.   PAYMENTS FOR WHAT?

17   A.   I HAD TO MAKE THE PAYMENTS FOR THE MERCHANDISE THAT RUIYU

18   HAD PURCHASED.

19   Q.   OKAY.  AND WHAT TYPE OF MERCHANDISE WAS BEING PURCHASED?

20   A.   WHAT KIND OF MERCHANDISE?  WELL, JUST THE MERCHANDISE THAT

21   MY PARENTS AND MY OLDER BROTHER DECIDE TO PAY FOR.  SO LIKE I

22   SAID, I REALLY DON'T KNOW THAT WELL ABOUT THE MERCHANDISE THAT

23   THEY SELL.

24   Q.   DID IT HAVE TO DO WITH SCRAP METAL PURCHASES?

25   A.   YES.

1    Q.   WOULD YOU BE CONTACTING ANY COMPANIES ON BEHALF OF YOUR

2    FAMILY'S BUSINESS THAT DEALT WITH ANYTHING ELSE OTHER THAN

3    SCRAP METAL?

4    A.   YOU MEAN MAKE CONTACT WITH THESE MERCHANTS?

5    Q.   WHO CONTACTS WITH MERCHANTS?

6    A.   I DON'T UNDERSTAND YOUR QUESTION.

7    Q.   OKAY.  LET ME MOVE ON A SECOND.

8         WHAT DOES THE -- NEXT TO GLOBAL, WHAT DOES THE SBC STAND

9    FOR?

10   A.   SBC IS ALSO A TELEPHONE COMPANY, AND WAS SELLING IT'S

11   MATERIAL THROUGH A BIDDING PROCESS TOO.

12   Q.   OKAY.  WHAT TYPE OF MATERIAL WERE THEY SELLING?

13   A.   CABLES.

14   Q.   AND WERE THE CABLES SOMETHING THAT YOUR FAMILY NEEDED TO

15   WORK WITH IN THE SCRAP METAL BUSINESS?  IF YOU KNOW.

16   A.   YEAH, THEY DID PURCHASE CABLES.

17   Q.   NOW, THE FIRST PAGE OF THESE -- THE FIRST TWO PAGES OF

18   THIS DOCUMENT COVER WHAT YEAR?  DIRECTING YOU TO THE UPPER

19   LEFT-HAND CORNER?

20   A.   STARTING IN 2000.

21   Q.   OKAY.  AND THEN GOING TO THE THIRD AND FOURTH PAGES, WHAT

22   YEARS DID THOSE TWO PAGES COVER?

23   A.   THERE'S 2002, 2003.

24   Q.   AND THEN THE NEXT TWO PAGES, THE FINAL TWO PAGES?

25   A.   2003 AND 2002.

1    Q.   OKAY.  WERE THESE RECORDS THAT SOMEONE INSTRUCTED YOU TO

2    MAKE?

3    A.   MY MOTHER.

4    Q.   DID YOUR MOTHER INSTRUCT YOU THAT THESE RECORDS SHOULD BE

5    KEPT IN THIS FORMAT, OR WERE THEY TO BE TRANSPORTED LATER TO

6    ANOTHER DOCUMENT?

7    A.   MY MOTHER WAS THE ONE WHO TAUGHT ME THIS FORMAT.

8    Q.   OKAY.  IS THIS SIMILAR -- WAS THE INFORMATION IN THIS

9    DOCUMENT PUT INTO THE LEDGER THAT WE'RE GOING TO TALK ABOUT?

10   A.   YES.

11   Q.   AND THIS WAS THE FIRST TIME YOU WOULD WRITE EVERYTHING

12   DOWN AND THEN YOU WOULD TRANSFER IT TO THE LEDGER?

13   A.   WELL, MY MOTHER HAD TO FIRST INSPECT IT.

14   Q.   AND IS THIS A DOCUMENT THAT YOUR MOTHER WOULD INSPECT?

15   A.   YEAH, I WOULD FAX IT TO HER OR WHEN SHE COMES HERE, I

16   WOULD GIVE IT TO HER AND SHOW IT TO HER.

17   Q.   AND THIS DOCUMENT, THE DOCUMENTS IN FRONT OF YOU COVERED

18   2000 TO 2003.  DID YOU HAVE DOCUMENTS SIMILAR TO THIS THAT

19   COVERED LATER YEARS?

20   A.   IT'S BEEN TOO LONG.  I DON'T REMEMBER.

21   Q.   OKAY.  WAS THIS A DOCUMENT THAT YOU COMPLETED IN THE

22   NORMAL COURSE OF YOUR BUYING SCRAP METAL ON BEHALF OF YOUR

23   FAMILY?

24   A.   COMPLETE WHAT DOCUMENTS?

25   Q.   THE DOCUMENTS BEFORE YOU IN THIS EXHIBIT, 1023.

1    A.   WELL, BASICALLY, THIS WAS TO SHOW MY MOTHER WHAT I DID.

2    AND WHAT MY MOTHER DID WITH IT, I'M NOT REALLY SURE.

3    Q.   SO THIS WAS A RECORD OF THE WORK YOU WERE DOING FOR YOUR

4    MOTHER AND THE FAMILY BUSINESS IN TIANJIN?

5    A.   YES, TO SHOW TO MY MOTHER.

6         MS. POLLOCK:  I WOULD MOVE THIS INTO EVIDENCE.

7         THE COURT:  IS THERE AN OBJECTION?

8         MR. MAGNANI:  YES, YOUR HONOR.  SAME OBJECTION.

9         MS. POLLOCK:  I THINK I'VE LAID IT AS A RECORD.

10        THE COURT:  AT WHAT -- LET'S HAVE A SIDEBAR.

11    (SIDEBAR DISCUSSION ON THE RECORD.)

12        THE COURT:  I JUST NEED TO KNOW WHAT YOU'RE OFFERING

13    IT AS.

14        MS. POLLOCK:  JUST AS A RECORD OF THE PURCHASES THAT

15    SHE KEPT FOR HER MOTHER.

16        THE COURT:  AS A BUSINESS RECORD?  I MEAN, THAT'S --

17    I'M TRYING TO HEAR THE MAGIC WORDS, BECAUSE THERE ARE MAGIC

18    WORDS.

19        MS. POLLOCK:  I KNOW THERE ARE.  I'M TRYING TO GET IT

20    OUT OF HER.

21        THE COURT:  THAT'S WHY I ASKED YOU WHAT YOU ARE

22    OFFERING IT AS.

23        MR. MAGNANI:  SO FOR 8036, THERE'S A REQUIREMENT THAT

24    THE RECORD BE MADE BY A PERSON OF KNOWLEDGE AT THE TIME OF THE

25    TRANSACTION.

1          IF YOU LOOK AT THIS, IT'S CLEARLY A SUMMARY.  THESE AREN'T

2     TALLIES WHERE SOMEONE COULD BE ADDING IT AT THE TIME OF THE

3     TRANSACTION, BUT IT'S TOTAL NUMBERS AT THE END OF EVERY PERIOD.

4     SO THIS COULDN'T BE MADE BY A PERSON OF KNOWLEDGE AT THE TIME

5     OF THE --

6          THE COURT:  WELL, I DON'T HAVE A SUFFICIENT

7     FOUNDATION ON HOW IT WAS ACCUMULATED.  THIS WOULD BE A SUMMARY

8     OF EACH MONTH, IS THE MOST IT WOULD SHOW, I WOULD AGREE, FOR

9     EACH CLIENT OR CUSTOMER.

10         MS. POLLOCK:  CORRECT.  IT WOULD BE.  IN THE COURSE

11    OF HER WORK AS A BUSINESS RECORD.

12         THE COURT:  WELL, IT'S NOT MADE -- WELL, THEN IT'S

13    NOT MADE AT OR NEAR THE TIME.

14         MS. POLLOCK:  WELL, ALL I HAVE -- IT'S BY THE YEAR.

15    WELL, I TAKE THAT BACK, YOUR HONOR, IT'S BY THE MONTH.

16         THE COURT:  IT'S BY THE MONTH.

17         MS. POLLOCK:  IT'S BY THE MONTH.

18         THE COURT:  SO I DON'T KNOW IF THERE'S ANY CASE LAW

19    ON HOW CLOSE IT NEEDS TO BE.

20         MS. POLLOCK:  THIS IS THE RECORD SHE KEPT FOR THE --

21         THE COURT:  I KNOW IT'S AS GOOD AS YOU'VE GOT.  I'M

22    TRYING TO FIGURE OUT, UNDER THE LAW, WAS IT MADE AT OR NEAR THE

23    TIME, WAS 30 DAYS NEAR THE TIME.

24         MS. POLLOCK:  I COULD ASK HER THAT SPECIFIC QUESTION.

25         MR. CANNON:  YOUR HONOR, I THINK MS. POLLOCK COULD

1    ASK HER, IS THIS A SUMMARY OF RECORDS THAT YOU COMPILED -- IS

2    THIS A SUMMARY THAT YOU COMPILED, WAS THE SUMMARY BASED ON

3    RECORDS YOU MADE AT OR ABOUT THE TIME.

4            THE COURT:  THAT'S NOT GOING TO GET IT IN.

5        A SUMMARY IS -- THAT'S NOT GOING TO GET IT IN.  THANK YOU,

6    BUT -- I AM REALLY STRUGGLING AS TO WHETHER MS. LIN DOESN'T

7    UNDERSTAND YOUR QUESTIONS OR THE TRANSLATION.

8            MS. POLLOCK:  IF I COULD TELL YOU, THERE IS A

9    PROBLEM.  SHE CAN UNDERSTAND BARBARA WELL.  SHE'S HAVING A

10   PROBLEM WITH THIS INTERPRETER, AND HER BROTHER TOLD US HE WAS

11   HAVING TROUBLE WITH HIM.

12       I'M HAVING TROUBLE WITH HIS ENGLISH, BUT SHE'S HAVING

13   TROUBLE WITH HIS CHINESE, AND I WAS GOING TO TRY TO CONTACT

14   OSCAR, BUT THAT'S A PROBLEM.

15           THE COURT:  I MEAN, WE HAVE WHO WE HAVE.

16           MS. POLLOCK:  YEAH.  I WAS GOING TO SEE IF THERE WAS

17   SOME WAY -- I DON'T KNOW -- THE ABILITY TO CONTACT HIM NOW OR

18   IF TIFFANY COULD, BUT WE HAVE A PROBLEM WITH THE INTERPRETER.

19           THE COURT:  WE HAVE A CERTIFIED INTERPRETER, SO

20   THAT'S THE WAY IT IS.  IT'S THE WAY IT IS.  I'VE NEVER SEEN

21   INTERPRETERS TRADE OFF DURING TESTIMONY, IT'S NOT THAT TAXING.

22   I'M SURPRISED.

23           MS. POLLOCK:  I'VE SEEN IT WITH -- WELL, YOU ARE

24   RIGHT.

25           THE COURT:  RIGHT NOW, I'M NOT GOING TO ADMIT THE

DIRECT EXAM BY MS. POLLOCK

1    EXHIBIT.  I DON'T THINK IT QUALIFIES AS A BUSINESS RECORD AT

2    THIS POINT.

3                MR. MAGNANI:  I WAS GOING TO SAY TWO MORE THINGS.

4        WE ALSO OBJECT ON RELEVANCE GROUNDS BASED ON THE FACT THAT

5    SHE DIDN'T KNOW SHE KEPT THESE RECORDS AFTER 2003.

6                MS. POLLOCK:  I'M ONLY INTRODUCING IT FOR THAT

7    PURPOSE.

8                THE COURT:  OKAY.  I'M NOT GOING TO ADMIT IT NOW.

9                MS. POLLOCK:  EXCUSE ME.  CAN I ASK TIFFANY IF SHE

10   COULD CONTACT OSCAR?

11               THE COURT:  NOT NOW.  SHE COULD DO IT AT LUNCH, I

12   SUPPOSE.

13       (ON THE RECORD.)

14               THE COURT:  ALL RIGHT.  THE OBJECTION IS SUSTAINED.

15   THE DOCUMENT IS NOT ADMITTED.

16               MS. POLLOCK:  MAY I HAVE A MOMENT, YOUR HONOR?

17       (PAUSE IN PROCEEDINGS.)

18   Q.  MS. LIN, JUST A COUPLE MORE QUESTIONS ABOUT THIS EXHIBIT.

19       DID YOU MAKE THESE RECORDS EACH MONTH AT THE TIME A SALE,

20   OR RATHER, A PURCHASE OF SCRAP METAL WAS MADE?

21   A.  YES.

22   Q.  DID YOU PUT THE INFORMATION DOWN ON ANOTHER PIECE OF PAPER

23   AND THEN AT SOME POINT DURING THE YEAR, TRANSFER IT INTO THIS

24   DOCUMENT THAT COVERS JANUARY TO DECEMBER?

25   A.  YES.

DIRECT EXAM BY MS. POLLOCK

1    Q.   SO YOU KEPT SEPARATE RECORDS ONCE A SALE WAS DONE AS TO

2    EACH COMPANY THAT YOU WERE DEALING WITH?

3    A.   COULD YOU REPEAT YOUR QUESTION AGAIN.

4    Q.   DID YOU KEEP SEPARATE RECORDS ONCE A SALE WAS COMPLETED TO

5    A PARTICULAR VENDOR AND THEN PUT IT INTO THIS TYPE OF A TABLE?

6    A.   YES.

7    Q.   DID YOU KEEP A FILE OF PURCHASES FROM EACH PARTICULAR

8    VENDOR THAT YOU WERE DEALING WITH?

9    A.   WELL, FOR EACH PURCHASE THAT WE MADE, THE SUPPLIERS WOULD

10   PROVIDE US WITH AN INVOICE, AND THEN I WOULD SEND THE INVOICE

11   ALONG TO TIANJIN RUIYU AND THEY WOULD KEEP IT FOR THEIR

12   RECORDS.

13   Q.   BEFORE YOU SENT THE INVOICE TO TIANJIN, WOULD YOU DOCUMENT

14   THAT INVOICE IN YOUR OWN TYPE OF RECORD, AS YOU'RE LOOKING AT

15   IN THIS EXHIBIT?

16   A.   I WOULD HAVE THE ORIGINAL INVOICE AND THEN I WOULD FAX THE

17   INVOICE OVER TO THEM AND THEN THEY WILL ALSO HAVE THE PURCHASE

18   AGREEMENT TOO.  I SENT ALL THAT TO THEM.

19   Q.   WITH THE ORIGINAL INVOICE, WOULD YOU KEEP THOSE ORIGINAL

20   INVOICES OF SALES AND THEN AT THE END OF THE YEAR CREATE THIS

21   TABLE?

22   A.   YOU MEAN REVIEW THE INVOICES, RIGHT?

23   Q.   DID YOU KEEP THE INVOICES, THE ORIGINAL INVOICES?

24   A.   IN MY OFFICE, YES.

25   Q.   OKAY.  DID YOU KEEP THEM AFTER YOU COMPLETED THIS TABLE?

1    A.   YES.

2    Q.   ALL RIGHT.  AT ANY POINT DID YOU GET RID OF THOSE

3    INVOICES?

4    A.   NO, I NEVER THROUGH THEM AWAY BECAUSE I WOULD KEEP THEM.

5    AND WHEN THEY COME, I CAN SHOW IT TO THEM.  EVEN THOUGH I HAD

6    ALREADY FAXED IT TO THEM.  BUT BASICALLY I FELT THAT SINCE I

7    WAS DOING THINGS FOR THEM, THEN I SHOULD SAFEGUARD THESE

8    THINGS.

9    Q.   ALL RIGHT.

10        AND ON THIS DOCUMENT, IS THIS DOCUMENT A RECORD OF HOW

11   MANY CONTAINERS OF SCRAP METAL YOU PURCHASED FOR THE YEARS

12   2000, 2001, 2002, AND 2003?

13   A.   YES, IT'S A VERY CLEAR RECORD.

14   Q.   AND ARE THE ENTRIES IN THIS DOCUMENT, IN THIS EXHIBIT,

15   ALSO REFLECTED IN YOUR LEDGER?

16   A.   YES.

17   Q.   SO YOU WOULD COPY THE INFORMATION THAT WAS IN EXHIBIT 1023

18   AND PUT IT IN YOUR LEDGER?

19   A.   YES.

20        MS. POLLOCK:  YOUR HONOR, I WOULD ONCE AGAIN MOVE

21   THIS INTO EVIDENCE.

22        THE COURT:  ANY OBJECTION?

23        MR. MAGNANI:  JUST THE SAME.  IN ADDITION TO THE

24   EVIDENCE REQUIREMENTS NOT BEING MET.

25        THE COURT:  THE OBJECTION IS SUSTAINED.  IT'S NOT

DIRECT EXAM BY MS. POLLOCK

```
1    ADMITTED.

2        LET'S MOVE ON.

3    BY MS. POLLOCK:

4    Q.   NOW WHEN YOU SPOKE TO THE SUPPLIERS OF SCRAP METAL HERE IN

5    THE UNITED STATES, WHO WOULD YOU TELL THEM THAT YOU WERE

6    PURCHASING SCRAP METAL FOR?

7    A.   I THINK THEY KNOW ALREADY.

8    Q.   BUT WHEN YOU WOULD CALL SOMEONE, SAY MR. HEITMEIER, WOULD

9    YOU IDENTIFY WHO YOU WERE PURCHASING THE SCRAP METAL FOR, OR IF

10   SOMEONE ANSWERED THE PHONE WHO WAS NOT WELL KNOWN TO YOU?

11   A.   NO, I WOULD JUST TELL THEM IF IT'S FOR REIJIN

12   INTERNATIONAL COMPANY.

13   Q.   THIS SCRAP METAL THAT YOU WERE PURCHASING WAS NOT GOING TO

14   REIJIN INTERNATIONAL IN SARATOGA, WAS IT?

15   A.   IMPOSSIBLE.

16   Q.   OKAY.  WHEN YOU WOULD CALL A SCRAP METAL PURCHASER, VENDOR

17   HERE IN THE UNITED STATES, DID YOU IDENTIFY YOURSELF AS REIJIN

18   INTERNATIONAL?

19   A.   YES, I WOULD.

20   Q.   AND DID YOU TELL THEM WHO YOU WERE PURCHASING SCRAP METAL

21   FOR?

22   A.   YES.  I WOULD SAY I WAS PURCHASING IT FOR MY PARENTS, FOR

23   MY OLDER BROTHER.  AND THEN SOMETIMES I WOULD TELL THEM NO, I

24   CANNOT MAKE THE DECISION MYSELF, I NEED TO INQUIRE WITH MY

25   PARENTS, WITH MY OLDER BROTHER FIRST, AND THAT I WOULD GET BACK
```

DIRECT EXAM BY MS. POLLOCK

1    TO YOU.

2    Q.   AND WHEN YOU SAY YOU WOULD HAVE TO INQUIRE FURTHER, WHAT

3    WOULD YOU HAVE TO INQUIRE FURTHER WITH YOUR FAMILY ABOUT?

4    A.   THE PRICE.  AND ALSO THE QUANTITY THAT WAS GOING TO BE

5    PURCHASED.

6    Q.   HOW DID YOU FIND OUT WHAT WAS AVAILABLE TO -- OR WHAT WAS

7    NECESSARY TO PURCHASE FOR TIANJIN?

8    A.   THEY WILL TELL ME THEIR NEEDS.  MY PARENTS AND MY OLDER

9    BROTHER, THEY WILL ALL TELL ME.

10   Q.   DID YOU GET A SALARY FROM YOUR FAMILY FOR ASSISTING THEM

11   IN THE FAMILY BUSINESS?

12   A.   IT'S CALCULATED ON THE BASIS OF HOW MANY CONTAINERS OF

13   PURCHASES.

14   Q.   OKAY.  AND WHO WOULD DETERMINE WHAT YOU WOULD RECEIVE FOR

15   EACH CONTAINER THAT WAS SENT?

16   A.   MY MOM.

17   Q.   WHO MADE THE DECISION ON WHETHER YOU -- ON THE FACT THAT

18   YOU WERE GOING TO BE PAID PER LOAD OR PER CONTAINER OF SCRAP

19   METAL?

20   A.   I THINK THAT BACK THEN WHEN MY FATHER FIRST CAME HERE FOR

21   BUSINESS AND WHAT THEY HAD USED BACK THEN, THAT WAS THE WAY

22   THEY HAD BEEN DOING BUSINESS IN THE PAST.

23          THE COURT:  WOULD THIS BE A GOOD TIME TO BREAK SO WE

24   DON'T HAVE TO CHANGE INTERPRETERS FOR A MOMENT?

25          MS. POLLOCK:  SURE.  THANK YOU VERY MUCH, YOUR HONOR.

```
 1                 THE COURT:  OKAY.  WE ARE GOING TO TAKE OUR LUNCH

 2     BREAK.  LET'S COME BACK AT 1:00.

 3            (RECESS FROM 12:00 P.M. UNTIL 1:02 P.M.)

 4                 THE COURT:  WE ARE BACK ON THE RECORD.  PLEASE BE

 5     SEATED.  ALL COUNSEL AND PARTIES ARE PRESENT AND ALL OF OUR

 6     JURORS AND ALTERNATE.

 7            ALL RIGHT.  WE ARE GOING TO GET RIGHT BACK DOWN TO WORK

 8     AFTER LUNCH.  I'M GOING TO HAVE MS. LIN RETURN TO THE WITNESS

 9     STAND.

10            AND MS. POLLOCK, YOU MAY CONTINUE WITH YOUR DIRECT EXAM.

11     BY MS. POLLOCK:

12     Q.  MEILI, I BELIEVE WE LEFT OFF WHERE I WAS ASKING YOU IF YOU

13     RECEIVED A SALARY FROM YOUR FAMILY BUSINESS FOR THE WORK THAT

14     YOU WERE ASSISTING THEM WITH HERE AS A BROKER IN THE

15     UNITED STATES; DO YOU REMEMBER THAT?

16     A.  YES.

17     Q.  I WOULD LIKE YOU TO DIRECT YOUR ATTENTION TO EXHIBIT 220,

18     GOVERNMENT EXHIBIT.  MEILI, DO YOU RECOGNIZE THIS DOCUMENT?

19     A.  YES.

20     Q.  OKAY.  WHAT IS THIS?

21     A.  THIS IS THE SALARY RUIYU WOULD PAY ME.

22     Q.  MEILI, IS THIS A DOCUMENT THAT WAS PREPARED BY YOU?

23     A.  YES -- NO.  THEY PREPARED THIS WITH THE OFFICIAL STAMP.

24     Q.  AND WHEN YOU REFER TO THE OFFICIAL STAMP, IS THAT THE

25     STAMP AT THE BOTTOM THAT'S TIANJIN RUIYU METAL?
```

1    A.   YES.

2    Q.   WAS THIS SENT TO YOU BY TIANJIN?

3    A.   THIS IS A BILL, THIS IS WHAT I PROVIDED TO TIANJIN.  I

4    SAID THERE WERE ALL TOGETHER 413 CONTAINERS.  AND THIS WAS THE

5    SALARY THEY PROMISED TO PAY ME.

6         AND THEN I SENT THIS TO THEM, AND WITH THEIR CONFIRMATION

7    AND THE OFFICIAL STAMP.

8    Q.   OKAY.  AND WHAT'S THE DATE ON THIS DOCUMENT?

9    A.   JANUARY 18TH, 2007.

10   Q.   AND THIS DEALS WITH COMMISSION CHARGES FOR WHAT YEAR?

11   A.   THIS WAS THE COMMISSION FOR 2006.

12   Q.   OKAY.  AND COMMISSION MEANS YOUR SALARY?

13   A.   YES.

14   Q.   NOW JUST TO CLARIFY, WAS THIS A DOCUMENT THAT YOU

15   PREPARED?

16   A.   YES, IT WAS PREPARED BY ME, BUT VERIFIED BY THEM.

17   Q.   OKAY.  AND WHEN YOU SAY VERIFIED, APPROVED AND CONFIRMED

18   BY TIANJIN?

19   A.   YES.

20   Q.   AND IS COMMISSION A WORD THAT MEANS SALARY?

21   A.   IT'S THE SALARY TO ME.  IT MEANS MY INCOME.

22   Q.   AND DO YOU KNOW WHO WAS IN CHARGE OF APPROVING THIS?

23   A.   THERE WAS ONLY ONE STAMP ON HERE.  IF IT WAS NOT FROM MY

24   MOM, THEN IT WOULD BE FROM MY OLDER BROTHER.

25   Q.   DO YOU KNOW WHO ACTUALLY PUT THE STAMP HERE?

DIRECT EXAM BY MS. POLLOCK

1    A.    OF COURSE, NO, I'M NOT SURE.

2    Q.    SHOWING YOU THE SECOND DOCUMENT UNDER 220.  DO YOU

3    RECOGNIZE THIS DOCUMENT?

4         (OFF-THE-RECORD DISCUSSION.)

5    BY MS. POLLOCK:

6    Q.    MEILI, DO YOU SEE THIS DOCUMENT?

7    A.    YES.

8    Q.    IS THIS A BILL THAT YOU SENT TO TIANJIN FOR SERVICES

9    RENDERED IN 2007?

10   A.    YES.

11   Q.    AND HOW MANY CONTAINERS DOES IT INDICATE THAT YOU HAD SENT

12   TO TIANJIN FOR THAT YEAR?

13   A.    146.

14   Q.    AND DID YOU HAVE A SET -- DID YOU HAVE AN UNDERSTANDING

15   WITH YOUR MOTHER AS TO WHAT YOU WERE GOING TO BE PAID FOR EACH

16   CONTAINER OR LOAD OF SCRAP METAL THAT CAME TO CHINA?

17   A.    IT WAS ALL DECIDED BY MY MOTHER AND BY MY ELDER BROTHER,

18   BOTH OF THEM WILL HAVE A DISCUSSION TO MAKE A DECISION.

19   Q.    AND WAS THERE AN AGREEMENT TO WHAT YOU WOULD BE PAID FOR

20   WHAT WAS CONSIDERED A BONUS, WHICH IS INDICATED ON THIS

21   DOCUMENT?

22   A.    BECAUSE SOMETIMES WHEN THE SHIPMENTS ARRIVED, THEY WERE

23   NOT UP TO THE STANDARD.  AND SOMETIMES THEY HAD TO FILE A

24   CLAIM.  IF THE CLAIM IS A LOT, THEN I WOULD NOT GET A BONUS.

25   IF THE CLAIM IS NOT THAT MUCH, I WOULD GET A BONUS.

1    Q.   AND WHO WOULD DETERMINE THE BONUS YOU WOULD RECEIVE?

2    A.   SAME THING, IT WAS -- IT WILL BE THE DISCUSSION BY BOTH OF

3    THEM.

4    Q.   MEANING YOUR MOTHER AND YOUR BROTHER?

5    A.   YES, CORRECT.

6    Q.   WERE THESE BILLS THAT WERE SENT OR THESE BILLS FOR YOUR

7    SERVICES RENDERED, WERE THEY BASED ON INFORMATION IN YOUR

8    LEDGER?

9    A.   WELL, EVENTUALLY, THE LEDGER WILL BE HOW MUCH MONEY I

10   RECEIVE.

11   Q.   OKAY.  BUT WERE THESE INVOICES THAT YOU SENT TO THE

12   COMPANY FOR PAYMENT, WAS THE INFORMATION BASED ON THE

13   INFORMATION ON YOUR LEDGER?

14   A.   YOU MEAN THE INFORMATION WAS BASED ON MY LEDGER?  IT WAS

15   THE FORM I PREPARED -- JUST NOW.  WE TALKED ABOUT THAT JUST

16   NOW.

17   Q.   AND EXHIBIT 220 AND 221 THAT YOU'VE JUST TALKED ABOUT, DID

18   YOU GET THE INFORMATION ON HOW MANY LOADS FROM YOUR LEDGER,

19   FROM CALCULATING YOUR LEDGER?

20   A.   YES.

21   Q.   NOW IF YOU COULD REFER, PLEASE, TO 1013.

22        MS. POLLOCK:  AND COULD I APPROACH, YOUR HONOR, FOR A

23   MOMENT?

24        THE COURT:  SURE.

25   Q.   MS. LIN, LOOKING AT THIS DOCUMENT, CAN YOU IDENTIFY IT?

1     A.   YES.

2     Q.   WHAT IS IT?

3                MR. MAGNANI:  I WOULD JUST OBJECT.  I THINK SHE'S

4     READING A LARGE PORTION OF THIS DOCUMENT.

5                MS. POLLOCK:  I DON'T KNOW WHAT SHE WAS DOING.

6                THE COURT:  WE HAVE NO IDEA.  YOUR CHINESE IS MORE

7     FLUENT THAN MINE.

8                THE WITNESS:  THIS WAS ACTUALLY A REPORT I MADE TO MY

9     ELDER BROTHER.  I TOLD HIM THAT IN 2004, THERE WERE ALL

10    TOGETHER, 1,042 SHIPMENTS OF GOODS -- LOAD -- 1,042 LOADS, ALL

11    CONTAINERS.  AMONG THEM, THERE WERE MTS.  MTS MEANS -- REFERS

12    TO THE LOW GRADE ELECTRIC MOTORS.

13        SO FOR THIS LOW GRADE COMMODITIES, THEY WILL PAY ME VERY

14    LITTLE, USUALLY I WOULD GET EITHER $80 TO $100 PER LOAD BECAUSE

15    OF THIS LOW GRADE COMMODITIES.

16        SO ALL TOGETHER, THE MONEY WAS $155,200.  AND BECAUSE I

17    BORROWED SOME MONEY FROM MY ELDER BROTHER, SO AFTER HE MADE THE

18    DEDUCTION OF $219,400, HE WILL ONLY NEED TO PAY ME $16,200.

19    Q.   AND IF THE UPPER LEFT-HAND CORNER WHERE IT ONLY SAYS TWO,

20    WHAT DO THE CHINESE CHARACTERS REFER TO?

21    A.   MY BROTHER'S NAME.

22                MS. POLLOCK:  IS THIS DOCUMENT IN EVIDENCE?

23                MR. MAGNANI:  NO.

24    BY MS. POLLOCK:

25    Q.   AND UNDER THAT LINE, IT SAYS "FROM."  WHAT DO THE CHINESE

1    CHARACTERS REFER TO HERE?

2    A.   THAT'S MY CHINESE NAME.

3    Q.   OKAY.

4         MS. POLLOCK:  YOUR HONOR, I WOULD MOVE EXHIBIT 1013

5    INTO EVIDENCE.

6         THE COURT:  IS THERE A PROBLEM WITH THE TRANSLATION

7    OR SOMETHING?  WITH A TRANSLATION OF THE ANSWER, NOT OF THE

8    DOCUMENT.

9         AMOUNT BORROWED WAS MORE THAN THE AMOUNT OWED, AND YET

10   THERE WAS AN AMOUNT THAT WAS REMITTED FROM THE BROTHER, AND

11   THAT DOESN'T WORK.

12        SO PERHAPS IT WAS THE BROTHER WHO BORROWED FROM HER.  IT

13   WAS NOT TRANSLATED CORRECTLY, OR MISSTATED.

14        MS. POLLOCK:  OKAY.

15        THE COURT:  SHE SAID SHE BORROWED 219 ON A PAYMENT OF

16   155, AND SO THE BROTHER OWED HER 64,000.  THAT CAN'T BE

17   CORRECT.

18        MS. POLLOCK:  DO YOU WANT ME TO GO THROUGH THIS OR

19   MOVE THE EXHIBIT IN AT THIS POINT?

20        THE COURT:  WELL, THE RECORD IS INCORRECT.  AND I

21   DON'T KNOW IF IT'S TRANSLATION OR THAT THE WITNESS WAS

22   INCORRECT.

23        MS. POLLOCK:  OKAY.

24        THE COURT:  THE MATH DOESN'T WORK.  IT'S JUST

25   ARITHMETIC.

1          MS. POLLOCK:  OKAY.

2     Q.   MEILI, WHAT DOES MTS STAND FOR?

3     A.   MOTOR, ELECTRIC MOTORS.

4     Q.   OKAY.  AND NEXT TO THE NUMBERS 155,200, WHAT WORD IS THAT?

5     A.   THAT'S WHEN THE MONEY WAS NOT HERE, AND THEN I BORROWED

6     THAT AMOUNT FROM HIM.

7     Q.   WHAT AMOUNT DID YOU BORROW FROM YOUR BROTHER?

8     A.   $155,200.

9     Q.   AND WHAT IS THE $219,400 REFER TO?

10    A.   IT'S BEEN A LONG TIME AND I ONLY RECALL WHEN I SAW WHAT I

11    WROTE HERE, THAT WAS THE MONEY I BORROWED FROM HIM.

12    Q.   OKAY.  SO IS THE AMOUNT THAT WAS BORROWED $155,200?

13    A.   YES.

14    Q.   AND DID YOU DEDUCT THAT AMOUNT FROM THE TOTAL AMOUNT OWED

15    TO YOU OF $219,400?

16    A.   AFTER THE DEDUCTION, I TOLD HIM THAT HE WOULD ONLY NEED TO

17    PAY ME $64,200.

18    Q.   OKAY.

19          MS. POLLOCK:  I WOULD ONCE AGAIN MOVE THAT INTO

20    EVIDENCE.

21          THE COURT:  ANY OBJECTION?

22          MR. MAGNANI:  YES.  HEARSAY.  SAME OBJECTION.

23          THE WITNESS:  THIS IS MY HANDWRITING.

24          THE COURT:  THE DOCUMENT APPEARS TO BE HEARSAY, BUT

25    THE TESTIMONY IS IN.

DIRECT EXAM BY MS. POLLOCK

1          MS. POLLOCK:  I DON'T KNOW IF THE COURT HAD THE

2    TRANSLATION.

3          THE COURT:  HOW WOULD I HAVE THE TRANSLATION?

4          MS. POLLOCK:  YOU DO.

5          THE COURT:  NO, HOW WOULD I?

6          MS. POLLOCK:  I'M SORRY, IT WAS PREPARED LAST WEEK.

7          THE COURT:  IT'S NOT BEEN ESTABLISHED AS A BUSINESS

8    RECORD.

9          MS. POLLOCK:  I KNOW, BUT JUST --

10          THE COURT:  THANK YOU.

11       I WILL SUSTAIN THE OBJECTION AND NOT ADMIT THE EXHIBIT,

12    BUT THE TESTIMONY HAS CLARIFIED THE WITNESS'S TESTIMONY.

13    BY MS. POLLOCK:

14    Q.   MEILI, IN THE COURSE OF ASSISTING YOUR FAMILY WITH THEIR

15    BUSINESS, DID YOU OPEN ANY BANK ACCOUNTS HERE IN THE

16    UNITED STATES FOR YOUR --

17    A.   I DON'T KNOW WHAT YOU MEAN.

18    Q.   I DIDN'T FINISH THE QUESTION.

19       DID YOU OPEN BANK ACCOUNTS HERE IN THE UNITED STATES FOR

20    YOUR FAMILY?

21    A.   THERE WAS ONLY THIS ONE, THE REIJIN INTERNATIONAL COMPANY.

22          THE COURT:  LET'S TAKE THE EXHIBIT DOWN.  I THINK THE

23    WITNESS IS STILL REFERRING TO THE EXHIBIT.

24          MS. POLLOCK:  OKAY.

25    Q.   LET ME BE A LITTLE BIT MORE CLEAR.

1          DID YOUR FAMILY -- WAS YOUR FAMILY HERE WHEN BANK ACCOUNTS

2     WERE OPENED IN THEIR NAMES, YOUR FATHER, YOUR MOTHER, AND YOUR

3     BROTHER?

4     A.   YES.  THEY HAVE THEIR OWN BANK ACCOUNTS IN HERE.

5     Q.   REFERRING TO EXHIBIT NUMBER 1028, IF YOU COULD LOOK AT

6     THAT, PLEASE.  DO YOU RECOGNIZE THIS DOCUMENT?

7     A.   YES.

8     Q.   HOW DO YOU RECOGNIZE IT?

9     A.   IT HAS MY ENGLISH NAME.

10    Q.   OKAY.  DO YOU SEE YOUR SIGNATURE ON THIS PAGE?

11    A.   NO.

12             MS. POLLOCK:  CAN I APPROACH, YOUR HONOR?

13             THE COURT:  YES.

14    Q.   DO YOU RECOGNIZE WHAT'S MARKED AS 1028?

15    A.   YES.

16    Q.   HOW DO YOU RECOGNIZE IT?

17    A.   IT HAD MY FATHER'S SIGNATURE AS WELL AS MINE.

18             MS. POLLOCK:  YOUR HONOR, I WOULD MOVE EXHIBIT 1028

19    INTO EVIDENCE.

20             THE COURT:  ANY OBJECTION?

21             MR. MAGNANI:  I JUST WANT TO CONFIRM THAT'S BATES

22    ENDING 190.

23             MS. POLLOCK:  THE BATES NUMBER?  YES.

24             MR. MAGNANI:  NO OBJECTION.

25             THE COURT:  IT WILL BE ADMITTED.

1          (DEFENDANT'S EXHIBIT 1028 WAS ADMITTED INTO EVIDENCE.)

2     BY MS. POLLOCK:

3     Q.   MS. LIN, WHAT DO YOU RECOGNIZE THIS AS?

4     A.   IT'S A DOCUMENT FROM CHINATRUST BANK.

5     Q.   AND DO YOU SEE ANYTHING IN THE UPPER RIGHT-HAND CORNER

6     THAT IDENTIFIES IT?

7     A.   IT'S A SIGNATURE CARD, BUSINESS SIGNATURE CARD.

8     Q.   AND WHO IS THE -- WHAT IS THE NAME OF THE ACCOUNT?

9     A.   IT'S FLORENCE TRADING COMPANY, A COMPANY INCORPORATED BY

10    FATHER.

11    Q.   OKAY.  AND DO YOU SEE YOUR FATHER'S NAME IN THE UPPER

12    LEFT-HAND CORNER?

13    A.   YES.

14    Q.   AND THAT'S TIEN-FU LIN?

15    A.   YES.

16    Q.   AND YOU ALSO SEE YOUR NAME RIGHT UNDER THAT?

17    A.   YES.

18    Q.   THIS IS DATED -- WHAT IS THE DATE ON THIS DOCUMENT?

19    A.   APRIL 22ND, 2004.

20    Q.   DO YOU RECALL WHERE YOU WERE WHEN YOU WENT TO THE BANK TO

21    CHINATRUST BANK WITH YOUR FATHER, WHETHER YOU WERE BACK EAST OR

22    IN THE BAY AREA?

23    A.   IT WAS -- IT SHOULD BE IN NEW JERSEY.  WE DID NOT MOVE

24    OVER HERE YET.

25    Q.   AND IF YOU COULD LOOK NOW AT EXHIBIT 1029.  IT'S A

1        TWO-PAGE DOCUMENT.  DO YOU RECOGNIZE THIS?

2        A.   YES.

3        Q.   AND WHAT IS THIS?

4        A.   THIS IS A DOCUMENT FROM MY FATHER'S FLORENCE TRADING

5        COMPANY.

6        Q.   DO YOU RECOGNIZE ANY SIGNATURES ON THIS DOCUMENT?

7        A.   YES, THERE WAS MY SIGNATURE AS WELL AS MY FATHER'S.

8             MS. POLLOCK:  YOUR HONOR, I WOULD MOVE EXHIBIT 1029

9        INTO EVIDENCE.

10            THE COURT:  ANY OBJECTION?

11            MR. MAGNANI:  NO OBJECTION.

12            THE COURT:  IT WILL BE ADMITTED.

13       (DEFENDANT'S EXHIBIT 1029 WAS ADMITTED INTO EVIDENCE.)

14       BY MS. POLLOCK:

15       Q.   MS. LIN, SHOWING YOU EXHIBIT 1029, IS THIS YOUR FATHER'S

16       NAME UP HERE?

17       A.   YES.

18       Q.   AND REFERRING TO PAGE 2 OF THE DOCUMENT --

19       A.   I SAW IT.

20       Q.   WHERE IT SAYS "SPECIMEN SIGNATURE AS AUTHORIZED PERSON."

21       IS THAT YOUR SIGNATURE?

22       A.   YES.

23       Q.   AND YOUR FATHER'S SIGNATURE IS DOWN HERE AS SIGNATURE OF

24       SOLE PROPRIETOR?

25       A.   YES.

1    Q.   DO YOU RECALL THAT BY SIGNING THIS DOCUMENT, YOUR FATHER

2    WAS AUTHORIZING YOU AS A PERSON TO USE THIS ACCOUNT?

3    A.   YES.

4    Q.   NOW, IN ONE OF THESE EXHIBITS THAT I HAVE JUST SHOWN YOU,

5    IT IDENTIFIED YOU AS VICE PRESIDENT; DO YOU RECALL THAT?

6    A.   YEAH, I SAW IT JUST NOW, YES.

7    Q.   OKAY.  WERE YOU EVER ADVISED THAT YOU WERE THE VICE

8    PRESIDENT OF FLORENCE TRADING COMPANY?

9    A.   NO.

10   Q.   I WOULD LIKE TO SHOW YOU WHAT IS MARKED AS 1031.  HAVE YOU

11   EVER SEEN THIS DOCUMENT?

12   A.   YES.

13   Q.   WHOSE NAME DO YOU SEE ON THIS DOCUMENT THAT YOU RECOGNIZE?

14   A.   MY FATHER'S AND MINE.

15   Q.   AND IS THE DATE ON THAT DOCUMENT THE APRIL 22ND DATE OF

16   THE OTHER DOCUMENTS WE JUST WENT THROUGH?

17   A.   YES, IT'S THE SAME.

18   Q.   ALL RIGHT.

19        MS. POLLOCK:  YOUR HONOR, I WOULD MOVE THIS INTO

20   EVIDENCE, EXHIBIT NUMBER 1031.

21        THE COURT:  ANY OBJECTION?

22        MR. MAGNANI:  YES, YOUR HONOR.  HEARSAY.

23        THE COURT:  I'M MISSING THE -- THIS IS A ONE-PAGE

24   DOCUMENT?

25        MS. POLLOCK:  YES, YOUR HONOR.  I HAVE ONE PAGE.

1          THE COURT:  I DON'T SEE MS. LIN'S SIGNATURE ON ANY,

2     THAT'S WHAT I'M MISSING.

3          MS. POLLOCK:  IT'S PART OF THE DOCUMENTS THAT WERE

4     SIGNED ON APRIL 22ND.

5          THE COURT:  YOU DRAW FROM THIS AS A SEPARATE

6     DOCUMENT, THAT'S ALL.

7          THE OBJECTION IS SUSTAINED.  IT WILL NOT BE ADMITTED.

8          MS. POLLOCK:  OKAY.  THANK YOU.

9     BY MS. POLLOCK:

10    Q.   REFERRING TO EXHIBIT 1001, WHICH IS THE BEGINNING, AND

11    DIRECTING YOUR ATTENTION TO PAGE 2 OF THIS DOCUMENT.

12    A.   I SEE IT.

13    Q.   DO YOU RECOGNIZE THIS DOCUMENT?

14    A.   I RECOGNIZE IT.

15    Q.   HOW DO YOU RECOGNIZE IT?

16    A.   MY OLDER BROTHER'S SIGNATURE AND ALSO MY SIGNATURE.

17    Q.   AND WHAT IS THE DATE OF THIS DOCUMENT?

18    A.   FEBRUARY 28TH, 2006.

19    Q.   I BELIEVE THIS DOCUMENT IS IN EVIDENCE, 1028 -- I'M SORRY,

20    1001, RATHER.

21         THE CLERK:  YES.

22    Q.   MEILI, DO YOU REMEMBER GOING TO THE CHINATRUST BANK IN, I

23    BELIEVE CUPERTINO, WITH YOUR BROTHER, AROUND FEBRUARY 28TH,

24    2006, TO OPEN A BANK ACCOUNT FOR HIM?

25    A.   YES.

DIRECT EXAM BY MS. POLLOCK

1    Q.    NOW SHOWING YOU WHAT IS MARKED AS PAGE 2 OF THIS DOCUMENT,

2    YOU'VE IDENTIFIED YOUR NAME OVER HERE AS THE ATTORNEY IN FACT?

3    A.    YES.

4    Q.    AND WHAT IS THIS DOCUMENT FOR?

5    A.    WELL, HE OPENED AN ACCOUNT AND THE POA.

6    Q.    OKAY.  WHAT IS A POA?

7    A.    IT'S A POWER OF ATTORNEY AUTHORIZING ME TO TAKE CARE OF

8    THINGS FOR HIM AT THE BANK.

9    Q.    DO YOU RECALL WHEN THIS DOCUMENT WAS FILLED OUT ON

10   FEBRUARY 28TH OF 2006, THAT YOU WERE PRESENT IN FRONT OF A BANK

11   OFFICIAL?

12   A.    YES, MY SIGNATURE IS RIGHT THERE.

13   Q.    DO YOU REMEMBER WHETHER SOMEONE SIGNED UNDERNEATH YOUR

14   SIGNATURE?

15   A.    YES.  WHAT I HAD MEANT WAS THERE IS A SIGNATURE BY THE

16   BANK EMPLOYEE UNDER MY SIGNATURE.

17   Q.    OKAY.  AND DO YOU SEE THE NAME PRINTED UNDERNEATH WHERE IT

18   SAYS VERIFIED BY?

19   A.    JASMINE CHAO.  C-H-A-O.

20   Q.    DO YOU REMEMBER WHEN YOU WERE WITH YOUR BROTHER ON

21   FEBRUARY 28TH, 2006, AT THE CHINATRUST BANK, THAT YOUR BROTHER

22   HAD TO ANSWER CERTAIN QUESTIONS TO THE BANK OFFICIALS REGARDING

23   OPENING A NEW ACCOUNT?

24   A.    YES, I REMEMBER.  WE ALL SPOKE MANDARIN THERE.

25   Q.    OKAY.  WHEN YOU SAY YOU ALL SPOKE MANDARIN, WAS THE BANK

1    OFFICIAL, THE BANK EMPLOYEE, ALSO SPEAKING MANDARIN TO YOUR

2    BROTHER?

3    A.   YES.

4    Q.   AND DO YOU RECALL IF YOUR BROTHER TOLD -- YOUR BROTHER HAD

5    TO GIVE CERTAIN INFORMATION ABOUT WHERE HE LIVED AND WHAT HIS

6    OCCUPATION WAS IN ORDER TO OPEN A BANK ACCOUNT, CORRECT?

7    A.   YES.

8    Q.   DID YOU REVIEW ANY OF THE INFORMATION THAT WAS BEING

9    WRITTEN THAT YOUR BROTHER TOLD THE BANK?

10   A.   MY BROTHER HAD PROVIDED OTHER INFORMATION AND ANSWERED ALL

11   THE QUESTIONS THEY HAD.

12   Q.   LOOKING AT EXHIBIT 1004, WHICH IS A ONE-PAGE DOCUMENT.  DO

13   YOU REMEMBER LOOKING AT THIS DOCUMENT BEFORE IT WAS GIVEN TO

14   THE BANK OFFICIALS ON FEBRUARY 28TH?

15   A.   REVIEW?

16   Q.   DO YOU REMEMBER -- HAVE YOU EVER SEEN THIS DOCUMENT

17   BEFORE?

18   A.   YES.

19   Q.   DID YOU REVIEW THE INFORMATION ON THIS DOCUMENT BEFORE IT

20   WAS TURNED OVER TO THE BANK?

21   A.   YES.

22   Q.   REFERRING TO THE BOTTOM LEFT-HAND PORTION OF THE DOCUMENT

23   WHERE IT SAYS POA BENEFICIARY, DO YOU SEE YOUR NAME?

24   A.   I SEE MY OLDER BROTHER'S NAME AND MY NAME.

25   Q.   OKAY.  DO YOU SEE YOUR NAME ON THE LOWER LEFT-HAND CORNER?

DIRECT EXAM BY MS. POLLOCK

1    A.   YES, I SEE IT.

2    Q.   IS THAT YOUR PRINTING OF YOUR NAME?

3    A.   YES.

4    Q.   DO YOU RECOGNIZE OTHER WRITING ON THIS DOCUMENT THAT IS IN

5    YOUR WRITING?

6    A.   THE SIGNATURE IS MINE.

7    Q.   CORRECT.  DO YOU RECOGNIZE ANY OTHER WORDS ON THIS

8    DOCUMENT THAT IS IN YOUR WRITING OR PRINTING?

9    A.   ARE YOU TALKING ABOUT THE TOP?

10   Q.   PARDON ME?

11   A.   ARE YOU TALKING ABOUT THE TOP PART?

12   Q.   OKAY.  REFERRING TO THE UPPER PORTION OF THIS DOCUMENT,

13   WHERE YOUR BROTHER'S NAME IS MENTIONED --

14   A.   YES.

15   Q.   -- IS ANY OF THAT HANDWRITING OR PRINTING IN YOUR

16   PENMANSHIP?

17   A.   NO.

18   Q.   AND REFERRING TO THE MIDDLE PORTION OF THE DOCUMENT, IS

19   ANY OF THE WRITING OR PRINTING IN THAT SECTION IN YOUR

20   HANDWRITING OR PENMANSHIP?

21   A.   NO.

22   Q.   DO YOU REMEMBER --

23   A.   ARE YOU TALKING ABOUT -- I DON'T THINK WE ARE TALKING

24   ABOUT THE SAME DOCUMENT HERE.

25          MS. POLLOCK:  MAY I APPROACH, PLEASE?

DIRECT EXAM BY MS. POLLOCK

1         THE COURT:  YES.

2         MS. POLLOCK:  YOU'RE NOT, NO.

3     (OFF-THE-RECORD DISCUSSION.)

4         THE COURT:  IS IT THE WRONG DOCUMENT?

5         MS. POLLOCK:  IT WAS.

6         THE COURT:  HOW MUCH DO WE NEED TO STRIKE OF THE

7     TESTIMONY?

8         MS. POLLOCK:  I BELIEVE SO, YEAH.

9         MR. MAGNANI:  WHAT'S THE BATES NUMBER OF THE

10    DOCUMENT?

11        MS. POLLOCK:  THE ONE THAT I WAS TALKING ABOUT --

12        MR. MAGNANI:  THE ONE YOU ARE GOING TO TALK ABOUT --

13        THE COURT:  OKAY.  I WILL STRIKE ALL OF THE TESTIMONY

14    REGARDING EXHIBIT 1004, ON THE BASIS THAT THE WITNESS WAS

15    LOOKING AT THE WRONG DOCUMENT.

16        AND MS. POLLOCK, I WILL LET YOU START OVER AGAIN NOW THAT

17    YOU CAN CONFIRM SHE HAS THE CORRECT DOCUMENT.

18        MS. POLLOCK:  ALL RIGHT.  THANK YOU.

19    Q.  GOING BACK TO EXHIBIT 1004, DO YOU RECOGNIZE ANYTHING

20    ABOUT THIS DOCUMENT?

21    A.  NO, MY OLDER BROTHER'S NAME IS ON HERE AND ALSO THE HOME

22    ADDRESS.

23    Q.  AND THE HOME ADDRESS THAT'S LISTED ON THIS DOCUMENT, IS

24    THAT WHERE IT SAYS PERMANENT -- WELL, THE SECOND LINE, IS THAT

25    HIS ADDRESS IN TAIWAN?

DIRECT EXAM BY MS. POLLOCK

1    A.   YES.

2    Q.   OKAY.  DO YOU RECOGNIZE ANY OF THE HANDWRITING OR PRINTING

3    ON THIS DOCUMENT?  IS ANY OF IT IN YOUR -- WAS ANY OF IT

4    WRITTEN BY YOU?

5    A.   NO.

6    Q.   OKAY.  THAT'S THAT DOCUMENT.

7         DID YOUR BROTHER GIVE YOU ANY INSTRUCTIONS REGARDING THE

8    USE OF HIS ACCOUNT AT CHINATRUST?

9    A.   YES.

10   Q.   AND WHAT INSTRUCTIONS DID HE GIVE YOU?

11   A.   SO HE HAS A HOUSE HERE.  SO THERE ARE SOME THINGS THAT

12   SHOULD BE SPENT ON THE MORTGAGE OF THE HOUSE, THINGS THAT HE

13   WANTED TO PURCHASE, OR IF HE HAS OTHER NEEDS OR OTHER

14   INSTRUCTIONS, HE WOULD TELL ME ABOUT IT OVER THE PHONE.

15        AND HE ALSO HAS A CREDIT CARD HERE.  SO SOMETIMES TO PAY

16   OFF THE MONEY ON THE CREDIT CARD, I WOULD NEED TO WRITE A CHECK

17   TO PAY OFF THE MONEY ON THE CREDIT CARD.

18   Q.   WHEN YOUR BROTHER GAVE YOU THE POWER OF ATTORNEY OVER HIS

19   BANK ACCOUNTS, DID HE GIVE YOU ANY SPECIFIC INSTRUCTIONS ON

20   WHAT CHECKS YOU COULD SIGN FOR?

21   A.   HE SAID I WILL MAKE A CLEAR RECORD OF EVERYTHING IN THE

22   LEDGER.  SO I HAD THE AUTHORITY TO WRITE THESE CHECKS.

23        AND THE REASON WHY HE GAVE ME THE POWER OF ATTORNEY IN THE

24   FIRST PLACE WAS BECAUSE HE TRUSTED ME.

25   Q.   OKAY.  IF YOU COULD LOOK AT GOVERNMENT EXHIBIT 660.

DIRECT EXAM BY MS. POLLOCK

1    A.   WHERE IS 660?

2    Q.   NO, YOU DON'T HAVE IT THERE WITH YOU.

3         JONATHAN, COULD THAT BE PLACED ON THE ELMO?  THANK YOU.

4    Q.   MEILI, LOOKING AT THIS DOCUMENT --

5    A.   I SEE IT.

6    Q.   -- DO YOU RECALL WHETHER YOUR BROTHER WAS IN THE

7    UNITED STATES ON APRIL 11TH OF 2007?

8    A.   THIS IS HIS SIGNATURE.

9    Q.   CORRECT.  DO YOU KNOW WHETHER OR NOT HE WAS IN CALIFORNIA

10   ON APRIL 11TH, 2007?

11   A.   THAT YEAR, YEAH, HE SHOULD BE HERE, YEAH, HE CAME.

12   Q.   WHEN YOUR BROTHER WOULD OPEN ACCOUNTS IN BANKS HERE IN THE

13   UNITED STATES, DO YOU KNOW WHETHER HE SIGNED BANK SIGNATURE

14   CARDS HERE OR ABROAD?

15   A.   BECAUSE MY SIGNATURES ARE NOT ON HERE, SO I DON'T KNOW.

16   Q.   OKAY.  DO YOU KNOW WHETHER YOUR BROTHER EVER OPENED

17   ACCOUNTS, UNITED STATES BANK ACCOUNTS, WHEN HE WAS IN CHINA?

18   A.   THAT, I DON'T KNOW, IT'S TOO LONG AGO.

19   Q.   ALL RIGHT.  SHOWING YOU WHAT IS MARKED FOR

20   IDENTIFICATION -- WHAT I THINK IS IN, EXHIBIT 1009, IT'S IN THE

21   BINDER.  DO YOU SEE THIS?

22   A.   YES.

23   Q.   AND WHAT IS THIS?

24   A.   MY SIGNATURE AND MY OLDER BROTHER'S SIGNATURE.

25   Q.   AND YOUR SIGNATURE IS UP HERE UNDER POA?

1    A.   YES, IT IS MINE.

2    Q.   AND THE SIGNATURE OF YOUR BROTHER IS DOWN HERE, OF THE

3    AUTHORIZED INDIVIDUAL?

4    A.   YES.

5    Q.   AND IT IS SIGNED JUNE 11TH OF '07?

6    A.   APRIL 11TH, 2007.

7    Q.   OH, I'M SORRY, APRIL 11TH.  SO THIS WAS SIGNED THE SAME

8    DAY AS YOUR BROTHER WAS HERE IN THE UNITED STATES OPENING UP

9    THE ACCOUNT?

10   A.   YES.

11   Q.   DID YOUR BROTHER GIVE YOU ANY SPECIFIC INSTRUCTIONS ABOUT

12   USING THIS METRO BANK ACCOUNT, SINCE YOU WERE THE POWER OF

13   ATTORNEY?

14   A.   YES.  HE TOLD ME, HE SAID HE WILL USE THIS BANK ACCOUNT

15   PRIMARILY FOR COMMERCIAL INVESTMENTS IN THE U.S.  THE LARGER

16   COMMERCIAL INVESTMENTS.  THE LARGER COMMERCIAL INVESTMENTS LIKE

17   A SHOPPING CENTER.

18   Q.   AND SHOWING YOU WHAT IS MARKED FOR IDENTIFICATION, I'M NOT

19   SURE IT'S IN, IS 1037.  DO YOU RECOGNIZE THIS DOCUMENT, 1037?

20   A.   WHICH ONE?

21        MS. POLLOCK:  MAY I APPROACH, YOUR HONOR?

22        THE COURT:  YES.

23   Q.   DO YOU RECOGNIZE THE SIGNATURES ON THIS DOCUMENT?

24   A.   THIS IS MY MOM AND MY DAD'S SIGNATURE.

25   Q.   DO YOU RECALL BEING PRESENT -- OR RATHER, DO YOU SEE A

1    DATE ON THE UPPER LEFT-HAND CORNER OF THIS DOCUMENT BY THE FAX

2    NUMBER?  DO YOU SEE THAT?

3    A.   YES, I SEE IT.  NOVEMBER 30TH, 2005.

4    Q.   OKAY.  AND WHAT IS THE NAME OF THE BANK THAT THIS IS

5    COMING FROM?

6    A.   CATHAY BANK.

7    Q.   DO YOU RECALL WHETHER OR NOT YOU WOULD BE PRESENT WITH

8    YOUR PARENTS WHEN THEY OPENED A BANK ACCOUNT?

9    A.   YES.

10   Q.   TO YOUR KNOWLEDGE, DID YOUR PARENTS EVER OPEN A BANK

11   ACCOUNT WITHOUT GIVING YOU POWER OF ATTORNEY?

12   A.   IMPOSSIBLE.  I DON'T THINK SO.

13   Q.   OKAY.

14       IF GOVERNMENT EXHIBIT 660 COULD BE PLACED ON THE ELMO,

15   PLEASE.

16            THE CLERK:  I'M SORRY, WHAT?

17            MS. POLLOCK:  EXHIBIT 660.

18            THE CLERK:  YOU WANT ME TO PLACE IT ON THE ELMO?

19            MS. POLLOCK:  NO, I'M SORRY, THE GOVERNMENT.

20       JONATHAN, COULD YOU BRING UP EXHIBIT 660.

21   Q.   LOOKING BACK AT THIS DOCUMENT, MS. LIN, DO YOU RECOGNIZE

22   THE NAME -- YOUR NAME ON THE UPPER TOP OF THIS DOCUMENT?

23   A.   OKAY.

24   Q.   AND IS THAT -- IS THIS YOUR NAME UP HERE UNDER POA?

25   A.   YES.

DIRECT EXAM BY MS. POLLOCK

1    Q.   DID YOUR BROTHER GIVE YOU ANY INSTRUCTIONS REGARDING YOUR

2    USE OF THIS METRO BANK ACCOUNT?

3    A.   HE SAID THE MONEY IN HERE IS HOW TO PREPARE TO PURCHASE

4    THE SHOPPING CENTER WITH.

5    Q.   WAS IT TO USE FOR PURCHASES OF OTHER ITEMS?

6    A.   BECAUSE HE WAS PLANNING HAVE THIS MONEY IN PLACE, HE

7    PLANNED IT FOR, LIKE, MAYBE A YEAR OR TWO.

8         SO IT'S BEEN TOO LONG, I DON'T REMEMBER WHETHER HE USED

9    THAT MONEY FOR ANYTHING ELSE.  I CANNOT REALLY REMEMBER

10   EXACTLY.

11   Q.   OKAY.  I REALIZE THIS IS 11 YEARS AGO, BUT REFERRING TO

12   EXHIBIT 1038, WHICH IS BEFORE YOU, 1-0-3-8, ARE YOU LOOKING AT

13   A BANK STATEMENT?  WHAT IS THE NAME ON THAT BANK STATEMENT?

14   A.   MY OLDER BROTHER'S NAME.

15   Q.   OKAY.  NOW REFERRING TO THE SECOND PAGE OF THIS DOCUMENT,

16   DO YOU SEE SEVERAL CHECKS?

17   A.   YES, I SEE IT.

18   Q.   AND WHOSE HANDWRITING IS SIGNED ON THESE CHECKS?

19   A.   MINE.

20   Q.   AND IS THIS THE ACCOUNT THAT YOUR BROTHER AUTHORIZED YOU

21   TO HAVE POWER OF ATTORNEY OVER AT METRO BANK?

22   A.   YES.

23        MS. POLLOCK:  YOUR HONOR, I WOULD MOVE EXHIBIT 1038

24   INTO EVIDENCE.

25        THE COURT:  ANY OBJECTION?

1              MR. MAGNANI:  CAN I JUST HAVE A CLARIFICATION ON THE

2      BATES NUMBERS, THE FULL RANGE?

3              MS. POLLOCK:  90049005.

4              MR. MAGNANI:  JUST THOSE TWO PAGES?

5              MS. POLLOCK:  YEAH.

6              THE COURT:  NO OBJECTION?

7              MR. MAGNANI:  NO OBJECTION.

8              THE COURT:  IT WILL BE ADMITTED.

9          (DEFENDANT'S EXHIBIT 1038 WAS ADMITTED INTO EVIDENCE.)

10     BY MS. POLLOCK:

11     Q.   MS. LIN, REFERRING TO THE FIRST PAGE OF THIS BANK

12     STATEMENT, WHICH INDICATES PAGE 2, DO YOU SEE YOUR BROTHER'S

13     NAME UP HERE?

14     A.   YES.

15     Q.   WHAT IS THE AVERAGE LEDGER BALANCE THAT'S INDICATED ON

16     THIS STATEMENT?

17     A.   $2,301,175.82.

18     Q.   AND WHAT IS THE AMOUNT THAT INDICATES THE INTEREST PAID

19     FOR 2007?

20     A.   $18,920.

21     Q.   AND REFERRING TO PAGE 3 OF THIS DOCUMENT, LOOKING AT CHECK

22     NUMBER 120 WHICH IS AT THE BOTTOM.  DO YOU SEE THIS CHECK?

23     A.   YES, I SEE IT.

24     Q.   WHO IS SIGNATURE IS ON THAT?

25     A.   MY SIGNATURE.

1    Q.   AND IS IT YOUR WRITING OR PENMANSHIP ON THE ENTIRE CHECK?

2    A.   YES.

3    Q.   THE CHECK IS MADE OUT TO COUNTRYWIDE, CORRECT?

4    A.   YES.

5    Q.   DO YOU RECALL -- AND WHAT IS THE AMOUNT OF THAT CHECK?

6    A.   $20,089.23.

7    Q.   AND DO YOU RECALL AS YOU ARE SITTING HERE NOW, WHAT THAT

8    PAYMENT WOULD HAVE GONE FOR TO COUNTRYWIDE?

9    A.   IT SHOULD HAVE BEEN FOR HIS HOUSE, BUT I KNOW THAT THIS

10   WAS NOT FOR THE MORTGAGE, THOUGH.

11   Q.   OKAY.  BUT IT WOULD HAVE BEEN FOR YOUR BROTHER'S HOME?

12   A.   YES.

13   Q.   AND WHEN YOU ARE REFERRING TO YOUR BROTHER'S HOME, WOULD

14   THAT BE THE CONDOMINIUM AT THE ST. REGIS ON MINNA STREET?

15   A.   YES.

16   Q.   NOW REFERRING TO THE BOTTOM CHECK WHICH IS NUMBER 121, DO

17   YOU RECOGNIZE THE WRITING ON THAT CHECK?

18   A.   THAT WAS MY HANDWRITING.

19   Q.   AND WHO IS THAT CHECK MADE OUT TO?

20   A.   IT WAS ISSUED TO THE TOWERS RESIDENCE ASSOCIATION, THEIR

21   FEES.

22   Q.   LIKE A HOMEOWNER'S FEE?

23   A.   YES, FOR A PARKING SPOT AND OTHER ASSOCIATION FEES ALL

24   TOGETHER.

25   Q.   OKAY.  AND THE DATE ON THAT CHECK IS WHAT?

DIRECT EXAM BY MS. POLLOCK

1    A.   MAY 23RD, 2007.

2    Q.   AND IN THE VERY BOTTOM, IT SAYS 32-B.  WHAT IS 32-B

3    REFERRING TO?

4    A.   THE 32ND FLOOR.  LIKE, FOR EXAMPLE, IN A BUILDING, THERE

5    WERE SEVERAL UNITS.  HIS UNIT IS B, ON THE 32ND FLOOR.

6    Q.   IS 32-B THE CONDOMINIUM YOUR BROTHER OWNED AT THE

7    ST. REGIS ON MINNA STREET IN SAN FRANCISCO?

8    A.   CORRECT.

9    Q.   SO THIS WAS AN EXPENSE YOUR BROTHER AUTHORIZED YOU TO PAY

10   FOR HIM ON BEHALF OF HIS RESIDENCE AT THE ST. REGIS?

11   A.   YES.

12   Q.   HOW REFERRING TO EXHIBIT NUMBER 1039 --

13            MS. POLLOCK:  OH, I'M SORRY.  I DON'T KNOW THAT I

14   MOVED THAT LAST EXHIBIT INTO EVIDENCE.

15            THE COURT:  YOU DID.  1038, YES.

16            MS. POLLOCK:  OKAY.

17   Q.   1039.  DO YOU RECOGNIZE THIS STATEMENT?

18   A.   YES.

19   Q.   LOOKING AT WHAT'S NUMBERED PAGE 3 AND PAGE 5 OF THIS

20   DOCUMENT, DO YOU RECOGNIZE THESE CHECKS?

21   A.   YES.

22   Q.   HOW DO YOU RECOGNIZE THEM?

23   A.   THEY ALL HAD TO HAVE MY SIGNATURE.

24   Q.   OKAY.

25            MS. POLLOCK:  YOUR HONOR, I WOULD MOVE THIS INTO

DIRECT EXAM BY MS. POLLOCK

1      EVIDENCE.

2                 THE COURT:  ANY OBJECTION?

3                 MR. MAGNANI:  CAN I JUST HAVE THE BATES NUMBERS,

4      COUNSEL.

5                 MS. POLLOCK:  97728979.

6                 MR. MAGNANI:  NO OBJECTION.

7                 THE COURT:  IT WILL BE ADMITTED.

8            (DEFENDANT'S EXHIBIT 1039 WAS ADMITTED INTO EVIDENCE.)

9      BY MS. POLLOCK:

10     Q.   MS. LIN, LOOKING AT PAGE 2 OF THIS STATEMENT, WHAT ARE THE

11     NAMES THAT ARE LISTED ON THE STATEMENT?

12     A.   MY BROTHER'S NAME, PING KUANG LIN, AND THE NEXT LINE, THE

13     LINE UNDER THAT, THAT'S MEILI LIN, POA.

14     Q.   OKAY.  POWER OF ATTORNEY?

15     A.   YES.

16     Q.   DOES THIS PAGE INDICATE WHAT THE AVERAGE LEDGER BALANCE

17     WAS FOR THIS ACCOUNT?

18     A.   $33,168,19.

19     Q.   AND THE DATE OF THIS STATEMENT IS WHAT?

20     A.   JULY 31ST, 2007.

21     Q.   NOW REFERRING TO WHAT'S MARKED AS CHECK NUMBER 107.

22     A.   YES, I SEE IT.

23     Q.   DO YOU RECOGNIZE THAT CHECK?

24     A.   YES, I DO.

25     Q.   IS THAT YOUR SIGNATURE?

DIRECT EXAM BY MS. POLLOCK

1    A.   YES.

2    Q.   AND WHAT'S THE DATE OF THAT CHECK?

3    A.   JULY 12TH, 2007.

4    Q.   AND WHO IS THAT CHECK MADE OUT TO?

5    A.   88 SOUTH BROADWAY ASSOCIATION.

6    Q.   AND WHAT IS THE AMOUNT OF THAT CHECK?

7    A.   $1,098.37.

8    Q.   AND IN THE MEMO PORTION OF THAT CHECK, WHAT DOES IT STATE?

9    A.   THIS IS THE NUMBER FOR THAT UNIT.

10   Q.   IS IT A UNIT NUMBERED 1302 AT 88 SOUTH BROADWAY?

11   A.   YES.

12   Q.   AND WHO ARE THE OWNERS -- IS THAT A CONDOMINIUM?

13   A.   YES.

14   Q.   WHO ARE THE OWNERS OF THAT CONDOMINIUM?

15   A.   MY BROTHER AND I.

16   Q.   OKAY.  NOW REFERRING A LITTLE FURTHER DOWN TO CHECK NUMBER

17   108, DO YOU SEE THAT?

18   A.   YES.

19   Q.   AND IS THAT CHECK ALSO MADE OUT TO 88 SOUTH BROADWAY

20   ASSOCIATION?

21   A.   YES.

22   Q.   AND WHOSE SIGNATURE IS IT?

23   A.   MINE.

24   Q.   AND IS THE DATE JULY 12TH, THE SAME AS THE DATE IN CHECK

25   NUMBER 107?

DIRECT EXAM BY MS. POLLOCK

1    A.   YES.

2    Q.   AND IS THERE A DIFFERENT -- UNDER MEMO, IS THERE A

3    DIFFERENT NUMBER WRITTEN THERE?

4    A.   NOT THE SAME.  THIS ONE WAS 1507.

5    Q.   AND WHAT WAS 1507?

6    A.   1507 WAS ON THE FIFTH FLOOR.  THIS ONE WAS PURCHASED BY MY

7    PARENTS.

8    Q.   OKAY.  WAS IT PURCHASED BY YOUR PARENTS AND YOU, OR JUST

9    YOUR PARENTS?

10   A.   MY PARENTS AND I BOUGHT THIS TOGETHER.

11   Q.   AND REFERRING TO THE CHECK RIGHT NEXT TO IT, 109, IS THIS

12   ALSO FOR 88 SOUTH BROADWAY ASSOCIATION?

13   A.   YES.

14   Q.   AND IN THE MEMO SECTION, WHAT NUMBER IS REFERENCED THERE?

15   A.   1503.

16   Q.   AND IS THAT ANOTHER CONDOMINIUM THAT WAS OWNED IN THAT

17   RESIDENCE OR THAT ADDRESS?

18   A.   YES.

19   Q.   WHO OWNED THAT CONDOMINIUM?

20   A.   MY BROTHER AND I.

21   Q.   AND THE AMOUNT ON THIS CHECK IS FOR HOW MUCH?

22   A.   $951.28.

23   Q.   AND ALL THREE OF THESE CHECKS, CHECK NUMBER 107, 108, AND

24   109, ARE TO THE SOUTH BROADWAY ASSOCIATION.  WERE THE CHECKS

25   FOR MORTGAGES OR HOMEOWNER'S ASSOCIATION FEES?

DIRECT EXAM BY MS. POLLOCK

1   A.   I CAN'T SAY FOR SURE.

2   Q.   NOW THIS WAS AN ACCOUNT IN THE NAME OF YOUR BROTHER AND

3   YOU AS A POWER OF ATTORNEY, CORRECT?

4   A.   YES.

5   Q.   DID YOUR BROTHER AUTHORIZE YOU TO MAKE THE PAYMENTS FOR

6   PROPERTIES THAT THE FAMILY OWNED?

7   A.   YES.

8   Q.   GOING BACK FOR ONE MOMENT TO EXHIBIT 1038.

9        ON 1038, THE FRONT PAGE, WERE IT INDICATES THE INTEREST

10   PAID FOR 2007, DO YOU KNOW WHO RECEIVED THE STATEMENT OF

11   INTEREST?

12   A.   WHO RECEIVED IT?

13   Q.   YES.

14   A.   IT WAS MAILED TO THE SPERRY LANE HOUSE.

15   Q.   TO YOUR HOME?

16   A.   YES.

17   Q.   AND DID YOU GET A STATEMENT, A 1099 FORM THAT INDICATED

18   THE INTEREST AMOUNT?

19   A.   YES.

20   Q.   AND THIS WAS WITH THE PERMISSION OF YOUR BROTHER THAT YOU

21   RECEIVED THESE STATEMENTS?

22   A.   YES.

23   Q.   DIRECTING YOUR ATTENTION TO EXHIBIT 1039.  -- I'M NOT SURE

24   IF I MOVED THE LAST EXHIBIT IN.

25        1038.

1        THE COURT:  YES, 1038 HAS BEEN ADMITTED.

2    BY MS. POLLOCK:

3    Q.   DO YOU RECOGNIZE EXHIBIT 1039?

4    A.   YES.

5    Q.   AND ONCE AGAIN, WHAT IS THIS?

6    A.   JUST NOW WE SAW THIS, RIGHT?

7    Q.   OH, I'M SORRY.  LET ME REFER YOU -- EXCUSE ME -- TO THE

8    LAST PAGE OF THIS DOCUMENT.  IT'S A LITTLE HARD TO READ, BUT

9    CAN YOU SEE WHO THIS CHECK IS MADE OUT TO?

10   A.   IT WAS ISSUED TO A PAINTING COMPANY.

11   Q.   OKAY.  CAN YOU READ WHAT IS IN THE MEMORANDUM SECTION?

12   A.   IT WAS RHODE ISLAND STREET, SECOND FLOOR.  IT WAS A

13   PAYMENT TO THE PAINTING DONE ON THE SECOND FLOOR.

14   Q.   OKAY.  AND WHAT IS THE AMOUNT OF THAT CHECK?

15   A.   $4,300.

16   Q.   OKAY.  NOW WHAT WAS RHODE ISLAND?

17   A.   IT WAS AN INVESTMENT BY THE FAMILY.

18   Q.   AND DO YOU RECALL WHOSE NAME THAT WAS IN?

19   A.   IT WAS UNDER MY NAME.  IT IS UNDER MY NAME.

20   Q.   REFERRING TO WHAT'S NOW MARKED AS EXHIBIT 1040, CAN YOU

21   PLEASE TAKE A LOOK AT THAT.  DO YOU RECOGNIZE THIS?

22   A.   YES.

23   Q.   IS IT ONCE AGAIN FROM THE METRO UNITED ACCOUNT THAT YOU

24   WERE THE POA FOR YOUR BROTHER?

25   A.   YES.

```
1    Q.  AND REFERRING TO THE CHECKS ON PAGE 2, IS THAT YOUR

2    WRITING AND SIGNATURE ON THOSE CHECKS?

3    A.  YES.

4         MS. POLLOCK:  YOUR HONOR, I WOULD MOVE THIS EXHIBIT

5    INTO EVIDENCE.

6         AND COUNSEL, IT'S 8980 AND 8982.

7         MR. MAGNANI:  80 TO 82?

8         MS. POLLOCK:  8980 TO 8982.

9         THE COURT:  IT WILL BE ADMITTED.

10        (DEFENDANT'S EXHIBIT 1040 WAS ADMITTED INTO EVIDENCE.)

11   BY MS. POLLOCK:

12   Q.  MEILI, ONCE AGAIN, DO YOU SEE YOUR NAME AND YOUR BROTHER'S

13   NAME ON THIS ACCOUNT FOR METRO UNITED BANK?

14   A.  YES.

15   Q.  WHAT IS INDICATED AS THE AVERAGE BALANCE OF THIS ACCOUNT?

16   A.  $50,960.39.

17   Q.  AND THE DATE OF THIS ACCOUNT?

18   A.  AUGUST 31ST, 2007.

19   Q.  THE STATEMENT IS DATED AUGUST 31ST?

20   A.  YES.

21   Q.  NOW DIRECTING YOUR ATTENTION TO THE NEXT PAGE WHICH

22   INDICATES -- SHOWS CHECK NUMBER 121.  DO YOU RECOGNIZE THIS

23   CHECK?

24   A.  YES.

25   Q.  AND WHO IS THE CHECK MADE OUT TO?
```

DIRECT EXAM BY MS. POLLOCK

1    A.   ABN, AMRO MORTGAGE.

2    Q.   AND THE DATE ON THIS CHECK?

3    A.   AUGUST 7, '07.

4    Q.   AND ON THE BOTTOM LEFT-HAND CORNER WHERE THE MEMO IS, WHAT

5    IS INDICATED THAT IT'S FOR?

6    A.   ST. REGIS.

7    Q.   WAS THIS THE MORTGAGE PAYMENT FOR THE MONTH OF AUGUST FOR

8    THE ST. REGIS CONDOMINIUM ON MINNA STREET?

9    A.   NOW I SEE IT MORE CLEARLY, IT WAS NOT $18,188.29.

10   INSTEAD, IT WAS $8,188.29.

11   Q.   OKAY.  WELL, IT APPEARS TO BE 8,000 WHERE IT SAYS TO THE

12   RIGHT OF THE NAME OF THE PAYEE.  THE ACTUAL AMOUNT WAS WRITTEN

13   AS $8,100?

14   A.   BUT ACTUALLY, IT WAS $8,180.29.

15   Q.   AND THAT WAS ALSO INDICATED ON THE STATEMENT, TOO?

16   A.   YES.

17   Q.   AND WAS THIS THE MONTHLY MORTGAGE FOR THE ST. REGIS

18   CONDOMINIUM ON MINNA STREET?

19   A.   YES.

20   Q.   AND THAT WAS A CHECK THAT YOUR BROTHER AUTHORIZED YOU TO

21   ISSUE ON HIS BEHALF?

22   A.   YES.

23   Q.   NOW FOR ANY TRANSFERS INTO THESE METRO BANK ACCOUNTS, DID

24   YOUR BROTHER TRANSFER MONEY IN?

25   A.   YES.

1    Q.   DID YOUR BROTHER TELL YOU WHEN MONEY WAS BEING TRANSFERRED

2    IN OR HOW WAS IT COMMUNICATED?

3    A.   BECAUSE EVERY DAY WHEN HE WAS ABOUT TO PURCHASE ANY

4    MERCHANDISE OR IF THERE WERE ANY TRANSACTIONS ON A PERSONAL

5    CAPACITY, HE WILL TALK WITH ME ON THE PHONE.

6    Q.   NOW, I'VE GONE THROUGH SOME OF THE ACCOUNTS THAT YOUR

7    FAMILY HAD HERE IN THE UNITED STATES.  WHY WERE SO MANY

8    ACCOUNTS, BANK ACCOUNTS OPENED?

9    A.   THE REASON FOR SO MANY BANK ACCOUNTS THAT WERE HAPPENING

10   IN THE UNITED STATES, WERE FOR MY MOTHER.  MY MOTHER USED TO

11   HAVE A LOT OF FRIENDS IN THE UNITED STATES THAT WERE WORKING IN

12   BANKS, AND THEN THEY WOULD ASK MY MOTHER TO GO TO THEIR BANK

13   AND OPEN A BANK ACCOUNT AND PUT IN SOME MONEY IN THEIR BANK

14   ACCOUNT SO THAT THEY HAVE FOR MORE PERFORMANCE.

15        AND MY MOTHER WAS VERY SOFT-HEARTED, SO WHENEVER SHE WAS

16   ASKED BY THE FRIENDS, THEN SHE WOULD DO THAT.  THEN I WOULD

17   TELL MY MOTHER, I SAID, THIS WILL BE VERY TROUBLESOME FOR ME,

18   AND MY MOTHER WOULD SAY, WELL, WE'RE FRIENDS, AND BECAUSE OF

19   OUR WORK RELATIONSHIP, WE NEED TO HELP THEM, WE NEED TO SUPPORT

20   THEM SO THAT THEY HAVE MORE PERFORMANCE.

21   Q.   MEANING THE BANK, THE PERSON WHO WORKED AT THE BANK WOULD

22   GET SOME CREDIT FOR OPENING A NEW ACCOUNT?

23   A.   YES, AND THEY WILL GET CREDITS, AND MAYBE THEY WILL GET

24   BONUS, I'M NOT TOO SURE.

25   Q.   NOW DID ANYONE OTHER THAN YOUR BROTHER DIRECT YOU TO MAKE

1    PAYMENTS ON THE RENTAL PROPERTIES THAT YOUR FAMILY OWNED?

2    A.   MY BROTHER HAS THAT POWER, AND THEN MY MOTHER TOO.

3    Q.   DID YOU HAVE TO DISCUSS EVERY CHECK THAT YOU WERE WRITING

4    WITH YOUR MOTHER AND YOUR BROTHER, OR WAS THERE A DOLLAR AMOUNT

5    THAT IF IT EXCEEDED, THEN YOU HAD TO GET THEIR PERMISSION?

6    A.   I KEEP ALL OF THE BANK STATEMENTS IN MY HOUSE IN VERY GOOD

7    ORDER.  SO WHENEVER THEY REQUEST TO VIEW THOSE, I WILL HAVE

8    THEM AVAILABLE.  BUT IF THE CHECK AMOUNTS EXCEEDED A CERTAIN

9    AMOUNT, THEN I WOULD TELL THEM.

10   Q.   DO YOU RECALL, AS YOU SIT HERE NOW, WHAT AN AMOUNT WOULD

11   HAVE BEEN FOR YOU TO SEEK AUTHORIZATION FROM YOUR FAMILY?

12   A.   APPROXIMATELY 30 TO $50,000, BECAUSE I WAS ON THE PHONE

13   WITH THEM EVERY DAY, SO IF I TALK ABOUT THIS, IT WILL SHOW MY

14   RESPECT TO THEM.

15   Q.   REGARDING YOUR HOME WITH YOUR MOTHER AND YOUR FAMILY ON

16   SPERRY LANE, DID YOUR FAMILY EVER HELP TO PAY THE MORTGAGE?

17   A.   YES.

18   Q.   WHY WAS THAT?

19   A.   BECAUSE MY MOTHER BELIEVES THE HOUSE ON SPERRY LANE IS OUR

20   BASE HERE.  SO WHENEVER A FAMILY MEMBER COME TO THE

21   UNITED STATES FOR VISIT, THEY WILL LIVE HERE.

22   Q.   AND IS THAT WHY THE FAMILY WOULD PAY FOR THE MORTGAGE ON

23   OCCASION?

24   A.   YES, BECAUSE HALF OF THE OWNERSHIP BELONGED TO MY MOTHER.

25   Q.   NOW OF THE CHECK STATEMENTS THAT I DISCUSSED WITH YOU FOR

DIRECT EXAM BY MS. POLLOCK

1    METRO BANK, WHERE DID YOU KEEP THOSE STATEMENTS?

2    A.   IN THE OFFICE INSIDE THE RESIDENCE ON SPERRY LANE.

3    Q.   DID YOU EVER TAKE THOSE STATEMENTS TO CHINA OR TO TAIWAN

4    WHEN YOU WENT ON VISITS TO SEE YOUR FAMILY?

5    A.   I WOULD MAKE A COPY.

6    Q.   AND WHEN YOUR FAMILY WOULD COME HERE, EITHER YOUR BROTHER

7    OR YOUR PARENTS, WOULD YOU SHOW THEM THE ACTUAL BANK

8    STATEMENTS?

9    A.   YES.

10        MS. POLLOCK:  YOUR HONOR, IF GOVERNMENT EXHIBIT 754

11   WOULD BE PLACED BEFORE MEILI.

12        THE CLERK:  WHAT EXHIBIT IS IT?

13        MS. POLLOCK:  754.

14        THE CLERK:  I DON'T HAVE AN ORIGINAL.  UNLESS IT'S

15   ONE OF --

16        MS. POLLOCK:  IT'S IN THE ACCORDION.

17   Q.   MEILI, DO YOU RECOGNIZE THOSE DOCUMENTS?

18   A.   YES.

19   Q.   WHAT ARE THEY?

20   A.   THOSE WERE BROUGHT FROM TAIWAN BY MY MOTHER, AND SHE

21   TAUGHT ME HOW TO MAKE RECORDS.

22   Q.   WHEN DID YOUR MOTHER BRING THOSE TO YOU?

23   A.   APPROXIMATELY IN 1998, 1999 OR '97.  HERE IT SAYS 1999, SO

24   I WOULD SAY IT WAS EITHER IN 1998 OR 1999.

25   Q.   DID YOUR MOTHER BRING YOU TWO SETS OF LEDGERS?

1    A.   WHEN SHE BROUGHT THE LEDGERS WITH HER, SHE BROUGHT TWO

2    BECAUSE SHE WAS AFRAID THAT I MIGHT MAKE MISTAKES ON ONE OF

3    THEM, SO THAT'S WHY SHE BROUGHT TWO.  SHE SAID THAT YOU CANNOT

4    BUY THESE HERE IN THE U.S.

5    Q.   OKAY.  AND WHAT INSTRUCTIONS DID YOUR MOTHER -- STRIKE

6    THAT.

7         WERE THE LEDGERS TOTALLY BLANK WHEN YOU GOT THEM?

8    A.   YEAH, THEY WERE ALL BLANK, BRAND-NEW.

9    Q.   OKAY.  HAD YOU EVER SEEN A DOCUMENT LIKE THIS BEFORE YOUR

10   MOTHER GAVE IT TO YOU?

11   A.   NO, I'VE NEVER SEEN ANYTHING LIKE THIS.  THE FIRST TIME I

12   SAW IT, IT GAVE ME A HEADACHE.

13   Q.   WHAT INSTRUCTIONS DID YOUR MOTHER GIVE YOU REGARDING THIS

14   LEDGER?

15   A.   SHE SAY YOU DON'T UNDERSTAND IT, THAT'S OKAY, BUT REPORT

16   IT LIKE YOU WOULD IN A DIARY.  REPORT THE AMOUNT THAT YOU HAVE

17   RECEIVED AND REPORT THE AMOUNT THAT YOU HAVE PAID.  JUST LIKE

18   THAT.

19   Q.   DID SHE SHOW YOU HOW TO ENTER -- MAKE ENTRIES IN THIS

20   DOCUMENT?

21   A.   SHE TAUGHT ME THAT IN THE BEGINNING.  I WOULD FIRST WRITE

22   DOWN WHAT PURPOSE THAT MONEY WAS FOR, AND THEN BASICALLY MAKE A

23   CLEAR RECORD OF HOW MUCH MONEY WAS RECEIVED AND HOW MUCH MONEY

24   WENT OUT.

25        I'M ALSO TO MAKE A CLEAR RECORD OF THE MONEYS THAT HAD

1    GONE OUT. AND IF THERE'S ANYTHING THAT I DON'T UNDERSTAND, I

2    CAN CALL HER AT ANY TIME.

3    Q.   OKAY. AND DID YOU CALL YOUR MOTHER MANY TIMES TO DISCUSS

4    HOW YOU WERE ENTERING ITEMS IN THIS?

5    A.   IN THE BEGINNING, IT WAS VERY FREQUENT.

6    Q.   OKAY. YOU SAID THAT IT GAVE YOU A HEADACHE. WHY DID IT

7    GIVE YOU A HEADACHE?

8    A.   BECAUSE I REALLY DID NOT WANT TO DO THESE THINGS.

9    Q.   NOW REFERRING TO PAGE 2, WHAT IS THE FIRST COLUMN SUPPOSED

10   TO BE WHERE WE SEE 3'S REPEATED?

11   A.   WHERE?

12   Q.   ON THE FAR LEFT COLUMN WHERE IT SAYS 3'S?

13   A.   MARCH. THAT'S THE DATE -- THE MONTH.

14   Q.   THE MONTH. OKAY. AND THE DATE NEXT TO IT, THE SECOND

15   COLUMN, WHAT DOES THAT REFER TO?

16   A.   DAY.

17   Q.   SO WHERE IT GOES, I DON'T WANT TO MARK THIS TOO MUCH, 12,

18   15, 16, 18, THOSE ARE THE DATES OF MARCH?

19   A.   YES.

20   Q.   AND WHAT WOULD YOU PUT IN THE COLUMN RIGHT NEXT TO THAT,

21   THE THIRD COLUMN?

22   A.   WHERE, WHICH DATE DO YOU HAVE IN MIND?

23   Q.   I'M SORRY, GO DOWN TO MARCH 15TH. CAN YOU STILL SEE THAT

24   AFTER MY MARK?

25   A.   I CAN SEE IT. SO ON MARCH 15TH, IT'S WRITTEN RU, WHICH IS

1     A CHARACTER, IT REPRESENTS MY SISTER, MEI-RU LIN, AND HER GAS,

2     AND THEN THE EXPENDITURE.

3     Q.   AND LET ME STOP YOU FOR A MOMENT.

4     A.   $29.35.

5     Q.   LET ME STOP YOU FOR A SECOND AND START ALL OVER.

6          WHERE IT SAYS MARCH 24TH, MINKIN.

7     A.   YES.

8     Q.   OKAY.  THERE'S NOTHING WRITTEN ON THE THIRD COLUMN, IS

9     THERE A REASON WHY?

10    A.   BECAUSE I HAD WRITTEN DOWN THE CONTAINER NUMBER.  SO NO, I

11    DIDN'T NEED TO WRITE DOWN ANYTHING IN THAT BOX.

12    Q.   OKAY.  AND IN THE BOX NEXT TO MINKIN, WHAT DO THOSE

13    LETTERS AND NUMBERS STAND FOR?

14    A.   3-15, YOH, IT'S A NAME OF A TYPE OF WIRE.

15    Q.   AND WHEN YOU GO FURTHER OVER, THERE'S A NUMBER 382.  WHAT

16    DOES THAT INDICATE?

17    A.   WHERE?  OH.

18    Q.   DIRECTLY OVER FROM MINKIN.

19    A.   FOR THAT CONTAINER, THE AMOUNT THAT WAS SPENT, $13,382.

20    Q.   WAS IT YOUR MOTHER'S INSTRUCTIONS THAT YOU SHOULD PUT THE

21    MONTH, THE DATE, THEN WHOMEVER YOU HAD DEALT WITH AND WHAT THE

22    ACTUAL PRICE WAS?

23    A.   YES.

24    Q.   WAS THERE OTHER INFORMATION THAT YOUR MOTHER DIRECTED YOU

25    TO PUT IN THIS LEDGER?

DIRECT EXAM BY MS. POLLOCK

1    A.   SHE SAID THE BOXES MAY NOT BE THAT LARGE, BUT DO YOUR

2    BEST, WHATEVER YOU CAN SQUEEZE IN, IN TO WRITING INSIDE THOSE

3    BOXES, JUST DO YOUR BEST AND PUT IT IN.

4    Q.   HOW OFTEN DID YOU MAKE ENTRIES INTO THIS LEDGER?

5    A.   WHEN I'M NOT BUSY, I WOULD MAKE A RECORD IN THERE EVERY

6    DAY.  SOMETIMES WHEN I'M BUSY WITH THE CHILDREN, THEN I WILL

7    MAKE A RECORD IN IT MAYBE EVERY THREE TO FOUR, OR FOUR TO

8    FIVE DAYS.

9    Q.   OKAY.  HOW WOULD YOU -- IF YOU DELAYED ON ENTERING MATTERS

10   INTO THE LEDGER, HOW WOULD YOU REMEMBER?

11   A.   I HAD TOLD THIS TO MY MOM, AND THEN SHE SAID WELL, JUST

12   PUT DOWN THE APPROXIMATE DATE, THAT WILL BE FINE.

13   Q.   DID YOU REPORT ITEMS THAT WOULD GO INTO THE LEDGER EVERY

14   DAY TO YOUR MOTHER?

15   A.   IT'S IMPOSSIBLE TO DO IT EVERY DAY BECAUSE SHE WILL GET

16   FRUSTRATED IF SHE HAD TO LISTEN TO THIS EVERY DAY.

17   Q.   DID THAT HAPPEN ON OCCASION?

18   A.   YES, BECAUSE IN THE PAST, WHEN I WAS WITH HER ON THE

19   PHONE, I WOULD TELL HER ITEM BY ITEM IN THE LEDGER.  AND THEN

20   SHE WOULD TELL ME, NOW TELL ME MORE ABOUT MY GRANDCHILDREN.

21        SHE SAID SINCE YOU ALREADY HAVE MADE A RECORD OF THIS IN

22   THE LEDGER, I CAN JUST LOOK AT IT MAYBE AFTER A MONTH OR TWO

23   AND THAT WOULD BE FINE.

24   Q.   WOULD YOU EVER FAX PAGES OF THE LEDGER TO YOUR MOTHER?

25   A.   YES.

1    Q.   WOULD YOU EVER SEND ANY PAGES OF THE LEDGER BY E-MAIL TO

2    YOUR MOTHER?

3    A.   MY MOM DID NOT KNOW HOW TO USE E-MAIL.

4    Q.   WERE YOU THE ONLY INDIVIDUAL WHO WROTE IN THIS LEDGER?

5    A.   YES, ONLY ME.

6    Q.   AND WHERE WAS THE LEDGER KEPT IN YOUR HOME?

7    A.   I WOULD LEAVE IT IN THE OFFICE.  SOMETIMES I WOULD TAKE IT

8    INTO MY BEDROOM.  I WOULD LIE ON THE BED AND MAKE A RECORD.

9    SOMETIMES WHEN I'M ON THE PHONE WITH MY MOM, I WOULD BE MAKING

10   A RECORD OF IT AT THE SAME TIME.

11   Q.   DID ANYONE ELSE HAVE ACCESS TO THIS LEDGER OTHER THAN WHEN

12   YOU WOULD SHOW IT TO YOUR FAMILY?

13   A.   NO, THEY CAN'T.

14   Q.   DID YOU KEEP IT LOCKED, OR HOW DID YOU KEEP IT SEPARATE?

15   A.   I PUT IT IN A DRAWER IN MY OFFICE.

16   Q.   AND THAT WAS YOUR DRAWER?

17   A.   YES.

18   Q.   DID YOUR MOTHER TELL YOU WHAT ITEMS WERE IMPORTANT TO

19   RECORD IN THE LEDGER?

20   A.   YES.

21   Q.   WHAT WERE THEY?

22   A.   WELL, IT'S HARD FOR ME TO LIST THEM FOR YOU ONE BY ONE.

23   BUT I CAN ONLY TELL YOU IS THAT WHATEVER SHE PROVED TO BE

24   IMPORTANT, SHE WOULD TELL ME ABOUT IT OVER THE PHONE.

25   Q.   AND WOULD THIS PERTAIN TO FAMILY INVESTMENTS, OR THE

1     PURCHASE OF SCRAP METAL, OR WHAT?

2     A.   SHE SAID EVERYTHING HAD TO BE RECORDED IN THE LEDGER.  SO

3     THAT WHEN SHE'S LOOKING IT OVER, IT WILL BE VERY EASY FOR HER

4     TO REVIEW EVERYTHING.

5     Q.   AND WHEN SHE SAID EVERYTHING HAD TO BE RECORDED, WHAT WAS

6     YOUR UNDERSTANDING OF WHAT EVERYTHING MEANT?  WAS IT MATTERS

7     PERTAINING TO YOUR MONEY, OR WHOSE MONEY?

8     A.   SHE HAD TOLD ME THAT THE MONEY THAT I HAD WITH MY HUSBAND,

9     THAT MONEY DOES NOT BELONG IN THE BOOK.  THIS LEDGER IS ONLY

10    FOR THE MONEY THAT BELONGS TO THE FAMILY.

11         SO IT BELONGS TO MY PARENTS, MY OLDER BROTHER, AND ONE OF

12    MY OLDER SISTERS.  SO IT'S -- YEAH, MY OLDER SISTER, IT'S THEIR

13    MONEY, BECAUSE THAT SISTER, OLDER SISTER OF MINE, SHE ALSO HAS

14    AN INVESTMENT IN THE U.S.  SHE HAS A HOUSE IN NEW YORK.

15    Q.   AND IS THAT OLDER SISTER MEI-RU?

16    A.   YES.

17    Q.   NOW REFERRING TO YOUR LEDGER, WHICH IS IN FRONT OF YOU, ON

18    PAGE, I BELIEVE 44, DO YOU SEE AN ENTRY FOR THE DATE OF 5-5?

19    A.   WHICH YEAR?

20    Q.   IT SHOULD HAVE A BATES NUMBER ON THE VERY FRONT.  DOES IT?

21         MS. POLLOCK:  MAY I APPROACH, YOUR HONOR?

22         THE COURT:  YES.

23    BY MS. POLLOCK:

24    Q.   MEILI, YOU HAVE TWO LEDGERS IN FRONT OF YOU, WHAT YEARS

25    DOES THE FIRST LEDGER COVER?

DIRECT EXAM BY MS. POLLOCK

1    A.   IT STARTS WITH MARCH 1999.

2    Q.   AND WHAT'S THE ENDING DATE OF THE FIRST LEDGER?

3    A.   MARCH OF 2002.

4    Q.   OKAY.  AND THE SECOND LEDGER, WHAT DATES DOES THAT COVER?

5    A.   STARTS FROM MARCH 11, 2002, UNTIL 2009.  ALSO, IT HAS SOME

6    OF THE ENTRIES FOR 2011.

7    Q.   OKAY.

8    A.   I'M NOT SURE, BECAUSE RIGHT HERE IT SAYS 2009, BUT THE

9    LAST PAGE HERE, THERE'S NO YEAR INDICATED.

10   Q.   OKAY.  LOOKING AT, I BELIEVE IT WAS THE FIRST LEDGER,

11   PAGE 44, THAT HAS DATES OF MAY 5TH.

12   A.   ARE YOU TALKING ABOUT THE FIRST LEDGER?

13   Q.   CORRECT.  WHEN I WAS STANDING THERE.

14   A.   OKAY.

15   Q.   DO YOU SEE HOW YOU RECORDED PURCHASES FROM VENDORS?

16   A.   YES, I SEE IT.

17   Q.   AND HOW WERE THESE RECORDED?

18   A.   I WOULD WRITE THE VENDOR'S NAMES IN THE FOURTH COLUMN.

19   Q.   OKAY.

20        MS. POLLOCK:  MAY I APPROACH, YOUR HONOR?

21        THE COURT:  YES.

22   Q.   SHOWING YOU PART OF THE LEDGER THAT IS JULY 17TH.  DO YOU

23   SEE THAT ON THE VERY TOP?

24   A.   YES, I SEE IT.

25   Q.   UNDER WHERE IT SAYS "OMNI" ON THE THIRD ENTRY DOWN, I'M

1    SORRY, JULY 5TH.

2    A.   YES, I SEE IT.

3    Q.   OKAY.  OMNI WAS WHAT TYPE OF A COMPANY?

4    A.   IT SPECIALIZES IN CABLES.  THEY ALSO HAVE A FACTORY.

5    Q.   NEXT TO THE DATE OF JULY 5TH AND THE NAME OMNI, WHAT IS

6    THIS INDICATION IN THE THIRD COLUMN?

7    A.   THE NAME OF, IT'S THE ABBREVIATION OF THE NAME OF THE

8    CABLE.

9    Q.   NOW, IF YOU GO DOWN TO JULY, THIS SECTION WHERE IT SAYS --

10   THERE ISN'T A DATE, I BELIEVE IT MIGHT BE JULY 12TH, AMERITECH.

11   DO YOU SEE WHAT I'M POINTING TO, MEILI, ON THE MONITOR, IT

12   SAYS --

13   A.   AMERITECH.  I SEE IT.  I SEE IT.

14   Q.   WHAT ARE THE NUMBERS 0718 REFER TO?

15   A.   IT'S BEEN TOO LONG, I DON'T REMEMBER.

16   Q.   WHERE WOULD YOU INDICATE HOW MANY LOADS YOU HAD RECEIVED?

17   LET ME DIRECT YOU INSTEAD TO PAGE 36, THE DATE OF MARCH 14TH.

18   A.   IT WILL BE AFTER THE DATE, YES, IT'S HERE, TWO CONTAINERS.

19   Q.   OKAY.  SO WHERE IT SAYS 3-14, AND THE NUMBER 2 IS RIGHT

20   NEXT TO IT.  WHAT DOES THE 2 REFER TO?

21   A.   TWO CONTAINERS.

22   Q.   AND IS THERE A CHINESE CHARACTER NEXT TO THE 2?

23   A.   YES, IT STANDS FOR "CONTAINER."

24   Q.   AND WHAT IS THE NAME OF THE COMPANY?

25   A.   THE ONE FOR THE TWO CONTAINERS?

1    Q.   THE NAME OF THE COMPANY THAT YOU PURCHASED FROM ON

2    MARCH 14TH, THE TWO CONTAINERS.

3    A.   LARIMIN.

4    Q.   NOW WHEN WOULD YOU RECORD THE TWO CONTAINERS, AT WHAT

5    POINT DURING THE TRANSACTION OF BUYING THE SCRAP METAL, WHEN

6    WOULD YOU RECORD THE TWO CONTAINERS?

7    A.   JUST WHEN I MADE THE PAYMENT, THE $30,000 SOMETHING, THEN

8    THAT'S WHEN I DID THE RECORDING.

9    Q.   OKAY.  AND THAT WAS WHEN YOU ACTUALLY SENT THE PAYMENT,

10   THE WIRE PAYMENT TO THE COMPANY?

11   A.   THIS COMPANY SHOULD HAVE BEEN -- WELL, YEAH, IT WAS AN

12   ELECTRONIC WIRE TRANSFER.  YEAH, IT WAS TOO LONG AGO, THOUGH.

13   YEAH, I THINK IT WAS AN ELECTRONIC WIRE TRANSFER.  I REMEMBER

14   THAT THIS COMPANY HAD BEEN DOING BUSINESS WITH MY FATHER FOR

15   OVER 20 YEARS.

16   Q.   OKAY.  BUT MY QUESTION TO YOU IS, WHEN WOULD YOU RECORD

17   HOW MUCH YOU PAID TO THE COMPANY?  WHEN YOU ACTUALLY SEALED THE

18   TRANSACTION AND SENT THEM THE WIRE, OR WHEN YOU ACTUALLY

19   RECEIVED THE CONTAINERS?  AT WHAT POINT WOULD THIS BE RECORDED?

20   A.   WHEN THEY SENT OUT THEIR INVOICE, THAT'S WHEN I MADE THE

21   RECORDING.

22   Q.   AND THEIR INVOICE WAS SENT AFTER YOU HAD SENT THEM THE

23   WIRED MONEY?

24   A.   AFTER THEY LOAD THE CONTAINERS, THEN THEY WOULD SEND US AN

25   INVOICE.

DIRECT EXAM BY MS. POLLOCK

1    Q.   OKAY.  SO YOU MADE THE PURCHASE BY WIRE, THEN THEY WOULD

2    LOAD THE CONTAINERS, AND THEN THEY WOULD SEND YOU AN INVOICE

3    THAT CONFIRMED THAT YOU HAD PURCHASED THE SCRAP?

4    A.   YES, BECAUSE THAT MONEY, THEY HAD NOT COLLECTED.

5    Q.   OKAY.  AND THEN THE SCRAP WOULD SLOWLY MAKE ITS WAY TO

6    CHINA?

7    A.   YES.

8    Q.   NOW JUST LOOKING BRIEFLY AT PAGE 36, THERE'S SEVERAL

9    ENTRIES DOWN HERE LIKE 3-6, AND IT SAYS OMNI.  IT APPEARS THE

10   WORD IS JELLY.  DOES THAT REFER TO A PURCHASE?

11   A.   JELLY IS ALSO THE NAME OF A CABLE.

12   Q.   OKAY.  DOES IT INDICATE HOW MUCH CABLE YOU HAD PURCHASED

13   THEN?

14   A.   IT'S VERY CLEAR FROM HERE THAT IN MARCH, FOR THE JELLY

15   ALONE, IT'S BETWEEN SIX TO SEVEN CONTAINERS.

16   Q.   AND IS BASICALLY, THIS IS A -- THIS RECORDING, AND I WAS

17   JUST REFERRING TO ONE DATE, IS WHAT YOU DID FOR A PERIOD OF

18   FROM 1999 THROUGH AT LEAST 2009 FOR YOUR PARENTS?

19   A.   YES.

20   Q.   AND ONE OF THE PRIMARY THINGS THAT YOU RECORDED IN THIS

21   LEDGER WAS RECORDS OF PAYMENTS TO SHIPPERS AND THE AMOUNT OF

22   CONTAINERS YOU WERE BUYING?

23   A.   WELL, THE AMOUNTS PAID TO THE SHIPPERS, I'M NOT LIABLE FOR

24   THAT AND THE SUPPLIER IS NOT LIABLE FOR THAT EITHER.  IT'S NOT

25   PAID BY THE SHIPPERS, IT'S PAID BY THE FREIGHT FORWARDER, IT'S

DIRECT EXAM BY MS. POLLOCK

1    A CUSTOM BROKER.  AND THEN THEY WOULD SEND ME THE INVOICE AND I

2    WOULD PAY THE INVOICE TO THE CUSTOM BROKER.

3    Q.   ARE YOU TALKING ABOUT THE SHIPPERS?

4    A.   LOGISTICS.

5    Q.   OKAY.  SO YOU HAD TO PAY THE SHIPPERS ALSO ONCE YOU GOT AN

6    INVOICE?

7    A.   YES.  AND THEN THEY WOULD MAKE ARRANGEMENTS WITH THE

8    SHIPPER ABOUT WHEN TO SHIP IT, THINGS LIKE THAT.

9    Q.   OKAY.

10             MS. POLLOCK:  I WAS GOING TO GO TO ANOTHER EXHIBIT.

11             THE COURT:  THIS WOULD BE A GOOD TIME FOR A BREAK

12   THEN.

13             MS. POLLOCK:  YES.

14             THE COURT:  OKAY.  LET'S TAKE OUR BREAK.  LET'S COME

15   BACK AT 3:15.

16        (RECESS FROM 2:56 P.M. UNTIL 3:16 P.M.)

17             THE COURT:  WE ARE BACK ON THE RECORD.  ALL COUNSEL

18   AND PARTIES ARE PRESENT AND ALL OF OUR JURORS ARE HERE.

19        MS. POLLOCK, YOU MAY CONTINUE.

20             MS. POLLOCK:  OKAY.

21   Q.   MEILI, COULD YOU PLEASE REFER TO EXHIBIT 1044 THAT IS

22   BEFORE YOU.  DO YOU RECOGNIZE THIS DOCUMENT?

23   A.   YES.

24   Q.   AND WHAT IS IT?

25   A.   THIS WAS A REPORT FROM THE METRO UNITED BANK AS A RESULT

1    OF MY REQUEST, AND I ASKED THEM TO LIST ALL OF THE BANK

2    ACCOUNTS FROM THIS BANK AND THE BALANCE AND EVERYTHING, AND ALL

3    OF THE DETAILS.  SO THEY PROVIDED THIS ONE, AND THEN I SENT

4    THIS TO MY ELDER BROTHER FOR REVIEW.

5    Q.   OKAY.  MY QUESTION IS, DO YOU SEE YOUR NAME ANYWHERE ON

6    THIS DOCUMENT?

7    A.   ACCOUNT NAME, THE FIRST ONE, ON THE TOP LINE, THAT'S MY

8    NAME AND MY HUSBAND'S NAME.

9    Q.   OKAY.  DIRECTING YOUR ATTENTION TO THE BOTTOM PORTION,

10   LEFT SIDE OF THIS DOCUMENT.  IS YOUR NAME MENTIONED ANYWHERE

11   THERE IN THE CHINESE CHARACTERS?

12   A.   NO.

13   Q.   DO YOU SEE ANY TELEPHONE NUMBERS THAT YOU RECOGNIZE ON

14   THIS DOCUMENT?

15   A.   YES, AND THIS ONE WAS FAXED TO MY HOUSE.  THAT WAS MY

16   HOUSE FAX NUMBER.

17   Q.   OKAY.  AND DO YOU SEE A DATE ON THIS DOCUMENT?

18   A.   YES.  JUNE 21ST 2007.

19   Q.   OKAY.  IS ANY OF THE WRITING AT THE BOTTOM PORTION YOUR

20   HANDWRITING?

21   A.   YES, THAT WAS MY HANDWRITING.

22   Q.   IS YOUR HANDWRITING THE DATES?

23   A.   I WROTE REPORTS TO PING KUANG --

24        MR. MAGNANI:  OBJECTION.  READING FROM THE DOCUMENT.

25   HEARSAY.

DIRECT EXAM BY MS. POLLOCK

```
 1              THE COURT:  THANK YOU.

 2          PLEASE DON'T READ FROM THE DOCUMENT.

 3     BY MS. POLLOCK:

 4     Q.   DO YOU RECOGNIZE ANY OF THE WRITING, DO YOU RECOGNIZE ANY

 5     OF THE WRITING ON THE BOTTOM PORTION?

 6     A.   IT WAS MY HANDWRITING.

 7     Q.   OKAY.

 8              MS. POLLOCK:  YOUR HONOR, I WOULD MOVE EXHIBIT 1044

 9     INTO EVIDENCE.

10              THE COURT:  OBJECTION?

11              MR. MAGNANI:  YES, YOUR HONOR.  ON HEARSAY GROUNDS.

12              THE COURT:  I DON'T SEE ANY AUTHENTICATION OF THIS

13     DOCUMENT.  I'M NOT PREPARED TO ADMIT IT AT THIS TIME.

14              MS. POLLOCK:  ALL RIGHT.  I WILL GO BACK TO IT LATER.

15              THE COURT:  OKAY.

16     BY MS. POLLOCK:

17     Q.   MEILI, I WOULD LIKE TO TALK TO YOU FOR A PERIOD OF TIME

18     ABOUT SOME OF THE PROPERTIES THAT YOUR FAMILY INVESTED IN HERE

19     IN THE UNITED STATES IN CALIFORNIA.

20          WE'VE ALREADY HEARD ABOUT INVESTMENTS IN NEW YORK CITY ON

21     INGRAM AND CLYDE AND THEN IN NEW JERSEY.

22     A.   THE ONE IN NEW JERSEY IS MINE.

23     Q.   CORRECT.  NO, I'M JUST SAYING, WE'VE TALKED ABOUT SOME OF

24     THE PROPERTIES BACK EAST.  I WOULD NOW LIKE TO TALK TO YOU

25     ABOUT THE PROPERTIES OUT HERE IN CALIFORNIA.
```

1          ONCE YOU MOVED OUT TO CALIFORNIA IN APRIL OF 2004, WHOSE

2     DECISION WAS IT THAT YOU SHOULD -- THE FAMILY SHOULD INVEST IN

3     ADDITIONAL PROPERTY HERE ON THE WEST COAST?

4     A.    MOTHER.

5     Q.    WERE YOU PART OF ANY DISCUSSION WITH THE FAMILY ABOUT

6     THEIR DESIRE TO INVEST IN PROPERTY OUT HERE?

7     A.    NO.

8     Q.    DO YOU KNOW WHY YOUR MOTHER WANTED TO INVEST IN PROPERTY

9     HERE IN CALIFORNIA?

10    A.    SHE TOLD ME THAT SHE HAD STARTED TO DO BUSINESS IN MINNAN

11    CHINA STARTING IN 1992.  IT WAS OVER TEN YEARS SINCE SHE DID

12    THAT AND SHE DIDN'T FEEL SAFE AT ALL.

13          SO IF I WERE TO MOVE TO CALIFORNIA, THEN I COULD ENJOY THE

14    GOOD WEATHER HERE, PLUS, CALIFORNIA IS MUCH CLOSER TO TAIWAN

15    AND CHINA.

16          SO AFTER SHE RETIRED THEN SHE WOULD MOVE HERE ALSO.  SO

17    SHE PERSUADED ME TO MOVE TO CALIFORNIA BECAUSE I WANTED TO STAY

18    IN NEW JERSEY.

19    Q.    WAS THERE A REASON WHY THE FAMILY DECIDED TO INVEST IN

20    PROPERTY ON THE WEST COAST, OTHER THAN THE FACT YOU WERE LIVING

21    HERE?

22    A.    BECAUSE THEY HAD BEEN DOING BUSINESS IN CHINA FOR OVER TEN

23    YEARS.  THEY HAD A PLAN TO DO SOMETHING ELSE.  SO THEY ALSO

24    THINK THE WEATHER IN CALIFORNIA REALLY WONDERFUL.  THEY SAID IF

25    I WERE WILLING TO MOVE TO CALIFORNIA AND THEN THEY WILL COME

1    OVER HERE TO MAKE SOME INVESTMENTS.

2    Q.   DO YOU HAVE ANY PERSONAL KNOWLEDGE AS TO WHY YOUR FAMILY

3    DID NOT INVEST IN PROPERTY IN CHINA AND INSTEAD INVESTED HERE

4    IN CALIFORNIA?

5    A.   IN MAINLAND CHINA, THERE WERE QUITE A FEW ALREADY.  AND

6    THEN AS NEXT STEP THEY THINK THAT IT WILL BE BETTER TO COME

7    OVER TO THE UNITED STATES TO MAKE SOME INVESTMENT HERE.

8    Q.   OTHER THAN THE FACT THAT YOU HAD A HOME HERE AND THE

9    WEATHER WAS BETTER HERE THAN IN CHINA, DO YOU HAVE ANY PERSONAL

10   KNOWLEDGE AS TO WHY THE FAMILY DECIDED TO INVEST MONEY HERE IN

11   PROPERTY IN THE UNITED STATES?

12   A.   IT WAS MAINLY BECAUSE MY FATHER, MY PARENTS' EXPERIENCE.

13   MY PARENTS EXPERIENCED THE WORLD WAR II, AND MY FATHER'S FAMILY

14   BROKE, ALL OF THE UNCLES WERE AGAINST EACH OTHER BECAUSE OF

15   MONEY.  SO MY FATHER HAD BEEN LIVING IN POOR CONDITIONS, AND HE

16   WORKED REALLY HARD TO STRIVE FOR A BETTER LIFE.

17        AND THEN HE THOUGHT CHINA AND TAIWAN WERE IN ADVERSARIAL

18   CONDITIONS FOR A LONG TIME.  SO HE NEVER FELT IT'S SAFER TO BE

19   IN MAINLAND CHINA.

20   Q.   AND YOU ARE TALKING ABOUT THE -- THE HE YOU ARE REFERRING

21   TO IS YOUR FATHER?

22   A.   YES, THAT'S WHAT WORRIED MY FATHER.  AND HE DID NOT FEEL

23   SAFE TO BE IN MAINLAND CHINA, AND HE WANTED HIS GRANDCHILDREN

24   TO GO TO SCHOOL AND TO FURTHER DEVELOP.

25   Q.   WAS THERE A REASON -- SINCE YOUR PARENTS WERE TAIWANESE

DIRECT EXAM BY MS. POLLOCK

1    CITIZENS RESIDING IN CHINA, WAS THERE ANY OTHER REASON WHY THEY

2    WANTED TO INVEST HERE IN THE UNITED STATES?

3    A.   BECAUSE FOR LONG TIME, TAIWAN IS NOT RECOGNIZED AS AN

4    INDEPENDENT COUNTRY.

5    Q.   BY WHICH COUNTRY?

6    A.   NOT RECOGNIZED BY A LOT OF COUNTRIES.

7    Q.   IS IT RECOGNIZED BY CHINA?

8    A.   CHINA DOESN'T RECOGNIZE TAIWAN AS A COUNTRY.  CHINA THINKS

9    THAT TAIWAN IS A PART OF CHINA.

10   Q.   DID YOUR PARENTS EXPRESS ANY CONCERN TO YOU ABOUT THE

11   CHINESE GOVERNMENT AS A REASON WHY THEY WANTED TO INVEST HERE

12   IN THE UNITED STATES?

13   A.   ASK THE QUESTION AGAIN, PLEASE.

14   Q.   DID YOUR PARENTS EXPRESS TO YOU ANY CONCERN ABOUT THE

15   CHINESE GOVERNMENT AS A REASON WHY THEY WANTED TO INVEST HERE

16   IN THE UNITED STATES?

17   A.   HE TOLD ME THAT EVER SINCE THEY HAD BEEN TO CHINA, THE

18   POLICIES HAVE BEEN CHANGING ALL THE TIME.

19   Q.   YOU ARE TALKING ABOUT YOUR FATHER?

20   A.   MY FATHER AND MY MOTHER, BOTH OF THEM.

21   Q.   AND WAS THERE CONCERN ABOUT THE CHINESE GOVERNMENT, THAT

22   MADE THEM WANT TO INVEST HERE IN THE UNITED STATES?

23        MR. MAGNANI:  OBJECTION.  ASKED AND ANSWERED.

24        THE COURT:  SUSTAINED.  LET'S MOVE ON.

25   BY MS. POLLOCK:

1    Q.   WE HEARD ABOUT THE PURCHASE OF THE ST. REGIS CONDOMINIUM

2    ON FRIDAY BY YOUR BROTHER.  DID ANY OF YOUR FAMILY MEMBERS LOOK

3    AT THAT CONDOMINIUM BEFORE IT WAS ACTUALLY PURCHASED?

4    A.   BOTH MY PARENTS AND MY BROTHER WENT BECAUSE THAT WAS A

5    PRESALE.  THE BUILDING TOOK OVER ONE YEAR.

6    Q.   TO BUILD?

7    A.   YES, I WOULD SAY THE CONSTRUCTION TOOK OVER ONE YEAR OR

8    ALMOST TWO YEARS.

9    Q.   SO ALL THREE OF THEM CAME, DID ALL THREE OF THEM COME

10   TOGETHER TO LOOK AT WHAT WAS BEING PLANNED AT THE 188 MINNA?

11   A.   NO, THEY CAME HERE IN TURNS.

12   Q.   OKAY.  DID YOUR PARENTS COME AT ONE POINT BEFORE THE

13   FAMILY DECIDED TO BUY MINNA?

14   A.   MY ELDER BROTHER LOVED IT, BUT HE WASN'T ABLE TO DECIDE.

15   AND THEN MY PARENTS CAME.

16   Q.   AND AFTER YOUR PARENTS SAW IT, WAS THERE A DECISION BY

17   YOUR PARENTS AND YOUR BROTHER THAT THEY WANTED TO BUY IT?

18   A.   YES, THEY MADE A DECISION TOGETHER.

19   Q.   WHOSE NAME WAS THE TITLE TO THE PROPERTY PUT IN?

20   A.   MY NAME.

21   Q.   AND WHO DID THE -- WAS A REFINANCE OF THE PROPERTY AT

22   MINNA EVER DONE?

23   A.   YES.

24   Q.   OKAY.  IF YOU COULD LOOK AT EXHIBIT 1011 FOR

25   IDENTIFICATION.  DO YOU RECOGNIZE THAT DOCUMENT?

```
1    A.   THIS WAS THE ONE DAY, ALL OF THE SUDDEN, MY ELDER BROTHER

2    FAXED THIS TO ME.

3    Q.   DO YOU RECOGNIZE IT?

4    A.   YES.

5    Q.   HOW DO YOU RECOGNIZE IT?

6    A.   IT HAS MY NAME.

7    Q.   AND IS THERE A REFERENCE ON THE MEMO SECTION TO WHAT IT

8    PERTAINS TO?

9    A.   THIS IS A CERTIFICATE OF DEPOSIT BALANCE.

10              MS. POLLOCK:  CAN I APPROACH, YOUR HONOR?

11              THE COURT:  YOU'VE GOT THE WRONG DOCUMENT.

12              MS. POLLOCK:  YEAH, I THINK SO.

13              THE COURT:  ALL RIGHT.  DO I NEED TO STRIKE THE

14   TESTIMONY?

15              MS. POLLOCK:  I'M SORRY, YOUR HONOR, YES.

16              THE COURT:  ALL THE TESTIMONY REGARDING EXHIBIT 1011

17   WILL BE STRICKEN.  THE WITNESS HAD THE WRONG DOCUMENT.

18         ALL RIGHT.  LET'S TRY AGAIN.

19              MS. POLLOCK:  OKAY.

20   Q.   MEILI, LOOKING AT EXHIBIT 1011.  DO YOU RECOGNIZE THIS

21   DOCUMENT?

22   A.   YES.

23   Q.   AND HOW DO YOU RECOGNIZE IT?

24   A.   MY SIGNATURE.

25   Q.   OKAY.  AND IS THERE A REFERENCE ON THE MEMO PORTION OF
```

1     THIS AS TO WHAT IT PERTAINS TO?

2     A.   IT WAS THE PROPERTY IN ST. REGIS THAT NEEDS A REFINANCE.

3             MS. POLLOCK:  YOUR HONOR, I WOULD MOVE EXHIBIT 1011

4     INTO EVIDENCE.

5             THE COURT:  ANY OBJECTION?

6             MR. MAGNANI:  NO OBJECTION.

7             THE COURT:  IT WILL BE ADMITTED.

8        (DEFENDANT'S EXHIBIT 1011 WAS ADMITTED INTO EVIDENCE.)

9     BY MS. POLLOCK:

10    Q.   MEILI, DO YOU SEE THE DATE ON THIS CHECK NUMBER 103?

11    A.   YES.  MAY 5TH, 2006.

12    Q.   AND THE NAME IN THE UPPER LEFT-HAND CORNER, WHOSE CHECK

13    DID THIS COME FROM?

14    A.   PING KUANG LIN, MY BROTHER'S.

15    Q.   AND WHO IS IT MADE OUT TO?

16    A.   TO CHINATRUST BANK.

17    Q.   AND THE PURPOSE OF THIS CHECK WAS FOR WHAT?

18    A.   IT WAS FOR THE REFINANCE FOR THE PROPERTY AT ST. REGIS.

19    Q.   DID YOU TALK TO YOUR BROTHER ABOUT THIS CHECK BEFORE YOU

20    SIGNED IT?

21    A.   I THINK SO, BECAUSE THE AMOUNT WAS ABOVE $30,000.

22    Q.   WHAT DO YOU MEAN THE AMOUNTS WERE ABOUT $30,000?

23    A.   BECAUSE THIS WAS $60,000, IT WAS ABOVE $30,000.  BECAUSE

24    THE DOLLAR AMOUNT IS BIG, I HAD TO CONSULT WITH HIM BEFOREHAND.

25    Q.   OKAY.  AND IS IT FAIR TO SAY THAT ANYTHING OVER $30,000

1    YOU HAD TO TALK TO YOUR BROTHER ABOUT BEFORE YOU COULD WRITE A

2    CHECK?

3    A.   WELL, NOT ABSOLUTELY, SOMETIMES FOR DOLLAR AMOUNTS ABOVE

4    $10,000 OR $20,000, I WOULD CONSULT HIM AS WELL.

5    Q.   DID YOU HAVE ANY PERCENTAGE OF OWNERSHIP IN THIS PROPERTY?

6    A.   INITIALLY, I HAD 30 PERCENT, AND LATER IT WAS DOWN TO

7    20 PERCENT.

8    Q.   AND WHO WAS THE CO-OWNER -- YOU WERE ON TITLE AS THE SOLE

9    OWNER?

10   A.   YES.

11          MS. POLLOCK:  JONATHAN, IF EXHIBIT 244 COULD BE

12   PLACED -- PARTICULARLY PAGE 2 AND 4.

13   Q.   MEILI --

14   A.   THE FONT IS SO SMALL.

15   Q.   I REALIZE THAT.

16   MEILI, DO YOU SEE YOUR NAME WHERE THE -- RIGHT HERE.

17   A.   YES, RIGHT HERE.  YES.

18   Q.   CAN YOU JUST MAKE IT AS THE ONE DOCUMENT, BECAUSE WE ARE

19   LOSING PARTS OF IT.

20   NOW, YOU SEE YOUR NAME UP HERE AS THE BORROWER?

21   A.   YES.

22   Q.   AND DO YOU SEE ON THIS DOCUMENT -- CAN WE HAVE PAGE 1

23   ALSO.

24   NOW SHOWING YOU PAGE 1 OF THIS DOCUMENT, DOES IT INDICATE

25   WHICH PROPERTY THIS MORTGAGE APPLICATION IS FOR?

1      A.   YES, 188 MINNA STREET.

2      Q.   UNIT 32-B?

3      A.   YES.

4      Q.   AND THAT'S THE ST. REGIS?

5      A.   YES.

6      Q.   THIS WAS AN APPLICATION THAT YOU PUT DOWN, THAT YOU

7      PRESENTED IN ORDER TO QUALIFY FOR THE LOAN FOR MINNA STREET?

8      A.   WHAT INFORMATION?

9      Q.   WELL, OKAY.  ON PAGE 4 OF THIS EXHIBIT 244, DO YOU SEE

10     UNDER LIABILITIES ON THE RIGHT SIDE, IT LISTS BANK ACCOUNTS

11     THAT YOU HAVE?  LIABILITIES.

12     A.   YES.

13     Q.   MORTGAGES THAT YOU HAVE?

14     A.   YES, CORRECT.

15     Q.   AND ON THE LEFT SIDE OF THIS DOCUMENT, IT INDICATES BANK

16     ACCOUNTS?

17     A.   YES.

18     Q.   AND THEN THERE'S A SECTION DOWN HERE LABELED AUTOMOBILES.

19     DO YOU SEE THAT?  THIS DOCUMENT WAS DONE IN, I BELIEVE,

20     DECEMBER OF 2005; DO YOU RECALL THAT?

21     A.   YES, CORRECT.

22     Q.   AT THAT TIME, YOUR BROTHER'S FERRARI WAS AT YOUR HOME,

23     WASN'T IT?

24     A.   YES.

25     Q.   THERE'S NOTHING LISTED HERE UNDER AUTOMOBILES OWNED, IS

1     THERE?

2     A.   CORRECT.

3     Q.   IS THERE ANY REASON WHY THE FERRARI IS NOT LISTED THERE?

4     A.   I WANT TO SAY THAT WAS NOT MY VEHICLE.

5     Q.   AND IS THERE ANY REASON WHY THE ROLLS ROYCE IS NOT LISTED

6     THERE UNDER AUTOMOBILES OWNED?

7     A.   THAT WAS MY PARENT'S CAR.

8     Q.   OKAY.  THANK YOU.

9          THANK YOU, JONATHAN.

10    Q.   NOW WHOSE DECISION WAS IT TO SELL THE CONDOMINIUM AT

11    MINNA?

12    A.   IT WAS ALSO MY MOM'S DECISION.

13    Q.   DO YOU KNOW WHY SHE DECIDED TO SELL IT?

14    A.   SHE KNEW SOMETHING HAPPENED TO ME.

15    Q.   OKAY.  NOW, GOING TO THE ADDRESS OF 1446 TO 1448

16    RHODE ISLAND, WHERE WERE THE CONDOMINIUMS ON RHODE ISLAND, WHAT

17    PART OF THE CITY WERE THOSE LOCATED IN?

18    A.   IN SAN FRANCISCO.

19    Q.   HOW DID IT COME ABOUT THAT THE CONDOMINIUMS ON RHODE

20    ISLAND WERE PURCHASED?

21    A.   WELL, IT'S A THREE-FAMILY HOUSE, AND MY PARENTS REALLY

22    LIKED IT BECAUSE IT HAD LAND ON IT.

23    Q.   DID ANY OF YOUR FAMILY EVER COME OVER TO SEE THE PROPERTY

24    ON RHODE ISLAND BEFORE IT WAS PURCHASED?

25    A.   YES.

1    Q.   WHO WAS THAT?

2    A.   IT'S BEEN TOO LONG, I DON'T REMEMBER.

3    Q.   OKAY.  BUT SOMEONE FROM -- YOUR PARENTS OR YOUR BROTHER

4    DID COME TO SEE IT?

5    A.   YES.

6    Q.   WHOSE DECISION WAS IT TO BUY THAT PROPERTY?

7    A.   THE THREE OF THEM WOULD DISCUSS, AND IN THE END, THE

8    PERSON THAT MADE THE FINAL DECISION WAS STILL MY MOM.

9    Q.   AND WHAT WAS THE PURPOSE OF BUYING THE PROPERTY ON RHODE

10   ISLAND?

11   A.   SHE FELT THAT THE THREE-FAMILY HOUSE, IT COULD BE LEASED

12   OUT, BE GOOD FOR INVESTMENT.

13   Q.   AND WHOSE NAME WAS THE TITLE IN FOR RHODE ISLAND?

14   A.   MY NAME.

15   Q.   DO YOU KNOW WHO IS THE OWNER OF THAT PROPERTY NOW?

16   A.   60 PERCENT BELONGS TO MY OLDER BROTHER.  ORIGINALLY I HAVE

17   20 PERCENT.  NOW I HAVE 30 PERCENT AND MY FATHER HAS

18   10 PERCENT.

19        MS. POLLOCK:  JONATHAN, WOULD YOU PLEASE PLACE 244 ON

20   THE ELMO AGAIN, PLEASE.  COULD PAGE 3 BE PLACED.

21   Q.   COULD YOU SEE THAT OKAY, MEILI?

22   A.   I SEE IT.  THE PRINT IS KIND OF SMALL.

23        MS. POLLOCK:  JONATHAN, COULD THE UPPER PORTION BE

24   MADE A LITTLE LARGER.  THANK YOU.

25   Q.   MEILI, DID YOU DISCUSS THE LOAN APPLICATIONS FOR

1    PROPERTIES THAT WERE PURCHASED FOR YOUR FAMILY WITH YOUR

2    MOTHER?

3    A.   YES, SIR.

4    Q.   DID YOU ALSO DISCUSS THEM WITH YOUR BROTHER?

5    A.   YES.

6    Q.   DID YOU EVER SEND THEM COPIES OF WHAT A BLANK LOAN

7    APPLICATION LOOKED LIKE?

8    A.   I HAD SENT IT TO THEM, AND THEN THEY SAID THAT THE ENGLISH

9    THEY COULD NOT READ.  SO OVER THE PHONE, I WOULD TELL THAT

10   PERSON LINE BY LINE, ONE BY ONE.

11   Q.   OKAY.  DID YOU EVER DISCUSS WITH YOUR FAMILY WHAT YOUR

12   INCOME SHOULD BE?  DID YOU EVER DISCUSS WITH YOUR FAMILY WHAT

13   YOU SHOULD PUT AS YOUR GROSS MONTHLY INCOME WHERE YOU WERE

14   LISTED AS THE BORROWER?

15        THE INTERPRETER:  THE INTERPRETER NEEDS

16   CLARIFICATION.

17        THE WITNESS:  I SPOKE WITH MY MOTHER AND MY OLDER

18   BROTHER THAT I NEED TO APPLY FOR MORTGAGE.  I TOLD THEM THAT

19   THEY WANT TO BUY SO MANY PROPERTIES AND THAT WITH MY INCOME, I

20   COULD NOT APPLY FOR SO MANY LOANS.

21   Q.   OKAY.  DID YOU DISCUSS WITH YOUR BROTHER OR YOUR MOTHER,

22   WHAT AMOUNT TO PUT IN AS YOUR BASE EMPLOYMENT INCOME UNDER

23   BORROWER?

24   A.   I HAD DISCUSSED THIS WITH THEM AND MY MOTHER TOLD ME THAT

25   THIS IS FAMILY'S HOUSE AND THAT SHE WAS GOING TO HAVE A MEETING

1    WITH MY FATHER AND MY OLDER BROTHER, AND AFTER THEY HAD A

2    MEETING, SHE WOULD THEN TELL ME HOW MUCH INCOME I SHOULD WRITE

3    DOWN.

4    Q.   AND DID YOU SUBSEQUENTLY HEAR BACK FROM YOUR MOTHER ABOUT

5    WHAT YOU SHOULD PUT IN AS YOUR BASE EMPLOYMENT INCOME ON

6    THIS -- ON LOAN APPLICATIONS?

7    A.   YEAH, THIS WAS MY MOTHER'S RESPONSE.

8    Q.   AND DID YOUR MOTHER EXPLAIN TO YOU HOW SHE CAME UP WITH

9    THAT NUMBER?

10   A.   SHE SAID SHE REFERENCED HER AND THEN THE ACCOUNTING

11   DEPARTMENTS AND THE OLDER BROTHERS.

12   Q.   AND THIS WAS THE NUMBER OF 126,000 SHE GAVE YOU?

13   A.   IT'S ONLY 125,000, RIGHT, NOT 126, IT'S NOT REALLY CLEAR

14   HERE.

15   Q.   I THINK IT'S 125 UP HERE.  BUT IT LOOKS LIKE --

16   A.   125.  IF YOU LOOK AT THE NUMBER TO THE RIGHT, IT LOOKS

17   LIKE 125.

18   Q.   CORRECT.

19        DID YOU SUBSEQUENTLY TALK TO YOUR MOTHER ABOUT OTHER LOAN

20   APPLICATIONS AND WHAT MONEY YOU SHOULD PUT IN AS YOUR BASE

21   EMPLOYMENT INCOME?

22   A.   WELL, I EXPLAINED THIS TO MY MOM, AND THEN SHE SAID THIS

23   BELONGS TO THE FAMILY.  SO OF COURSE I HAD TO WRITE DOWN THE

24   ONE FOR THE FAMILY.

25   Q.   NOW YOU WERE LISTED AS THE BORROWER ON THIS APPLICATION AS

DIRECT EXAM BY MS. POLLOCK

1    WELL AS OTHER APPLICATIONS.  IS THERE ANY REASON WHY YOUR

2    FAMILY WAS NOT LISTED AS THE BORROWER?

3    A.   WRITE DOWN MY FAMILY?

4    Q.   IS THERE ANY REASON WHY YOU WERE LISTED AND NOT YOUR

5    FAMILY AS THE BORROWER ON THE LOAN APPLICATIONS?

6    A.   THEY BELIEVED THAT SINCE I WAS THE COMPANY'S BROKER, I WAS

7    ALSO THE FAMILY'S BROKER.  THAT WOULD BE MUCH EASIER IF I COULD

8    SIGN ON THEIR BEHALF.  IT WOULD BE MUCH EASIER FOR THEM THAT

9    WAY, LESS TROUBLESOME.

10   Q.   OKAY.  AND THEY WEREN'T PRESENT HERE IN THE UNITED STATES

11   TO SIGN AT AN ESCROW COMPANY?

12   A.   SO USING MY NAME AS THEIR REPRESENTATIVE AND SIGNING ON

13   THEIR BEHALF, THEY BELIEVED THAT THIS WOULD BE FINE, MUCH MORE

14   CONVENIENT FOR THEM.

15   Q.   OKAY.  NOW I WOULD LIKE TO REFER TO PROPERTY THAT WAS

16   PURCHASED IN NEW YORK AT 10824 71 STREET, APARTMENT 15D IN

17   FOREST HILLS, NEW YORK; DO YOU RECALL THAT PROPERTY?

18   A.   OH, THAT'S MY HOUSE.

19   Q.   OKAY.  WAS THAT A CONDOMINIUM THAT YOU PURCHASED?

20   A.   YES.

21   Q.   AND DO YOU RECALL IT BEING PURCHASED IN JULY OF 2006?

22   A.   2006?

23   Q.   2006.

24   A.   I REMEMBER IT WAS SUMMERTIME, BUT WHETHER OR NOT IT WAS

25   JULY, I DON'T REMEMBER.

DIRECT EXAM BY MS. POLLOCK

1    Q.   OKAY.  YOU WERE ALREADY LIVING OUT HERE ON SPERRY LANE IN

2    2006.  WHOSE IDEA WAS IT TO PURCHASE PROPERTY BACK IN FOREST

3    HILLS, NEW YORK?

4    A.   BECAUSE MY FAMILY AND I, WE HAD LIVED THERE A WHILE BACK.

5    AND THEN AT THAT TIME, IT JUST SO HAPPENED TO BE THAT A NEW

6    BUILDING WAS GOING TO BE BUILT AT FOREST HILLS.  SO MY MOM

7    SUGGESTED THAT INVESTING THERE WOULD BE A PRETTY GOOD IDEA.

8    Q.   AND HOW DID YOU LEARN ABOUT THIS NEW BUILDING COMING

9    ABOUT?

10   A.   MY MOTHER'S FRIEND INTRODUCED ME TO THAT IDEA.

11   Q.   OKAY.  AND WAS YOUR MOTHER'S FRIEND IN NEW YORK OR HERE IN

12   CALIFORNIA?

13   A.   IN NEW YORK.

14   Q.   YOUR MOTHER HAD BEEN COMING TO THE UNITED STATES FOR WELL

15   OVER 20 YEARS, CORRECT?

16        THE INTERPRETER:  MAY THE INTERPRETER HAVE THE

17   QUESTION AGAIN?

18   Q.   YOUR MOTHER HAD BEEN COMING TO THE UNITED STATES FOR WELL

19   OVER 20 YEARS, CORRECT?

20   A.   ABOUT THE SAME TIME THAT I STARTED COMING TO THE U.S.,

21   THAT'S WHEN SHE CAME.

22   Q.   OKAY.  BUT SHE HAD BEEN COMING BACK AND FORTH ONE OR TWO

23   TIMES A YEAR SINCE THE 90'S WHEN YOU WERE IN COLLEGE, CORRECT?

24   A.   YES.  EVER SINCE I BEGAN MY STUDIES HERE, SHE ENJOYED

25   VISITING.

DIRECT EXAM BY MS. POLLOCK

1    Q.   AND IS IT FAIR TO SAY THAT YOUR MOTHER BECAME FRIENDS WITH

2    PEOPLE IN NEW YORK?

3    A.   WELL, SOME OF THE FRIENDS SHE HAD KNOWN BACK IN TAIWAN AND

4    THEN THEY LATER IMMIGRATED TO NEW YORK.  AND SOME OF THE

5    FRIENDS SHE MET IN NEW YORK HERSELF.

6    Q.   OKAY.  AND WHEN YOU WERE LIVING IN NEW JERSEY, DID YOUR

7    PARENTS RESIDE WITH YOU WHEN THEY CAME TO VISIT?

8    A.   YES.

9    Q.   AND DID YOUR MOTHER BECOME ACQUAINTANCES WITH PEOPLE WHO

10   HAD EITHER MOVED TO THE UNITED STATES FROM TAIWAN OR WHO SHE

11   MET IN NEW JERSEY?

12   A.   YES.

13   Q.   AND WAS THIS ALSO TRUE WHEN YOU WERE LIVING -- WHEN SHE

14   MOVED INTO THE HOME ON SPERRY LANE AND YOUR MOTHER WAS STAYING

15   WITH YOU ONE OR TWO TIMES A YEAR, SHE WOULD MEET PEOPLE WHO HAD

16   EITHER IMMIGRATED HERE FROM TAIWAN OR SHE BECAME FRIENDLY WITH?

17   A.   WHEN I GOT HERE, SHE DID NOT HAVE AS MANY FRIENDS HERE AS

18   SHE DID IN NEW YORK.

19   Q.   I WOULD LIKE TO HAVE YOU LOOK AT EXHIBIT 1052.  ON 1052,

20   ARE YOU LOOKING AT A CHECK?

21   A.   YES.

22   Q.   OKAY.  DO YOU SEE ANY PART OF THIS DOCUMENT THAT YOU

23   RECOGNIZE?

24   A.   THIS IS MY CHECK, MY SIGNATURE.

25   Q.   AND THE DATE OF THIS -- WHO IS THE CHECK -- WHO IS THE

DIRECT EXAM BY MS. POLLOCK

1    PAYEE ON THIS CHECK?

2    A.   PAYMENT -- IT'S A DOWN PAYMENT FOR WINDSOR.

3    Q.   OKAY.  AND WHOSE NAME ON THE UPPER LEFT-HAND CORNER IS ON

4    THIS CHECK?

5    A.   MY NAME.

6         MS. POLLOCK:  YOUR HONOR, I WOULD MOVE EXHIBIT 1052

7    INTO EVIDENCE.

8              THE COURT:  ANY OBJECTION.

9              MR. MAGNANI:  NO OBJECTION.

10             THE COURT:  IT WILL BE ADMITTED.

11        (DEFENDANT'S EXHIBIT 1052 WAS ADMITTED INTO EVIDENCE.)

12   BY MS. POLLOCK:

13   Q.   MEILI, SHOWING YOU EXHIBIT 1052.  ON THE MEMO PORTION OF

14   THIS, I BELIEVE YOU WERE JUST EXPLAINING, WHAT IS THIS CHECK IN

15   THE AMOUNT OF $93,000 FOR?

16   A.   TO BUY WINDSOR.

17   Q.   AND WINDSOR IS A CONDOMINIUM?  I SEE THE NUMBER 15-D?

18   A.   YES, 15-D, YES.

19   Q.   OKAY.  IS THAT IN FOREST HILLS?

20   A.   YES.

21   Q.   THIS $93,000, WAS THIS YOUR PERSONAL MONEY?

22   A.   YES.

23   Q.   AND IF YOU COULD TURN NOW TO 1053.  DO YOU RECOGNIZE THAT?

24   A.   YES.

25   Q.   WHAT IS THAT DOCUMENT?

DIRECT EXAM BY MS. POLLOCK

```
 1    A.   THIS IS FOR WINDSOR, PROOF THAT I HAD PAID IN FULL.

 2    Q.   OKAY.  AND WINDSOR IS THE PROPERTY AT 71ST STREET IN

 3    FOREST HILLS?

 4    A.   YES.

 5    Q.   DO YOU SEE YOUR NAME ANYWHERE ON THIS DOCUMENT?

 6    A.   YES, MEILI LIN.

 7         MS. POLLOCK:  YOUR HONOR, I WOULD MOVE EXHIBIT 1053

 8    INTO EVIDENCE.

 9         THE COURT:  ANY OBJECTION.

10         MR. MAGNANI:  YES, YOUR HONOR.  ON HEARSAY GROUNDS.

11         THE COURT:  OVERRULED.  I WILL ADMIT IT.

12    (DEFENDANT'S EXHIBIT 1053 WAS ADMITTED INTO EVIDENCE.)

13    BY MS. POLLOCK:

14    Q.   MS. LIN, AT THE VERY TOP OF THIS DOCUMENT, WHAT IS THIS?

15    A.   WHERE?

16    Q.   WHAT IS THIS?

17    A.   TYPE OF LOAN.

18    Q.   OKAY.  IS THIS A SETTLEMENT STATEMENT FOR THE PURCHASE OF

19    YOUR PROPERTY ON 71ST ROAD?

20    A.   YES.

21    Q.   AND THE CHECK THAT WE JUST SAW ON EXHIBIT 1052 WAS FOR

22    $93,000?

23    A.   YES.

24    Q.   AND ON THIS SETTLEMENT STATEMENT, DOES IT INDICATE WHAT

25    THE CONTRACT SALE PRICE WAS IN NUMBER 101?
```

1    A.   $930,000.

2    Q.   AND IT ALSO INDICATES IN BIG LETTERS, PAID IN FULL.  DO

3    YOU SEE THAT?

4    A.   YES.

5    Q.   DID YOU PAY FOR THE PURCHASE OF THIS CONDOMINIUM IN FULL

6    WITHOUT GOING THROUGH A LOAN?

7    A.   I KNOW THAT THE WHOLE THING WAS PAID IN FULL.  BUT IF YOU

8    ARE TALKING ABOUT THE WHOLE PROCESS, THEN --

9    Q.   THE QUESTION IS WAS THIS PROPERTY PAID IN FULL?

10   A.   OF COURSE IT WAS PAID IN FULL, THAT'S WHY I WAS ABLE TO

11   GET THIS DOCUMENT.

12   Q.   OKAY.  ALL RIGHT.  WHERE DID YOU GET THE MONEY FOR THE

13   PAYMENT OR THE PURCHASE OF THIS CONDOMINIUM, THE WINDSOR

14   CONDOMINIUM ON 71ST STREET?

15   A.   THE MONEY WAS IN MY SAVINGS.

16   Q.   OKAY.  DID YOUR MOTHER ASSIST YOU IN ANY WAY IN BUYING

17   THIS CONDOMINIUM?

18   A.   SO THAT WAS 2006, 2007.  I BELIEVE I HAD ENOUGH SAVINGS

19   SAVED UP.

20   Q.   AND IF YOU COULD TURN NOW -- SO YOU PURCHASED THIS TOTALLY

21   ALONE?

22   A.   I PURCHASED IT ALONE.

23   Q.   OKAY.  IF YOU COULD TURN NOW TO EXHIBIT 1053 FOR

24   IDENTIFICATION.

25          THE COURT:  THAT WAS THE ONE WE JUST FINISHED.

DIRECT EXAM BY MS. POLLOCK

1           MS. POLLOCK:  ARE THERE TWO PAGES THERE, MEILI?

2    UNDER 1053?

3           THE COURT:  THERE'S A BANK OF AMERICA DOCUMENT CHECK.

4    BY MS. POLLOCK:

5    Q.   DO YOU SEE THE CHECK IN THE SECOND PAGE?  DO YOU RECOGNIZE

6    THOSE CHECKS?

7    A.   MY NAME IS ON IT.

8    Q.   WERE THESE CHECKS THAT YOU USED TO PURCHASE THE PROPERTY

9    AT WINDSOR ON 71ST STREET?

10   A.   YES, THESE ARE CASHIER'S CHECKS.

11   Q.   AND THESE ARE CASHIER'S CHECKS WITH YOUR NAME ON THEM?

12   A.   YES.

13          MS. POLLOCK:  YOUR HONOR, I WOULD MOVE PAGE 2 OF

14   EXHIBIT 1053 INTO EVIDENCE.

15          THE COURT:  ANY OBJECTION?

16          MR. MAGNANI:  SO IT'S A TWO-PAGE EXHIBIT WITH BATES

17   NUMBER 6781, AND 3708?

18          MS. POLLOCK:  YEAH.

19          MR. MAGNANI:  NO OBJECTION.

20          THE COURT:  IT WILL BE ADMITTED.

21       (DEFENDANT'S EXHIBIT 1053, PAGE 2, WAS ADMITTED INTO

22   EVIDENCE.)

23   BY MS. POLLOCK:

24   Q.   MEILI, LOOKING AT THIS EXHIBIT WHICH ARE THE TWO CASHIER'S

25   CHECKS FOR BANK OF AMERICA, THE FIRST CHECK IS DATED

DIRECT EXAM BY MS. POLLOCK

1    SEPTEMBER 28TH OF 2006, CORRECT?

2    A.   YES.

3    Q.   AND THE SECOND CHECK RIGHT UNDERNEATH IT IS ALSO DATED

4    SEPTEMBER 28TH, 2006?

5    A.   YES.

6    Q.   AND WHAT IS THE AMOUNT FOR THE FIRST CHECK, THE TOP CHECK?

7    A.   $204,095.80.

8    Q.   AND THE AMOUNT FOR THE CHECK ON THE BOTTOM?

9    A.   $36,700.

10   Q.   AND THESE ARE FUNDS THAT YOU PERSONALLY HAD TO PURCHASE

11   THE PROPERTY ON 71ST STREET IN NEW YORK?

12   A.   YES.

13   Q.   NOW, DID YOU ALSO, YOU AND YOUR FAMILY, PURCHASE

14   CONDOMINIUMS IN MILLBRAE?

15   A.   YES.

16   Q.   AND DO YOU RECALL THE ADDRESS OF THOSE CONDOMINIUMS?

17   A.   88 SOUTH BROADWAY, MILLBRAE.

18   Q.   HOW MANY CONDOMINIUMS DID YOU BUY?

19   A.   OUR FAMILY PURCHASED THREE IN TOTAL.

20   Q.   AND DIRECTING YOUR ATTENTION, DID YOUR FAMILY COME OVER

21   HERE AT ANY POINT IN TIME TO VIEW THE CONDOMINIUMS BEFORE THEY

22   WERE PURCHASED?

23   A.   YEAH, THAT WAS ALSO A NEWLY BUILT CONDO.  I THINK THEY

24   TOOK A LOOK BEFORE THE CONSTRUCTION WAS FINISHED.

25   Q.   OKAY.  SO THESE WERE NEW CONDOMINIUMS?

DIRECT EXAM BY MS. POLLOCK

1    A.   YES.

2    Q.   DO YOU RECALL WHOSE IDEA IT WAS TO PURCHASE THESE

3    CONDOMINIUMS?

4    A.   OLDER BROTHER AND MOTHER.

5    Q.   OKAY.  AND THESE CONDOMINIUMS WERE PURCHASED 11 YEARS AGO;

6    DO YOU RECALL?

7    A.   I REMEMBER THAT THEY WERE PURCHASED RIGHT BEFORE THE

8    FINANCIAL CRISIS.  AND RIGHT AFTER THE FINANCIAL CRISIS HIT,

9    THE PRICES WENT DOWN.

10   Q.   NOW DIRECTING YOUR ATTENTION TO NUMBER 1503, IS ONE OF

11   THOSE THE CONDOMINIUMS THAT WAS PURCHASED?

12        THERE'S NOTHING IN THE BINDER.  DO YOU RECALL ANYTHING

13   ABOUT THE THREE DIFFERENT CONDOMINIUMS THAT WERE PURCHASED?

14   A.   YES, I REMEMBER.

15   Q.   DO YOU RECALL WHOSE NAME CONDOMINIUM 1503 WAS IN?

16   A.   UNDER MY NAME.

17   Q.   OKAY.  WAS YOUR HUSBAND'S NAME ALSO INCLUDED ON THAT?

18   A.   NO.

19   Q.   DO YOU RECALL WHERE THE MONEY CAME FROM FOR THAT PROPERTY?

20   A.   FAMILY.

21   Q.   DO YOU RECALL WHAT PERCENTAGE THE OWNERSHIP WAS ON THAT

22   PARTICULAR CONDOMINIUM, 1503?

23        THE INTERPRETER:  COULD THE INTERPRETER HAVE THE

24   QUESTION AGAIN?

25   BY MS. POLLOCK:

1    Q.   DO YOU RECALL WHAT THE PERCENTAGE OF OWNERSHIP WAS ON

2    CONDOMINIUM 1503, BETWEEN YOU AND YOUR FAMILY?

3    A.   IN THE BEGINNING, 50 PERCENT BELONGED TO THE FAMILY, AND I

4    ALSO HAD 50 PERCENT.  AND THEN AS EACH SUCCESSIVE YEAR CAME BY,

5    MY OWNERSHIP PERCENTAGE WAS REDUCED.

6    Q.   YOUR PERCENTAGE WAS REDUCED?

7    A.   YES.

8    Q.   AND WHY WAS THAT?

9    A.   BECAUSE I DIDN'T HAVE ANY INCOME ANYMORE.  SO I

10   TRANSFERRED MY SHARES TO MY FAMILY.

11   Q.   OKAY.  AND THIS WAS A MATTER YOU DISCUSSED WITH YOUR

12   FAMILY?

13   A.   YES, I HAD DISCUSSIONS WITH MY PARENTS AND MY OLDER

14   BROTHER.

15   Q.   NOW REFERRING TO 1507, WHICH IS ONE OF THE PROPERTIES

16   PURCHASED ON SOUTH BROADWAY IN MILLBRAE.  DO YOU RECALL THAT

17   THAT WAS PURCHASED IN MARCH OF '07 OR SOMEWHERE NEAR THAT TIME?

18   A.   YES.

19   Q.   WHOSE NAME WAS THAT PROPERTY PLACED IN?

20   A.   MY PARENTS AND MY HUSBAND, HENRY.

21   Q.   AND YOU?

22   A.   MY NAME IS NOT ON IT.

23   Q.   OKAY.

24        MS. POLLOCK:  YOUR HONOR, I WOULD LIKE TO HAVE MARKED

25   FOR NEXT IN ORDER, A DOCUMENT.

DIRECT EXAM BY MS. POLLOCK

1          THE CLERK:  IT WILL BE EXHIBIT 1093.

2          (DEFENDANT'S EXHIBIT 1093 WAS MARKED FOR IDENTIFICATION.)

3          MS. POLLOCK:  MAY I APPROACH MS. LIN?

4          THE COURT:  YES.

5     Q.   SHOWING YOU, MEILI, WHAT'S MARKED FOR IDENTIFICATION AS

6     EXHIBIT 1093.  LOOKING AT THE COMPLETE DOCUMENT, DO YOU

7     RECOGNIZE ANYTHING ON THIS DOCUMENT?

8     A.   YES, I SEE MY PARENT'S SIGNATURES.

9     Q.   DID YOUR PARENTS EVER DISCUSS THIS DOCUMENT WITH YOU --

10    STRIKE THAT.  I WILL ASK A DIFFERENT QUESTION.

11         DID YOUR PARENTS -- AS YOU LOOK AT THIS DOCUMENT ON

12    PAGE 2, DOES IT APPEAR TO YOU THAT THIS DOCUMENT WAS EXECUTED

13    AT THE BEIJING EMBASSY OF THE UNITED STATES OF AMERICA?

14    A.   YES, I SEE IT.

15    Q.   OKAY.  AND THE DATE THAT IT WAS EXECUTED WAS MARCH 1ST OF

16    2007?

17    A.   YES.

18    Q.   AND YOU SEE YOUR PARENT'S, BOTH YOUR MOTHER AND FATHER'S

19    NAME ON THE DOCUMENT?

20    A.   YES, I SEE IT.

21    Q.   DID YOUR PARENTS EVER TELL YOU THAT THEY WERE GOING TO BE

22    GIVING YOU A SPECIAL POWER OF ATTORNEY IN THE PROPERTY AT 1507

23    SOUTH BROADWAY -- I'M SORRY, 88 SOUTH BROADWAY, UNIT 1507?

24    A.   YES, BECAUSE THEY HAD TO GO TO BEIJING TO GET THIS DONE.

25    Q.   DID THEY EXPLAIN TO YOU WHY THEY WANTED TO GET A SPECIAL

1    POWER OF ATTORNEY TO APPOINT YOU AS THE SPECIAL POWER OF

2    ATTORNEY FOR THIS PROPERTY?

3    A.   THEY WERE HOPING TO SELL THIS PROPERTY.

4    Q.   AND REFERRING TO THE VERY FIRST PARAGRAPH ON THE FIRST

5    PAGE WHERE IT SAYS SPECIAL POWER OF ATTORNEY, DO YOU SEE YOUR

6    NAME?

7    A.   YES.

8    Q.   DID YOUR PARENTS TALK TO YOU BEFORE THIS DOCUMENT WAS

9    EXECUTED ON FEBRUARY 27TH OF 2007?

10   A.   SO, YES, THEY DID TALK TO ME --

11          THE INTERPRETER:  THE INTERPRETER NEEDS

12   CLARIFICATION.

13          THE WITNESS:  MY PARENTS TOLD ME THAT I DID HAVE TO

14   GO TO BEIJING TO GET THIS DONE.

15   Q.   DID THEY TELL YOU WHAT THEY WOULD BE GETTING DONE?

16   A.   THEY SAID TO BE THE POWER OF ATTORNEY TO APPOINT ME TO

17   HAVE THE POWER OF ATTORNEY.  TO AUTHORIZE ME TO HAVE THE HOUSE

18   SOLD.

19   Q.   OKAY.  NOW, WE'VE SEEN -- MEILI, WE'VE SEEN MANY DOCUMENTS

20   WHERE YOUR FAMILY HAS APPOINTED YOU AS POWER OF ATTORNEY OVER

21   BANK ACCOUNTS?

22   A.   YES.

23   Q.   HAVE THEY EVER APPOINTED YOU AS POWER OF ATTORNEY OVER ANY

24   PROPERTY THAT THEY OWNED?

25   A.   IN ADDITION TO THAT, WE ALL KEEP OUR RECORDS, MY MOTHER

DIRECT EXAM BY MS. POLLOCK

1    AND MY ELDER BROTHER ALL KEPT THEIR RECORDS.  AND HERE, THERE

2    ARE RECORDS TOO.

3    Q.   OKAY.  MY QUESTION IS WERE THERE ANY POWER OF ATTORNEYS

4    EVER EXECUTED ON REALLY ESTATE PROPERTY THAT YOUR FAMILY OWNED,

5    OTHER THAN THIS PARTICULAR DOCUMENT?

6    A.   WELL, THEY SAID SO I'M THE REPRESENTATIVE OF ALL OF THEIR

7    PROPERTIES IN THE UNITED STATES.  THEY TRUSTED ME.

8    Q.   OKAY.  WAS 2007 ABOUT THE TIME THAT YOUR PARENTS STOPPED

9    COMING TO THE UNITED STATES TO VISIT DUE TO HEALTH ISSUES?

10   A.   AT THE END OF 2007, THEY CAME.

11   Q.   OKAY.  BUT THEY WEREN'T HERE WHEN THIS DOCUMENT WAS

12   EXECUTED THE END OF FEBRUARY 2007?

13   A.   THIS TIME IN 2007, NO, THEY WERE NOT IN THE UNITED STATES.

14   NOW IT OCCURRED TO ME, I THINK THIS DOCUMENT WAS FOR THE

15   PURCHASE OF 1507.  THIS IS THE FEBRUARY 2007, CORRECT?  SO THIS

16   IS FOR THE PURCHASE, NOT TO SELL IT.

17   Q.   OKAY.  AND YOUR PARENTS WERE THE PURCHASERS?

18   A.   YES.

19   Q.   ALL RIGHT.

20        MS. POLLOCK:  I WOULD MOVE EXHIBIT 1093 INTO

21   EVIDENCE.

22        THE COURT:  ANY OBJECTION?

23        MR. MAGNANI:  I OBJECT ON FOUNDATION GROUNDS.

24        THE COURT:  I DON'T BELIEVE THE WITNESS HAS EVER SAID

25   SHE SAW THIS DOCUMENT.

1          MS. POLLOCK:  LET ME ASK ONE QUESTION.

2          THE COURT:  OKAY.

3     Q.   WAS THIS DOCUMENT EVER SENT TO YOU BY YOUR PARENTS?

4     A.   YES, THEY DID.  AND WHEN THEY HAD THIS PROCESSED IN

5     BEIJING, THEY GIVE THAT TO ME SO THAT I CAN MAKE THE PURCHASE.

6     Q.   OKAY.  AND WHERE DID YOU KEEP THIS DOCUMENT?

7     A.   ALL OF THE DOCUMENTS ARE KEPT IN THE OFFICE IN MY HOUSE.

8          MS. POLLOCK:  I WOULD ONCE AGAIN MOVE IT INTO

9     EVIDENCE.

10         THE COURT:  DO YOU CONTINUE TO OBJECT?

11         MR. MAGNANI:  YES, YOUR HONOR.

12         THE COURT:  THE OBJECTION IS OVERRULED.  I WILL ADMIT

13    IT.

14        (DEFENDANT'S EXHIBIT 1093 WAS ADMITTED INTO EVIDENCE.)

15    BY MS. POLLOCK:

16    Q.   NOW I ASKED YOU A LITTLE WHILE AGO, A SHORT WHILE AGO,

17    ABOUT HOW YOU DISCUSSED WITH YOUR PARENTS AND YOUR BROTHER WHAT

18    YOUR MONTHLY INCOME SHOULD BE ON MORTGAGE APPLICATIONS; DO YOU

19    RECALL THOSE QUESTIONS?

20    A.   YES.

21    Q.   AND THE NUMBER THAT YOUR MOTHER AND YOUR BROTHER TOLD YOU

22    TO PUT DOWN WAS AN AMOUNT THAT COVERED THE MONTHLY INCOME FOR

23    THE FAMILY, CORRECT?

24    A.   YES.

25    Q.   DID YOU EVER DISCUSS WHAT THAT NUMBER WOULD BE ON THE

1    MORTGAGE APPLICATIONS WITH YOUR HUSBAND?

2    A.   THERE WAS NO NEED TO DISCUSS WITH HIM.

3    Q.   WHY NOT?

4    A.   BECAUSE WHEN I SAID THE FAMILY, IT REFERS TO MY PARENTS'

5    HOME, MY PARENTS' FAMILY.  SO IT SHOULD BE MY FATHER, MY MOTHER

6    AND MY ELDER BROTHER.

7    Q.   I WOULD LIKE TO NOW TALK ABOUT THE PURCHASE OF THE

8    SHOPPING CENTER AT SERRA IN MILPITAS.  DID THERE COME A TIME

9    WHEN YOUR FAMILY DECIDED TO MOVE FROM PURCHASING RESIDENTIAL

10   PROPERTY INTO COMMERCIAL PROPERTY?

11   A.   YES.

12   Q.   AND WERE YOU PART OF THE FAMILY DISCUSSION ABOUT THIS?

13   A.   NO.

14   Q.   WHO IN YOUR FAMILY TOLD YOU THAT THE FAMILY WANTED TO

15   EXPAND AND BUY COMMERCIAL REAL ESTATE?

16   A.   I WOULD SAY MY MOTHER TOLD ME ABOUT THIS, MY ELDER BROTHER

17   TOLD ME ABOUT THIS, BUT NOT MY FATHER.  BECAUSE MY FATHER DOES

18   NOT LIKE TO CHAT ON THE PHONE WITH ME.

19   Q.   AND DID YOUR MOTHER GIVE YOU OR YOUR BROTHER GIVE YOU ANY

20   DIRECTION AS TO WHAT TYPE OF PROPERTY THEY WERE INTERESTED IN

21   OBTAINING?

22   A.   YES.

23           THE INTERPRETER:  YOUR HONOR, THE WITNESS USED THE

24   "TA" AGAIN, I NEED TO DECIDE IF IT'S FEMALE OR MALE.

25           THE WITNESS:  YES, MY MOTHER TOLD ME THAT THE PLACES

1    SHE LIKED WERE PALO ALTO AND CUPERTINO.  AND SHE ASKED ME TO

2    LOOK TOWARDS THOSE PLACES.

3    Q.  DID YOU OBTAIN THE ASSISTANCE OF ANY BROKER TO HELP YOU

4    FIND COMMERCIAL PROPERTY?

5    A.  YES.

6    Q.  OKAY.  HOW WAS IT THAT YOU FOUND THE PROPERTY AT SERRA

7    WAY?

8    A.  WELL, ONE WAS OBTAINED, NOT THROUGH THE BROKER, IT WAS

9    THROUGH THE OWNER OF A RESTAURANT.  AND THE NAME OF THAT

10   RESTAURANT IS CALLED THE DYNASTY.

11   Q.  OKAY.  WAS THE PERSON WHO TOLD YOU ABOUT THE INVESTMENT

12   ALSO THE OWNER OF A RESTAURANT?

13   A.  YES.

14   Q.  AND WAS IT SOMEONE YOU AND YOUR FAMILY KNEW?

15   A.  YES, ALL OF US KNEW THAT PERSON.

16   Q.  OKAY.  WHAT WAS HIS NAME?

17   A.  ALAN WONG.

18        THE INTERPRETER:  INTERPRETER SPELLING W-O-N-G FOR

19   HONG KONG SPELLING OR W-A-N-G FOR MAINLAND SPELLING.

20   Q.  IS MR. WONG STILL ALIVE?

21   A.  APPROXIMATELY THREE YEARS AGO HE DIED OF CANCER.

22   Q.  DID YOUR BROTHER COME OVER HERE TO LOOK AT THE PROPERTY

23   THAT MR. WONG HAD TOLD HIM ABOUT?

24   A.  YES.

25   Q.  DID YOUR BROTHER COME WITH YOUR PARENTS OR DID THEY COME

1    SEPARATELY?

2    A.   MY PARENTS CAME HERE FIRST, THEN MY PARENTS RELATED TO MY

3    BROTHER AND SAID THIS PROPERTY LOOKED REALLY GOOD.  AND THEN

4    THEY ASKED HIM TO ARRANGE TO SET ASIDE A FEW DAYS SO THAT HE

5    CAN COME OVER AND TAKE A LOOK.

6    Q.   AND DID HE COME OVER AND LOOK?

7    A.   YES.

8    Q.   DO YOU REMEMBER HOW MUCH MONEY WAS NEEDED FOR THE

9    INVESTMENT?

10   A.   BACK THEN I RECALL BECAUSE WE WERE HAVING A COLLABORATION,

11   LIKE A JOINT VENTURE WITH SOMEONE ELSE, SOME PEOPLE WANTED TO

12   PUT MORE MONEY IN, BUT SOME PEOPLE DID NOT WANT TO PUT A LOT OF

13   MONEY IN.

14        AND LATER, MAYBE IT WAS MY MOM OR MY ELDER BROTHER WHO HAD

15   A TALK WITH THE ALAN WONG, AND WANTED TO FIND OUT HOW MANY

16   SHAREHOLDERS ALL TOGETHER.  AND THEN THEY WANTED TO MAKE SURE

17   EVERY SHAREHOLDER WILL PUT IN THE SAME AMOUNT OF MONEY.

18   Q.   OKAY.

19   A.   BUT FOR THE DETAILS, I DO NOT HAVE THAT TO SHARE.

20   Q.   DID YOU ACTUALLY GO LOOK AT THE PROPERTY AT SERRA WAY?

21   A.   I WENT THERE WITH MY FATHER AND MOTHER AND MY ELDER

22   BROTHER.  EVERY TIME THEY CAME HERE, I WOULD ACCOMPANY THEM TO

23   TAKE A LOOK.  AND ALSO MR. WONG ALSO WENT TO TAKE A LOOK.

24   Q.   OKAY.  AND THE PROPERTY AT SERRA WAY, WAS IT UNDEVELOPED

25   COMMERCIAL PROPERTY OR WERE THERE ACTUALLY BUILDINGS THERE?

DIRECT EXAM BY MS. POLLOCK

1     A.   IT WAS A PROPERTY WITH PRETTY OLD BEAUTY, LIKE A VERY OLD

2     SHOPPING CENTER.  I HEARD THAT THIS PLACE WAS NOT REFURBISHED

3     DURING THE PAST 100 YEARS.

4     Q.   BUT YOUR FAMILY WAS INTERESTED IN PURCHASING IT?

5     A.   MY FATHER, MY MOTHER AND MY ELDER BROTHER LIKED IT VERY

6     MUCH.

7     Q.   DO YOU RECALL WHAT THE FINAL PURCHASE PRICE WAS GOING TO

8     BE FOR THE ENTIRE SHOPPING CENTER?

9     A.   FOR THE ENTIRE SHOPPING CENTER, IT WAS GOING TO BE $40

10    MILLION, AROUND $40 MILLION.

11    Q.   AND DO YOU KNOW HOW MUCH YOUR FAMILY INVESTED?

12    A.   APPROXIMATELY 25 PERCENT.

13    Q.   WHOSE MONEY WAS IT THAT WENT INTO THIS INVESTMENT?

14    A.   IT WAS THE MONEY FROM MY PARENTS AND MY ELDER BROTHER.

15    Q.   AND WHO WAS IT WHO ACTUALLY SENT YOU THE MONEY?

16    A.   IT'S BEEN SUCH A LONG TIME, EITHER WAY THEY CALLED ME AND

17    ASKED ME TO KEEP A GOOD RECORD OF IT IN THIS BOOK.

18    Q.   AND DO YOU HAVE ON YOUR LEDGER FOR 2007, ON PAGE 70 TO 72,

19    A RECORD OF THE WIRES THAT WERE SENT FROM YOUR BROTHER TO

20    PURCHASE THE SHOPPING CENTER?

21    A.   YOU SAID PAGE 72?

22    Q.   I BELIEVE 70 TO 72.

23    A.   YES.

24         MS. POLLOCK:  MAY I APPROACH, YOUR HONOR?

25         THE COURT:  YES.

1    Q.   SO WERE THERE A TOTAL OF 24 WIRES THAT WERE SENT INTO THE

2    METRO BANK TO COVER THIS INVESTMENT?

3    A.   YES.

4    Q.   AND FROM THE METRO BANK ACCOUNT, THAT WAS YOUR BROTHER'S

5    BANK ACCOUNT, DO YOU KNOW WHERE THE MONEY THEN WENT?

6    A.   I ONLY KNEW THAT THE TOTAL INVESTMENT IN THE SERRA WAY

7    PROPERTY WAS $5.35 MILLION.

8    Q.   OKAY.  AND MS. LIN, COULD YOU PLEASE LOOK AT EXHIBIT

9    NUMBER 1055.

10   A.   IS THAT A CHECK?

11   Q.   YES.  DO YOU SEE A CHECK THAT'S UNDER EXHIBIT 1055?

12   A.   IS THIS THE $5 MILLION CHECK?

13   Q.   YES.

14        DO YOU SEE A SIGNATURE ON THAT PAGE THAT YOU RECOGNIZE?

15   A.   MY SIGNATURE.

16   Q.   OKAY.  AND IS THERE A DATE ON THAT CHECK?

17   A.   DECEMBER 28TH, '07.

18   Q.   AND ON THE UPPER LEFT-HAND CORNER, DOES IT SAY "FLORENCE

19   CAPITAL GROUP?"

20   A.   YES.

21   Q.   AND ARE YOU PART OF THE FLORENCE CAPITAL GROUP?

22   A.   YES.

23        MS. POLLOCK:  YOUR HONOR, I WOULD MOVE 1055 INTO

24   EVIDENCE.

25        THE COURT:  ANY OBJECTION?

1          MR. MAGNANI:  NO OBJECTION.

2          THE COURT:  IT WILL BE ADMITTED.

3          (DEFENDANT'S EXHIBIT 1055 WAS ADMITTED INTO EVIDENCE.)

4     BY MS. POLLOCK:

5     Q.  MS. LIN, SHOWING YOU WHAT'S MARKED AS 1055.  WHO IS THIS

6     CHECK MADE OUT TO?

7     A.  200 SERRA WAY, LLC.

8     Q.  AND THE AMOUNT OF THE CHECK YOU HAVE WRITTEN IS

9     $5 MILLION?

10    A.  YES.

11    Q.  AND THIS IS MONEY THAT YOU RECEIVED FROM YOUR BROTHER?

12    A.  YES.

13    Q.  AND HE IS ONE OF THE INVESTORS IN SERRA WAY?

14    A.  YES.

15    Q.  WAS YOUR NAME ON ALL OF THE PROPERTY PURCHASES FOR THE

16    FAMILY HERE IN THE UNITED STATES?

17    A.  YES.

18    Q.  DO YOU KNOW IF YOUR PARENTS COULD HAVE OBTAINED A MORTGAGE

19    LOAN HERE IN THE UNITED STATES?

20    A.  MY PARENTS?

21    Q.  YOUR PARENTS.

22    A.  I'M NOT SURE.  I ONLY KNEW THAT MY PARENTS AND MY ELDER

23    BROTHER ALL TOLD ME THAT IF THE PROPERTIES WERE UNDER THEIR

24    NAMES, THEN THEY WILL HAVE TO DO THE CERTIFICATION, THEY WILL

25    HAVE TO DO THE NOTARY PUBLIC, NOTARIZED, SO IT WILL BE EASIEST

1    TO USE MY NAME.

2         AND ALSO, IF THEY WERE TO COME OVER HERE, THEY WILL HAVE

3    TO GO TO THE U.S. EMBASSY IN BEIJING TO GET A VISA.  THE THING

4    IS THAT THEY DID NOT LIVE IN BEIJING.

5    Q.   OKAY.  HOW FAR WAS BEIJING FROM TIANJIN?

6    A.   IT'S ALMOST THREE HOURS TO DRIVE.

7    Q.   ONCE YOU MOVED OUT HERE TO CALIFORNIA IN 2004, HOW DID YOU

8    MANAGE PROPERTY, RENTAL PROPERTY THAT WAS BACK IN NEW YORK?

9    A.   MY MOTHER MADE SOME INVESTMENTS IN THE PROPERTIES IN NEW

10   YORK, AND SHE WAS USING THAT ONE BROKER.

11   Q.   OKAY.  AND WAS THAT SOMEONE YOU ALSO USED?

12   A.   MY MOTHER WAS USING A PERSON, THEN I FOLLOWED MY MOTHER IN

13   USING THAT PERSON ALSO.

14   Q.   IF YOU COULD LOOK AT EXHIBIT 1056.  DO YOU RECOGNIZE THIS

15   DOCUMENT?

16   A.   IS THE BATES NUMBER US07828.

17   Q.   NO.  WHAT'S THE NUMBER ON THE VERY BOTTOM YOU SAID?

18   A.   US07828.

19   Q.   YES.  AND ABOVE THAT, DO YOU SEE A TAG THAT SAYS 1056?

20   A.   YES.

21   Q.   OKAY.  DO YOU RECOGNIZE THIS DOCUMENT?

22   A.   YES.  THIS WAS WRITTEN MY BY ME.

23   Q.   IT WAS WRITTEN BY YOU.  SO THAT IS YOUR HANDWRITING --

24   A.   YES.

25   Q.   -- AND PRINTING ON THE DOCUMENT?

1    A.   YES.

2    Q.   DO YOU KNOW WHEN YOU WROTE THIS?

3    A.   IT WAS ONCE MY ELDER BROTHER CAME TO HOME AND HE WAS

4    ASKING ME WHAT OTHER PROPERTIES BELONGED TO HIM.

5         AND HE ASKED ME HOW MUCH WERE HIS LOANS, AND HE ALSO ASKED

6    ME HOW MUCH IT WOULD BE -- HOW MUCH HIS PERCENTAGE WOULD BE.

7    SO I WROTE EVERYTHING DOWN, I GAVE IT TO HIM, AND EACH OF US

8    KEPT A COPY.

9    Q.   AND DID YOU REVIEW ANY DOCUMENTS BEFORE YOU WROTE THIS

10   OUT, OR WAS IT JUST SOMETHING YOU KNEW IN YOUR HEAD?

11   A.   I MADE REFERENCE TO THIS BLUE LEDGER, THE BLUE LEDGER DID

12   NOT HAVE THAT MANY DETAILS.  SOME OF THEM WERE IN MY HEAD.  AND

13   FOR OTHERS, I WILL HAVE TO MAKE SOME REFERENCES TO THE

14   DOCUMENTS.

15   Q.   ARE YOU REFERRING TO THE GREEN LEDGER?

16   A.   BECAUSE ONLY -- IN THE BLUE LEDGER, IT WAS ONLY RECORDED

17   HOW MUCH THE MORTGAGES ARE.  BUT HE WAS LOOKING FOR THE

18   PERCENTAGE AND ALSO THE AMOUNT ON HIS LOANS.  SO I HAD TO GO

19   AND MAKE REFERENCES TO SOME DOCUMENTS.

20   Q.   OKAY.  WHAT BLUE LEDGER ARE YOU REFERRING TO?

21        THE INTERPRETER:  SORRY, I THINK IT'S INTERPRETER

22   MISTAKE, IT'S A GREEN LEDGER, SORRY, IT'S MY MISTAKE.

23        MS. POLLOCK:  YOUR HONOR, I WOULD MOVE 1056 INTO

24   EVIDENCE.

25        THE COURT:  ANY OBJECTION?

1           MR. MAGNANI:  YES, YOUR HONOR.  ON HEARSAY GROUNDS.

2           THE COURT:  SUSTAINED.  NOT ADMITTED.

3           MS. POLLOCK:  THIS IS A DOCUMENT SHE WROTE.

4           THE COURT:  IT'S HEARSAY.  IT'S AN OUT-OF-COURT

5       STATEMENT.

6       BY MS. POLLOCK:

7       Q.   WAS YOUR -- WHEN YOU DISCUSSED WITH YOUR BROTHER WHAT HIS

8       INTERESTS WERE IN THE PROPERTIES THAT YOU OWNED IN THE UNITED

9       STATES, DID YOU ALSO REFER TO THE LEDGER TO CONFIRM THAT?

10      A.   YES.

11      Q.   AND DID HE AGREE WITH WHAT THE PERCENTAGES WERE OF

12      OWNERSHIP?

13      A.   YES.

14      Q.   DID YOUR BROTHER EVER QUESTION ANYTHING THAT YOU HAD

15      DOCUMENTED IN YOUR LEDGER?

16      A.   NO.  HOWEVER, MY ELDER SISTER ACTUALLY POSTED A QUESTION,

17      BUT MY ELDER BROTHER NEVER HAD ANY QUESTIONS.

18      Q.   AND WHAT WAS THE QUESTION THAT -- IS YOUR OLDER SISTER

19      MEI-RU?

20      A.   ONCE MY ELDER SISTER BORROWED A SUM OF MONEY FROM MY

21      BROTHER, AND THEN I WAS THE PERSON TO KEEP THE RECORDS.  I

22      SHOULD HAVE CALCULATED ALL OF THE INTEREST OWNED.

23           AND THEN MY ELDER SISTER SAID SHE DESERVED MORE INTEREST

24      THAN WAS PAID TO HER.  THEN I SAID NO, I SAID ORIGINALLY THERE

25      WAS AN AGREEMENT AS TO THE INTEREST PAYMENT.

```
1              AND THEN SHE SAID SHE DESERVED MORE.  SO BOTH OF US HAD TO

2    GO TO OUR ELDER BROTHER TO TALK ABOUT THIS.

3    Q.   AND WAS YOUR BROTHER THEN THE ARBITRATOR TO RESOLVE THAT

4    MATTER?

5    A.   OF COURSE, MY ELDER BROTHER LOVES HIS YOUNGER SISTER, SO

6    HE PAID A LITTLE BIT MORE, AND THAT SOLVED THE PROBLEM.

7    Q.   AND DID YOUR MOTHER EVER HAVE ANY QUESTIONS ABOUT THE

8    ACCOUNTING THAT YOU KEPT IN YOUR LEDGERS?

9    A.   INITIALLY, MY MOTHER TOLD ME TO KEEP CLEAR AND SUCCINCT

10   RECORDS AND THEN LATER SHE SAID THE FUND WAS TOO SMALL AND MY

11   BOOKKEEPING WAS TOO COMPLICATED.  THEN SHE SAID OH, JUST MAKE A

12   GENERAL BOOKKEEPING, THAT SHOULD BE FINE.

13   Q.   SO SHE GAVE YOU DIRECTION OVER THE YEARS AS TO HOW TO KEEP

14   THE LEDGER?

15   A.   YES.  SHE WAS OPINIONATED.  SOMETIMES IF I USE SMALL

16   FONTS, THEN SHE WILL COMPLAIN, EITHER WAY.  SO I WILL HAVE TO

17   ABIDE BY WHAT SHE ASKED ME TO DO.

18   Q.   IS IT FAIR TO SAY THE WRITING IN THE LEDGER IS QUITE

19   SMALL?

20   A.   YES.

21   Q.   BECAUSE YOU WERE TRYING TO PUT --

22   A.   BECAUSE THE SPACE WAS LIMITED.

23   Q.   OKAY.  YOU PUT A LOT OF MONEY INTO YOUR INVESTMENT IN

24   BROOKSIDE, THE HOME IN NEW JERSEY, AS WELL AS THE CONDOMINIUM

25   IN FOREST HILLS, THE WINDSOR PROPERTY.
```

1    WHERE DID YOU GET THE MONEY, YOUR OWN MONEY, FOR THOSE TWO

2    INVESTMENTS?

3    A.   EVER SINCE THE FIRST YEAR I WAS IN COLLEGE, MY MOTHER

4    WOULD GIVE ME A SET AMOUNT OF MONEY OF $95,000.  AND SHE WANTED

5    ME TO STUDY HOW TO MANAGE THIS MONEY.  I ACTUALLY PURCHASED

6    THAT PIANO OUT OF THIS $95,000 SHE GAVE ME.

7    Q.   AND THAT WAS THE AMOUNT THAT YOUR PARENTS GAVE YOU EVERY

8    YEAR?

9    A.   YES.

10   Q.   REFERRING, I BELIEVE, TO YOUR SECOND LEDGER, THE GREEN

11   LEDGER THAT'S IN FRONT OF YOU, PAGE 81, FOR THE DATE OF

12   MARCH 20TH, 2007.  DO YOU SEE A RECORDING OF THE AMOUNT THAT

13   YOU RECEIVED ON A YEARLY BASIS FROM YOUR PARENTS?

14   A.   YES.

15   Q.   AND HOW IS IT WRITTEN?

16   A.   THE ENTRY SAID ENTRY INTO MEILI'S ACCOUNTS, 2007, WITH THE

17   AMOUNT OF $94,982.

18   Q.   AND IS THERE CHINESE WRITTEN BEFORE THE NUMBER OF $94,000?

19   A.   YES.

20   Q.   OKAY.

21        MS. POLLOCK:  SHOULD I STOP HERE, YOUR HONOR?

22        THE COURT:  OH, I KNOW YOU'RE NOT DONE, IS THIS YOUR

23   STOPPING POINT?

24        MS. POLLOCK:  IT'S GOOD.

25        THE COURT:  ALL RIGHT.

1    LADIES AND GENTLEMEN, WE'VE REACHED THE END OF THE COURT

2    DAY.  TOMORROW YOU KNOW WE START AT 10:00.

3    I WANT TO ALSO LET YOU KNOW I HAVE TO STOP AT 3:30

4    TOMORROW, AND I WILL STOP PROMPTLY THEN BECAUSE I NEED TO LEAVE

5    AS WELL.  SO I WANT YOU TO BE ABLE TO MAKE USE OF THE TIME, AND

6    IT'S ALWAYS GOOD TO KNOW IN ADVANCE SO THAT YOU CAN LET OTHERS

7    KNOW.

8    LEAVE ME YOUR NOTEBOOKS AND YOUR BADGES, AND LET ME REMIND

9    YOU NOT TO FORM OR EXPRESS ANY OPINIONS IN THE CASE OR DO ANY

10   RESEARCH OR INVESTIGATION.

11   HAVE A GOOD EVENING.  I WILL SEE YOU TOMORROW AT 10:00.

12   (THE PROCEEDINGS WERE HELD OUT OF THE PRESENCE OF THE JURY

13   AT 4:57 P.M.)

14   THE COURT:  ALL RIGHT.  PLEASE BE SEATED, EVERYONE.

15   OUR WITNESS MAY STEP DOWN.

16   AND WE ARE ON THE RECORD OUTSIDE THE PRESENCE OF THE JURY.

17   I JUST HAVE A FEW THINGS THIS EVENING.

18   THANK YOU FOR SENDING THE REVISED JURY INSTRUCTIONS.  AS I

19   MENTIONED TO YOU YESTERDAY, I WAS SURPRISED BY HOW MUCH MORE

20   WORK THERE IS.  YOU SHOULD PLAN TO SPEND A PORTION OF THE

21   MORNING WITH ME ON THURSDAY, AND I WILL LET YOU KNOW WEDNESDAY

22   WHAT TIME IT WILL BE NO LATER THAN 9:00, AND IT MAY BE EARLIER,

23   BECAUSE I HAVE A FULL DAY, I THOUGHT WE WERE GOING TO BE DONE

24   LAST WEEK, AND WE'RE NOT.

25   AND THERE WAS SOME INDICATION THAT YOU WOULD CONTINUE TO

1   WORK ON THOSE, AND IF YOU CAN RESOLVE IT, THAT'S FINE, BUT IT

2   LOOKS AS THOUGH EVERYTHING IN DISPUTE REMAINS IN DISPUTE.  AND

3   I THOUGHT WE HAD A LAY OUT, BUT APPARENTLY NOT.  SO JUST PLAN

4   ON THURSDAY.

5        AND I ALSO HAVE RECEIVED THE WRITTEN RULE 29 MOTION FROM

6   THE DEFENSE, AND IN ADDITION -- AND I GOT A PARTIAL OPPOSITION

7   FROM THE GOVERNMENT WHICH ONLY ADDRESSES ONE ISSUE WITH THE

8   FOREIGN BANK ACCOUNT.

9        I DON'T KNOW WHAT THE GOVERNMENT'S PLAN IS ON THE

10  REMAINDER OF THE MOTION.  THERE'S NO REQUIREMENT OF A WRITTEN

11  SUBMISSION, BUT I NEEDED TO KNOW WHAT YOUR PLAN WAS.

12        MR. PITMAN:  WE DO PLAN TO SUBMIT WRITTEN RESPONSE TO

13   THE RULE 29 MOTION AS WELL, YOUR HONOR.

14        THE COURT:  OKAY.  OF COURSE I DEFERRED RULING ON IT.

15        AND I GUESS IT WILL BE RENEWED AT THE CLOSE OF THE DEFENSE

16   CASE, WHICH OF COURSE IS REASONABLE.

17        AS FOR THE ONE ISSUE OF THE INDICTMENT LANGUAGE IN REGARD

18   TO THE FOREIGN BANK ACCOUNTS, I BELIEVE THAT'S FULLY BRIEFED?

19        MR. CANNON:  YES, YOUR HONOR.

20        THE COURT:  ALL RIGHT.  IT IS MY DETERMINATION THAT

21   THE DEFENSE HAS WAIVED THAT ARGUMENT, HAVING NOT RAISED THE

22   ISSUE BEFORE THE COMMENCEMENT OF TRIAL, WHICH IS THE LAST DAY.

23        I ACTUALLY BELIEVE I SET THE LAST DAY FOR FILING MOTIONS

24   AT THE FINAL PRETRIAL CONFERENCE, WHICH WAS A MONTHS EARLIER,

25   AND THIS WAS A DEFECT THAT WAS CLEAR ON THE FACE OF THE

1       INDICTMENT, THAT HAS NOT CHANGED THROUGHOUT THE PROCEEDINGS.

2           AND SO I FIND THAT IT WOULD BE WAIVED.

3           I ALSO FIND THAT UNDER THE CASE LAW CITED BY THE

4    GOVERNMENT, I FIND PERSUASIVE THAT THE THEORY OF THE GOVERNMENT

5    ACTUALLY NARROWS THE SCOPE.  AND SO EVEN IF IT WEREN'T WAIVED

6    WHICH I THINK IS EXCLUSIVELY ESTABLISHED BY THE NINTH CIRCUIT,

7    I THINK THAT THIS WOULD NOT CAUSE IT TO BE DISMISSED.

8           THAT IS A MATTER THAT I NEEDED TO RULE ON BECAUSE IT WOULD

9    AFFECT SENDING IT TO THE JURY, AND I THINK IT WOULD BE WRONG TO

10   EVEN SEND IT TO THE JURY IF I HAD ALREADY DETERMINED THAT I

11   WOULD OVER TURN IT BECAUSE I WANT TO MAKE SURE THAT THE VERDICT

12   FORM IS AS CLEAN.

13          ON THE OTHER ISSUE, I GUESS LET ME JUST SAY TO YOU,

14   MR. PITMAN, I READ THE ATTACHMENT TO THE MOTION, THERE WAS A

15   SECOND MOTION FILED SATURDAY ON DEFENDANT'S MEMORANDUM

16   REGARDING SPECIFIC ITEMS OF PROOF.  AND THIS HAS TO DO WITH THE

17   THEORY OF PROOF.

18          THE GOVERNMENT HAS TOLD ME THROUGHOUT, AS THE ISSUE IS

19   RAISED BY THE DEFENSE, IT'S NOT AN EXPENDITURE THEORY.  AT OUR

20   CONFERENCE THE OTHER DAY I MADE CLEAR IT WAS NOT AN INDIRECT

21   METHOD OF BANK DEPOSIT PROOF, THAT THIS WAS DIRECT EVIDENCE OF

22   FAILURE TO REPORT ITEMS OF INCOME.

23          I CAN READ THE MANUAL AND I DIDN'T UNDERSTAND IT AT ALL.

24   I THINK I GRASP WHAT IS NECESSARY IN EXPENDITURE AND BANK

25   DEPOSIT, BUT I'M JUST MISSING SOMETHING HERE ON THE DIRECT

1    METHOD.

2         SO I EXPECT THE GOVERNMENT WILL WALK ME THROUGH THE

3    EVIDENCE YOU HAVE ON YOUR DIRECT METHOD OF PROOF SO I CAN MAKE

4    A DETERMINATION ON THIS.  BUT I GUESS WE JUST KEEP GOING.  AND

5    I'M NOT SURE WHEN YOU ARE EXPECTING TO FILE THAT.  I KNOW YOU

6    ARE WORKING HARD.  I DON'T FORGET THAT FOR A MINUTE THAT YOU

7    ARE WORKING HARD, BUT I CAN'T DO ANYTHING UNTIL I HEAR FROM YOU

8    ON THAT.

9         AT THE LEAST, THE JURY MUST BE INSTRUCTED THAT THEY MAY

10   NOT CONVICT BASED ON EXPENDITURES ALONE AND THEY MAY NOT

11   CONVICT BASED ON BANK DEPOSITS ALONE.  AND I THINK YOU MAY

12   ALREADY HAVE AN INSTRUCTION ALONG THOSE LINES, MR. PITMAN, I

13   THINK IT'S IN DISPUTE, BUT I THINK THAT THAT'S ALREADY

14   OUTLINED.

15        SO THAT SEEMS CLEAR TO ME.  THAT'S ALL I HAVE TONIGHT.  I

16   DON'T KNOW WHAT -- HOW MUCH LONGER, MS. POLLOCK, YOU THINK YOU

17   WILL BE IN DIRECT EXAMINATION OF MS. LIN?

18        MS. POLLOCK:  I DON'T WANT TO BE HELD TO THIS,

19   YOUR HONOR.

20        THE COURT:  I UNDERSTAND.

21        MS. POLLOCK:  BUT I WOULD THINK A COUPLE OF HOURS.

22        THE COURT:  RULES DO NOT GIVE ME THE DISCRETION TO

23   REDUCE IT, BUT IT HAS BEEN PAINFULLY SLOW TODAY, AND

24   REPETITIVE.  AND SO I JUST ASK YOU TO KEEP THAT IN MIND.

25        MR. CANNON WILL HAVE THE OPPORTUNITY TO CROSS-EXAMINE THE

1    WITNESS, OF COURSE, AND THE GOVERNMENT WILL AS WELL.

2        SO I EXPECT MS. LIN WILL BE ON THE STAND ALL DAY TOMORROW,

3    IS THAT WHAT YOU ANTICIPATE?

4            MS. POLLOCK:  ARE YOU ADDRESSING ME?

5            THE COURT:  I'M THE LAST TO KNOW.

6            MS. POLLOCK:  I WILL BE DONE SOME TIME IN THE

7    MORNING, BUT THEN --

8            THE COURT:  WE ARE NOT STARTING UNTIL 10.

9            MS. POLLOCK:  I KEEP FORGETTING.  I WOULD THINK THAT

10   I WILL BE DONE BY THE NOON HOUR, BUT THERE IS

11   CROSS-EXAMINATION.

12           MR. CANNON:  YOUR HONOR, ON THE SUBJECT OF

13   SCHEDULING, I HAVE DISCUSSED THIS WITH THE GOVERNMENT, IF IT

14   WOULD BE POSSIBLE TO CALL A WITNESS OUT OF ORDER TOMORROW, WE

15   COULD HOPEFULLY GET HIM ON AND OFF IN AN HOUR, AND THEN COME

16   BACK TO MS. LIN, AND THEN HE CAN GET ON A PLANE AND GET OUT OF

17   THE BAY AREA.

18           THE COURT:  YOU KNOW, IF THERE'S NO OBJECTION, IT'S

19   FINE WITH ME.

20       SO IF YOU CAN JUST TALK ABOUT THAT AND SEE IF THERE'S

21   GOING TO BE ANY PROBLEM.  I MENTIONED TO YOU LAST WEEK THAT WE

22   DO NEED TO END AT 3:30 TOMORROW, AND THEN WEDNESDAY WILL BE A

23   FULL DAY, AND FRIDAY WILL BE A FULL DAY.  AND THEN WE HAVE THE

24   LONG WEEKEND.

25       SO I DON'T THINK WE ARE CHARGING THE JURY UNTIL THE

1        FOLLOWING WEEK AT THIS POINT.  I THINK IT DROPPED -- IT SLOWED

2        UP A LOT.

3               MR. CANNON:  AND MAYBE I CAN POSSIBLY ENCOURAGE THE

4        COURT ON THE SUBJECT OF JURY INSTRUCTIONS, THEY ARE ACTUALLY

5        CLOSER THAN THEY LOOK.

6           FOR A LOT OF THE INSTRUCTIONS, MR. PITMAN SUBMITTED ONE

7        SET OF LANGUAGE, I SUBMITTED ANOTHER SET OF LANGUAGE.  SO THE

8        COURT CAN EITHER PICK THE --

9               THE COURT:  WE DO THIS TOGETHER, I DON'T DO IT ALONE.

10        WE DO IT TOGETHER.

11               MR. CANNON:  THAT'S FINE.

12               THE COURT:  OKAY.  SO YOU NEED TO PLAN ON THURSDAY

13        MORNING.

14           AND AS I SAY, I WILL LET YOU KNOW WHETHER IT'S GOING TO BE

15        AT 8:00, OR 9:00.  IT CAN'T BE ANY LATER BECAUSE I HAVE A FULL

16        DAY OF HEARINGS, AND I DON'T KNOW IF I WILL HAVE TIME IF WE DO

17        IT AT 9.  I WILL JUST HAVE TO LOOK AT WHAT ELSE I HAVE.

18           AND THEN MR. PITMAN, WE WILL PREPARE, I MEAN, WE STILL

19        NEED -- THERE WILL STILL BE THINGS WE NEED TO DISCUSS AFTER THE

20        CLOSE OF EVIDENCE, BUT I'M NOT PREPARED TO LEAVE THE PRODUCTION

21        OF THE FINAL SET UNTIL THE END BECAUSE IT WON'T BE DONE AND IT

22        WILL HAVE MISTAKES AND I WON'T READ IT UNDER THAT PRESSURE.  SO

23        THAT'S WHAT WE'LL DO.

24           OKAY.

25               MR. CANNON:  THANK YOU.

1           THE COURT:  ANYTHING ELSE?  ALL RIGHT.  I WILL SEE

2    YOU TOMORROW.

3           (THE PROCEEDINGS WERE CONCLUDED AT 5:05 P.M.)

1

2

3

4                          **CERTIFICATE OF REPORTER**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9      REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10     THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11     FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12     CERTIFY:

13             THAT THE FOREGOING TRANSCRIPT,

14     CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15     CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16     SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17     HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18     TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24     _____

25     SUMMER A. FISHER, CSR, CRR
       CERTIFICATE NUMBER 13185          DATED: 3/25/19