# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br> v. <br> JYH-CHAU HORNG, <br> Defendant. | Case No. 15-cr-00065-BLF-2 <br><br> **ORDER RE APPLICATION OF SENTENCING GUIDELINES** |

Presently before the Court is the sentencing of Defendant Jyu-Chau Horng, also known as Henry Horng, for two counts of filing false federal income tax returns in violation of 26 U.S.C. § 7206(1) (Counts 1 and 2) and one count of making false statements to a government agency in violation of 18 U.S.C. § 1001(a)(2) (Count 3).

Specifically, the Court must calculate the applicable sentence range under the U.S. Sentencing Guidelines (the "Guidelines"). The parties agree that, pursuant to §§ 3C1.1 and 3D1.2 of the Guidelines, Counts 1 through 3 are to be grouped and the base offense level for the group is the base offense level for Defendant's convictions under 26 U.S.C. § 7206(1). *See* U.S.S.G. §§ 3C1.1, 3D1.2(c) (U.S. Sentencing Comm'n 2018).[1] The parties further agree that the base offense level for Defendant's convictions under 26 U.S.C. § 7206(1) is governed by § 2T1.1 of the Guidelines. *Id.* at § 2T1.1. Under § 2T1.1, the base offense level is the level in the Tax Table at § 2T4.1 corresponding to the amount of tax loss. *Id.* at § 2T4.1. In this Order, the Court lays out its calculation of the amount of tax loss. The Court has held two hearings regarding the amount of

---

[1] The Court applies the 2018 version of the Guidelines. *See United States v. Warren*, 980 F.2d 1300, 1304 (9th Cir. 1992) ("Normally, a district court is to apply the version of the Sentencing Guidelines in effect on the date of sentencing" unless "amended versions of the Sentencing Guidelines are ex post facto.").

1  tax loss and received extensive written submissions from the parties, *see* ECF 374, 375, 376, 399,
2  411, 426, 427, 428, 429. Having reviewed these submissions, the parties' oral arguments, and the
3  trial record, the Court finds that the total tax loss is $5,653,734.24. The Defendant's base offense
4  level is thus 24.

## I. BACKGROUND

Unless otherwise noted, the following facts are not disputed by the parties.

On January 28, 2015, a grand jury returned an Indictment charging Horng and his wife Meili Lin ("Lin") with, *inter alia*, two counts of filing false tax returns in violation of 26 U.S.C. § 7206(1). ECF 1 ("Indictment") at 1-2. Count 1 alleged that Horng and Lin filed a joint Form 1040 for the calendar year 2006 containing two false statements: (1) Horng and Lin "reported total income for the year of $232,116" knowing that their actual total income was higher; and (2) Horng and Lin stated that they "had no interest in, or signature, or other authority over, bank, securities, and other financial accounts in a foreign county" knowing Lin did have an interest in financial accounts in Canada and China. *Id.* at 1-2. Count 2 alleged that Horng and Lin filed a joint Form 1040 for the calendar year 2007 reporting "total income for the year of $-212,217" knowing that their actual total income was higher. *Id.* at 2. On June 4, 2018, a jury convicted Horng of both counts. ECF 285.

The false statements of income are principally at issue in sentencing. To establish the false statements, the Government offered evidence at trial of three categories of unreported income: (1) profits from a company called Reijin International ("Reijin"); (2) rental income; (3) diverted funds. Because the Government only seeks a finding of tax loss as to the first category, ECF 399 ("Gov't Supp. Memo") at 25, the Court focuses upon the evidence regarding Reijin.

Reijin was in the scrap metal business: It bought scrap metal from U.S. companies and then shipped the metal to China to be reprocessed and sold. *See, e.g.*, ECF 384 (Heitmeir 5/9/18 Transcript) at 12-14, 18, 28; ECF 404-4 (Trial Exhibit 350); ECF 404-10 (Trial Exhibit 370). One of the companies for which Reijin procured scrap metal was Tianjin Ruiyu Metal Products ("TRMP"), a Chinese company owned by Lin's family. *See, e.g.*, ECF 411-7 (PK Lin 5/16/18 Transcript) at 105-06; ECF 400-12 (Meili Lin 5/23/18 Transcript) at 69-70. Reijin operated from

at least 1999 until at least 2009. *See, e.g.*, ECF 384 (Heitmeir 5/9/18 Transcript) at 8-10.

The Government presented evidence that Horng and Lin were the sole owners of Reijin during that entire period. Specifically, the Government presented evidence that Reijin was an unincorporated "Sole Proprietorship" prior to 2007 and that Lin was the proprietor. ECF 400-2 (Campbell 5/15/18 Transcript) at 30-31; ECF 400-6 (Garrison 5/8/18 Transcript) at 64-67; *e.g.*, ECF 401-1 (Trial Exhibit 1, 2006 Form 1040) at 12. As such, Reijin was not a separate legal entity; instead, its profits were to be reported in Schedule C of Horng and Lin's joint Form 1040 and thus flow to Horng and Lin's Total Income (Line 22). *See* ECF 400-2 at 30-31; ECF 400-3 (Carl 5/25/18 Transcript) at 166-67; ECF 400-6 at 64-67. Then, in 2007, Horng and Lin incorporated Reijin as an "S Corporation," also known as a "flow-through" corporation. ECF 402-9 (Trial Exhibit 191, Articles of Incorporation); ECF 401-4 (Trial Exhibit 7) at 10-11. An S Corporation is a separate legal entity for which a separate tax return is required—a Form 1120S. However, the profits of an S Corporation flow to its shareholders, who are then taxed on the profits as part of their income. ECF 400-3 at 167-68; ECF 400-4 (Eckley 5/14/18 Transcript) at 13-14. The Government offered evidence that Horng and Lin were Reijin's only shareholders, ECF 401-4 (Trial Exhibit 7) at 10-11, and were thus required to file an accurate Form 1120S on Reijin's behalf and include Reijin's profits as income on their Form 1040.

The Government argued that Horng and Lin's tax returns did not accurately report Reijin's profits or, consequently, Horng and Lin's total income. In 2006, Horng and Lin filed a joint Form 1040 reporting total income of $232,116. ECF 401-1 (Trial Exhibit 1, 2006 Form 1040) at 3; ECF 400-2 (Campbell 5/15/18 Transcript) at 13. Attached thereto was a Schedule C reporting profits of $72,239 for Reijin. ECF 401-1 at 12; ECF 400-2 at 30. In 2007, Horng and Lin filed a joint Form 1040 reporting total income of negative $212,217. ECF 401-2 (Trial Exhibit 2, 2007 Form 1040) at 3; ECF 400-2 (Campbell 5/15/18 Transcript) at 13. Attached thereto was a Schedule E reporting profits of $28,465 for Reijin. ECF 401-2 at 19. Reijin also filed a Form 1120S for 2007, which reported gross receipts of $41,500 and a net loss of $28,465. ECF 401-4 (Trial Exhibit 7).

The Government then endeavored to show that Reijin's profits in 2006 and 2007 were greater than the amounts reported, offering evidence of Reijin's business profits in 2006 and 2007.

3

*See, e.g.*, ECF 405-14 (Trial Exhibit 912); ECF 389 (Campbell 5/15/18 Transcript) at 83-86 (testifying as to her analysis). In addition, the Government introduced evidence suggesting that Horng and Lin's spending in 2006 and 2007 far exceeded the total income they had reported. *See, e.g.*, ECF 389 (Campbell 5/15/18 Transcript) at 17, 20 (testifying that Defendants spent at least $1.2 million in 2006 and at least $2.4 million in 2007). Horng also admits to having signed loan applications reporting annual income greater than reported on the couple's joint income tax returns. *See* ECF 403-8 (Trial Exhibit 271: loan application signed on 4/3/07, reporting monthly income of $95K); ECF 403-9 (Trial Exhibit 272: loan application signed on 4/23/07, reporting monthly income of $36K); ECF 404-6 (Trial Exhibit 355: loan application signed on 8/29/07, reporting monthly income of $48K).

Although the Indictment only charged Horng and Lin with filing false tax returns in 2006 and 2007, the Government also presented evidence that Horng and Lin misstated Reijin's profits for tax years 1999 to 2005 and from 2008 to 2009 (the "Uncharged Years"). *See, e.g.*, ECF 401-5 (Trial Exhibit 29, Individual Master File Return summary for Jyu Chau Horng and Meili Lin, 1999 to 2007); ECF 386 at 24-26 (Garrison 5/9/18 transcript, describing Trial Exhibit 29).

At trial, Horng and Lin's principal defense was that they were the owners of Reijin in form only, and that Lin's family were the "real owners of Reijin." ECF 411 ("Def. Response") at 1; *see also* ECF 279 at 64 (Jury Instructions, Theory of Defense). Various defense witnesses testified that Reijin was one of several companies that comprised the Lin Family scrap metal business, and that Reijin acted as a "broker" for the Chinese companies, including TRMP. ECF 411-2 (Meili Lin 5/21/18 Transcript) at 33-35, 54; ECF 411-7 (PK Lin 5/16/18 Transcript) at 78-79, 93-95; ECF 411-8 (PK Lin 5/18/18 Transcript) at 89. Specifically, Horng and Lin introduced evidence that Lin's mother and brother made all of Reijin's business and financial decisions; the Lin Family had simply designated Lin to be its nominee in the U.S. ECF 411-2 at 35-36, 69-70; ECF 411-7 at 93-94, 96, 111. As a result, Horng and Lin argued, all of the money associated with Reijin belonged to Lin's family and not to Lin and Horng. *See* Def. Response at 4. For that reason, Lin's mother required Lin to keep a written ledger of Reijin's business transactions. ECF 411-7 at 117; *see* ECF 402-1 (Trial Exhibit 112 Part 1, scanned ledger); ECF 402-2 (Trial Exhibit 112 Part

2, scanned ledger); ECF 402-3 (Trial Exhibit 113, translation of ledger).

## II. DISCUSSION

The Court now turns to its calculation of the amount of tax loss under §§ 2T1.1 and 2T4.1. As set out below, the Court bases its Guideline determination on the cumulative tax loss for tax years 1999 through 2009. To calculate the tax loss in each year, the Court adopts the Government's method with two key modifications: (1) the Court excludes deposits into the bank account BOA XXXX-X6526, because there is insufficient evidence that it was controlled by Horng and Lin; and (2) the Court subtracts the $1,725,140 wired to Greater China from net business profits in 2006.

### A. Applicable Law

As noted above, U.S.S.G. § 2T1.1 provides for the Guideline for convictions under 26 U.S.C. § 7206(1). § 2T1.1, in turn, states that the base offense level is the level in the Tax Table at § 2T4.1 "corresponding to the tax loss." *Id.* at § 2T1.1(a)(1). The Tax Table at § 2T4.1 is duplicated below:

|     | **Tax Loss (Apply the Greatest)** | **Offense Level** |
| --- | --- | --- |
| **(A)** | $2,500 or less | **6** |
| **(B)** | More than $2,500 | **8** |
| **(C)** | More than $6,500 | **10** |
| **(D)** | More than $15,000 | **12** |
| **(E)** | More than $40,000 | **14** |
| **(F)** | More than $100,000 | **16** |
| **(G)** | More than $250,000 | **18** |
| **(H)** | More than $550,000 | **20** |
| **(I)** | More than $1,500,000 | **22** |
| **(J)** | More than $3,500,000 | **24** |
| **(K)** | More than $9,500,000 | **26** |
| **(L)** | More than $25,000,000 | **28** |
| **(M)** | More than $65,000,000 | **30** |
| **(N)** | More than $150,000,000 | **32** |
| **(O)** | More than $250,000,000 | **34** |
| **(P)** | More than $550,000,000 | **36**. |

§ 2T1.1 states that if, as here, "the offense involved . . . a fraudulent or false return, statement, or other document, the tax loss is the amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." *Id.* at

1  § 2T1.1(c)(1). Accordingly, the Court's task is to determine the "amount of loss that was the
2  object of the offense."

3  The Application Notes to § 2T1.1 further state that, "[i]n determining the total tax loss
4  attributable to the offense (*see* § 1B1.3(a)(2)), all conduct violating the tax laws should be
5  considered as part of the same course of conduct or common scheme or plan unless the evidence
6  demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1 cmt. n.2. This is a specific
7  application of the general rule that a court must consider all "relevant conduct" in determining the
8  Guideline range. *See United States v. Dentman*, 44 Fed. App'x 856, 857 (9th Cir. 2002) (citing
9  § 1B1.3(a)(2)); *United States v. Zegzula*, 111 F.3d 139 (9th Cir. 1997) ("In calculating tax loss,
10 uncharged relevant conduct must also be included.").

11 "When determining an amount of loss for sentencing purposes, a district court must
12 provide reasoning to explain its determination of such loss." *United States v. Stargell*, 738 F.3d
13 1018, 1024 (9th Cir. 2013) (internal quotation marks, alterations, and citation omitted). The
14 Guidelines make clear, however, that they do not require absolute precision; rather, a district court
15 should "make a reasonable estimate based on the available facts." *Stargell*, 738 F.3d at 1025
16 (quoting U.S.S.G. § 2T1.1 cmt. n.1). Moreover, "[a]lthough the district court's findings must be
17 expressed, they need only state the court's resolution of the disputed issues." *Id.* (internal
18 quotation marks, alterations, and citation omitted).

19 Finally, as to the standard of proof, this Court previously held that "the Government must
20 prove any tax loss attributable to Horng for 2006 and 2007 by a preponderance of the evidence
21 and any tax loss attributable to Horng from 1999 to 2005 and 2008 to 2009 by clear and
22 convincing evidence." ECF 382.

### B. The Government's Method

24 As noted above, the Government's calculation of tax loss is based solely on Defendant's
25 underreporting Reijin's profits. The Government relied upon analyses conducted by Jowei
26 Campbell, a Revenue Agent with the Internal Revenue Service. *See* ECF 406 ("Campbell Decl.").
27 Campbell first estimated the Reijin's profits based upon the bank records and the Lin ledger.
28 Campbell then substituted the profit figures she estimated with the figures reported on Defendant's

Form 1040 and calculated the difference in tax liability. Campbell applied this method to the years of conviction (2006 and 2007) and to the Uncharged Years (1999 to 2005 and 2008 to 2009).

### i. Tax Years 2006 and 2007

The analysis for the years of conviction is based on bank records admitted at trial. *See* Campbell Decl. ¶¶ 5-10 & 17. Campbell's basic method was to (1) estimate gross business receipts, (2) estimate cost of goods sold ("COGS"), and (3) subtract the COGS figure from gross business receipts to obtain net profit.

To estimate gross business receipts, Campbell looked at deposits into various bank accounts controlled by Horng and Lin. In 2006, these bank accounts received 140 deposits totaling $24.48 million from the People's Republic of China, the Republic of China (Taiwan), and Hong Kong (collectively "Greater China"). *Id.* ¶ 7(a). In 2007, Defendants' bank accounts received 70 deposits totaling $13.07 million from Greater China. *Id.* ¶ 8(a). These deposits were sent by TRMP as well as various other companies and individuals in Greater China; Campbell excluded any deposits that appeared to be transfers between Defendants' accounts, deposits from renters, insurance companies, banks, title companies, and retailers. *Id.* ¶ 7(a).

Campbell then reduced the 2007 deposits by $5.35 million to account for the possibility that Lin's brother (PK Lin) had loaned $5.35 million investment to Horng and Lin, which they then invested into a Milpitas shopping center. *See* Campbell Decl. ¶ 8(a); Gov't Supp. Memo at 25. Subtracting $5.35 million from 13.07 million produced gross business receipts of $7.72 million in 2007. *Id.*

To estimate COGS, Campbell looked at withdrawals from Defendants' bank accounts to determine the amount Defendants paid to buy scrap metal and ship it to China. In 2006, Defendants sent $21.10M to scrap traders, shipping and logistics providers, and an insurance company, and received $27,015.81 from two scrap traders, producing a net COGS of $21.08M. Campbell Decl. ¶ 7(b). In 2007, Defendants sent $6.71M to scrap traders, shipping and logistics providers, an insurance company, a CPA, and a cleaning service, producing a net COGS of $6.71M. *Id.* ¶ 8(b).

7

Subtracting COGS from gross business receipts resulted in a net business profit of $3.40 million in 2006 and $1.01 million in 2007. Campbell Decl. ¶¶ 7(c), 8(c).

If these Net Business Profit numbers for 2006 ($3.40 million), and 2007 ($1.01 million), are substituted for the profit figures Defendants reported for Reijin on their 2006 Form 1040, Schedule C and on Reijin's 2007 Form 1120S, which ultimately flowed through to Defendants' 2007 Form 1040, Schedule E, and tax is calculated on the difference, the result is an additional tax due of $1,236,827 in 2006 and $261,741 in 2007. Campbell Decl. ¶ 10.

### ii. Tax Years 1999 – 2005, 2008 – 2009

Because bank records are not available for the Uncharged Years, Campbell's analysis relied upon the ledger maintained by Lin. Campbell's basic method was to (1) estimate profit margin, (2) estimate gross business receipts, and (3) multiply gross business receipts by the profit margin to obtain net profit.

The parties agree that the ledger is very accurate as to Reijin's transactions. Gov't Supp. Memo at 13; Def. Response at 30. Nevertheless, Campbell first verified the accuracy of the ledger by comparing its 2006 and 2007 entries to the bank records previously analyzed. Campbell Decl. ¶ 12. For 2006, the ledger captured 98% of the deposits reflected in bank records; for 2007, the ledger captured 99.6% of the deposits reflected in the bank records. *Id.* The difference between the ledger and the bank records with respect to COGS is greater, but still very high (88% correlation for 2006, and 78% for 2007). *Id.*

First, Campbell conducted a Straight Ledger Analysis. Excluding 115 items that Campbell concluded were likely not business income, the ledger listed $139.25 million in gross business receipts, $120.43 million in COGS, and $19,824 in deductible expenses over all the Uncharged Years, which yields $18.80 million in net business profits. Campbell Decl. ¶ 13(a). Campbell did not directly use this net business profit figure to calculate the tax loss, however. Instead, she combined the COGS and net business profit figures for the Uncharged Years with those for 2006 and 2007 (from bank records, as discussed above) and calculated the gross profit margin, which was 13.54%. *Id.* ¶ 13(b). Campbell then rounded down from 13.54% to 10% to obtain the profit margin she would use in her calculations.

Campbell had already tabulated the gross business receipts based on the ledger's entries. Instead of using those figures, however, Campbell used the COGS estimates she had tabulated from the ledger to conservatively approximate gross business receipts for the Uncharged Years. Campbell Decl. ¶ 13(b)(ii). Applying the profit margin to the COGS (which were being used to approximate gross business receipts), Campbell obtained her final profit estimates for the Uncharged Years, shown in the table below.

| Year | Gross Business Receipts | Profit Margin | Net Business Profit |
|---|---|---|---|
| 1999 | $ 8,967,210 | 10% | $ 896,721 |
| 2000 | $ 15,136,083 | 10% | $ 1,513,608 |
| 2001 | $ 11,335,772 | 10% | $ 1,133,577 |
| 2002 | $ 14,705,953 | 10% | $ 1,470,595 |
| 2003 | $ 16,256,643 | 10% | $ 1,625,664 |
| 2004 | $ 23,040,428 | 10% | $ 2,304,043 |
| 2005 | $ 26,901,180 | 10% | $ 2,690,118 |
| 2008 | $ 3,154,212 | 10% | $ 315,421 |
| 2009 | $ 950,385 | 10% | $ 95,039 |

If these Net Business Profits figures for the Uncharged Years are substituted for the profit figures Reijin reported in those years, and tax is calculated on the difference, the result is an additional tax due of $4,553,601 for those years. Campbell Decl. ¶ 17; *see* ECF 401-5 (Trial Exhibit 29, Individual Master File Return summary for Jyu Chau Horng and Meili Lin, 1999 to 2007).

### C. Defendant's Challenges

Because the Court "need only state the court's resolution of the disputed issues," *Stargell*, 738 F.3d at 1024, the Court focuses upon Defendant's challenges to the Government's method.

#### i. Inclusion of Uncharged Years

Defendant challenges the Government's inclusion of the Uncharged Years on the ground that sentencing a defendant based on uncharged conduct violates the Due Process Clause and the Sixth Amendment. *See* ECF 426 ("Def. Supp. Memo.") at 1-3. Under current Supreme Court and Ninth Circuit law, it is clear that a judge "can increase the defendant's sentence based—as here— on uncharged conduct, *see Witte v. United States*, 515 U.S. 389 (1995), and even acquitted

conduct, *United States v. Watts*, 519 U.S. 148, (1997)." *United States v. Fitch*, 659 F.3d 788, 795 (9th Cir. 2011). So long as the facts do not "increase[] the penalty beyond the prescribed statutory maximum," *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), or increase the mandatory minimum sentence, *Alleyne v. United States*, 570 U.S. 99, 116 (2013), district courts may consider criminal conduct that the jury did not find. *United States v. Barragan*, 871 F.3d 689, 716 (9th Cir. 2017).

The Court acknowledges that the constitutionality of sentencing a defendant based on facts not found by a jury is an evolving area of the law. As Defendant points out, multiple Supreme Court justices have expressed their "concern about the use of acquired conduct at sentencing." *United States v. Bell*, 808 F.3d 916 (D.C. Cir. 2015) (Kavanaugh, J., concurring); *see also Jones v. United States,* 574 U.S. 948 (2014) (Scalia, J., dissenting from denial of certiorari); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J., commenting that "it is far from certain whether the Constitution allows" a district judge to increase a defendant's sentence "based on facts the judge finds without the aid of a jury or the defendant's consent"). Nevertheless, at this point in time, Defendant's constitutional argument is precluded by binding Circuit and Supreme Court law. And although the Supreme Court may well the grant the pending petitions for writ of certiorari in *Asaro v. United States*, No. 19-107, and *People v. Beck*, No. 19-564, those cases concern the use of acquitted conduct, which is not at issue here.

In this case, the inclusion of relevant but uncharged conduct only alters the advisory Guideline range—not the maximum or minimum sentence. The Court notes that Defendant does not challenge the Government's contention that Defendant's alleged misstatements of income in the Uncharged Years are relevant conduct, which § 1B1.3(a)(2) requires the Court to consider. At any rate, the Court agrees that Defendant's alleged violations in the Uncharged Years are part of "the same course of conduct" as the offenses of conviction—namely, a practice of systematically underreporting Reijin's profits. As a result, the Court must consider the tax loss in the Uncharged Years in determining the Guideline range. The effect of including the uncharged conduct is appropriately addressed under the Court's analyses of the 18 U.S.C. § 3553(a) factors, as explained at the February 11, 2020 sentencing.

### ii. Attribution of Reijin Profits to Defendant Horng

Second, Defendant objects globally to the attribution of Reijin's profits to Defendant. As Defendant put it in his briefing, "There is no question that Reijin was profitable. The issue is who owned those profits." Def. Response at 32. According to Defendant, the evidence does not support a finding that Horng and Lin—rather than Lin's family—were the sole owners of Reijin's profits. *See* Def. Response at 3-8.

The Court disagrees. There is ample evidence that Horng and Lin controlled the bank accounts into which the relevant deposits were made. Other than the account discussed in Part II.iii below, the accounts were either in Horng, Lin, or Reijin's name, or else Horng or Lin was an additional signatory; that is sufficient to show Horng and Lin's control over the accounts. *See* ECF 400-6 (Garrison 5/8/18 Transcript) at 89-94; ECF 426-12; ECF 426-13. Furthermore, Defendant does not dispute that Horng and Lin were the owners of Reijin on paper. Rather, Defendant points to evidence that Lin's mother and brother were the true decisionmakers behind Reijin. That may be, but it does not negate Defendant's ownership of Reijin. At most, Defendant has shown that he and Lin accepted substantial instruction from non-owners. The Government has proven that Defendant owned Reijin.

In any event, Defendant is not correct that "the issue is who owned" Reijin's profits. As noted above, the Court's task under § 2T1.1 is to determine the tax loss that was "the object of the offense." As the Government points out, "The guideline does not make a distinction for an employee who prepares fraudulent returns on behalf of his employer." U.S.S.G. § 2T1.1 cmt. Background. In other words, if the object of the employee's fraud is to understate the employer's tax liability, the entire tax loss from the employer's tax return would be attributed to the employee because that is "the loss that would have resulted had the offense been successfully completed." *Id.* at § 2T1.1(c)(1). It is the harm to the United States and not the benefit to the defendant that determines the tax loss. Here, it is immaterial whether Defendant owned Reijin's profits in a "real" or "functional" sense. What matters is that Horng and Lin's own Forms 1040 and the Forms 1120S they prepared on behalf of Reijin designated them as the sole proprietors of Reijin through 2006 and then as the sole shareholders in the S Corporation from 2007 onward—none of

which Defendant contests. Their joint tax returns—which Defendant signed—therefore purported to accurately report the profits of Reijin. The failure to do so is the object of the offense.

Accordingly, the Court finds it proper to attribute the tax loss resulting from the misstatements of Reijin's profits to Defendant.

### iii. Inclusion of Non-Reijin Bank Accounts

Defendant next objects to Campbell's calculation of Reijin's net business profits in 2006 and 2007. Specifically, Defendant argues that only deposits into accounts held in Reijin's name should be considered as gross business receipts. Def. Supp. Memo. at 4. Defendant provides a list of deposits into accounts not in Reijin's name, which he believes should be excluded. ECF 426-12; ECF 426-13. It is true that Defendant Campbell's analysis encompassed accounts in Reijin's name as well as other accounts controlled by Horng and Lin. Looking at Defendant's list of accounts, Horng or Lin are signatories on all the accounts, save one: BOA XXXX-X6526. This account is held by Tien Fu Lin, and neither Horng nor Lin is an additional signatory. The Court agrees with Defendant that there is insufficient evidence connecting this account to Reijin and will exclude the below deposits from the Government's calculation of gross receipts in 2006 and 2007.

| Date | Deposit |
|---|---|
| 9/28/2006 | $ 59,980.00 |
| 10/20/2006 | $ 99,982.00 |
| 10/31/2006 | $ 100,000.00 |
| 10/31/2006 | $ 100,000.00 |
| 3/20/2007 | $ 199,985.00 |
| | |
| 2006 TOTAL | $ 359,962.00 |
| 2007 TOTAL | $ 199,985.00 |

Subtracting $359,962 from the Government's original calculation of net business profits in 2006 ($3.40 million) results in net profits of $3,040,038 in 2006. Subtracting $199,985 from the Government's original calculation of net business profits in 2007 ($1.01 million) results in net profits of $810,015 in 2007. These reductions in net profits correspond to reductions in the tax due of $100,789.36 in 2006 and $55,995.80 in 2007.[2]

---

[2] Although Campbell calculated the tax due on Reijin's net profits by flowing them through

12

There is clear and convincing evidence, however, that Horng and Lin had control over the accounts in their names or for which they had signatory authority. Importantly, moreover, Campbell did not consider all deposits to be gross business receipts. She included only deposits from Greater China that appeared to be business-related transactions. *See* Campbell Decl. ¶ 7(a); *see also* ECF 389 (Campbell 5/15/18 Transcript) at 94-95. Hence, Campbell excluded any deposits that appeared to be transfers between Defendants' accounts, deposits from renters, insurance companies, banks, title companies, and retailers. *Id.* ¶ 7(a).

Campbell's calculations of gross business receipts in 2006 and 2007 were also corroborated by the ledger, the accuracy of which Defendant has repeatedly affirmed. *See* Def. Response at 30, 34, 35; ECF 374 ("Rather than simply using the ledger, however, the government ignores the ledger in its calculation of income . . . .").

The Court is therefore satisfied that, excluding deposits into account BOA XXXX-X6526, the deposits represent a "reasonable estimate" of Reijin's gross business receipts.

### iv. Transfers to China

Finally, Defendant objects that Campbell failed to account for $1,825,160 in wire transfers that were sent from various accounts controlled by Horng and Lin to TRMP and PK Lin in Greater China. Def. Supp. Memo. at 3. Defendant lists these wire transfers in Exhibit A to their briefing, duplicated below. *See* ECF 426-2.

| Date | Account | Amount |
|---|---|---|
| 5/24/2006 | CTC Bank Canada 6306 | $ 200,000.00 |
| 5/30/2006 | CTC Bank Canada 6306 | $ 220,030.00 |
| 7/6/2006 | CTC Bank Canada 6306 | $ 430,030.00 |
| 8/21/2006 | CTC Bank Canada 6306 | $ 125,000.00 |
| 2/8/2006 | Cathay 0827 | $ 150,020.00 |
| 2/9/2006 | Cathay 0819 | $ 200,020.00 |
| 3/10/2006 | Cathay 0843 | $ 200,020.00 |
| 2/6/2006 | BOA 2898 | $ 200,020.00 |
| | **TOTAL** | **$ 1,725,140.00** |

Defendant's actual tax returns, the parties agreed at the February 11, 2020 sentencing that it would be appropriate under § 2T1.1(c)(1)(A) for the Court to calculate the reduction in tax due as 28% of the reduction in net profits.

13

In response, the Government concedes that Campbell's analysis erroneously omitted these transfers. ECF 427 at 3. Yet, the Government argues that these transfers do not affect Reijin's net profits in 2006, either through Reijin's COGS or its deductible business expenses. *Id.*

At the February 11, 2020 sentencing, the parties agreed that the wire transfers to Greater China represented capital investments in TRMP, though they disagreed as to the significance of that fact. The Government maintained that the transfers were simply expenditures of Reijin's profits; they do not reduce the profits earned. Defendant reiterated his argument that the transfers represent money that belonged to TRMP and that they should therefore be omitted from Reijin's profits.

The Court disagrees with the Government: The transfers may represent money that was held on behalf of TRMP, rather than profits to Reijin. Importantly, however, the Government has established by clear and convincing evidence that, as of January 18, 2006, Lin herself held a 51.67% interest in TRMP. *See* ECF 405-6 (Trial Exhibit 802). Accordingly, the Court believes it is appropriate to exclude half of the amount transferred to Greater China from the Government's calculation of net business profits in 2006. In addition, the Court finds that the total for these transfers is $1,725,140, not $1,825,160. The Court therefore subtracts $862,570 from the previously calculated $3,040,038 in net profits to obtain net profits of $2,177,468 in 2006. That reduction in net profits corresponds to a further reduction of the tax due in 2006 by $241,519.60.[3]

### III. FINDINGS

For the foregoing reasons, the Court holds that the following facts have been established by clear and convincing evidence:

1. Reijin was in the scrap metal business: It bought scrap metal from U.S. companies and then shipped them to China to be reprocessed and sold. *See, e.g.*, ECF 384 (Heitmeir 5/9/18 Transcript) at 12-14, 18, 28; ECF 404-4 (Trial Exhibit 350); ECF 404-10 (Trial Exhibit 370).

---

[3] Again, although Campbell calculated the tax due on Reijin's net profits by flowing them through Defendant's actual tax returns, the parties agreed at the February 11, 2020 sentencing that it would be appropriate under § 2T1.1(c)(1)(A) for the Court to calculate the reduction in tax due as 28% of the reduction in net profits.

14

2. One of the companies for which Reijin procured scrap metal was Tianjin Ruiyu Metal Products ("TRMP"). *See, e.g.*, ECF 411-7 (PK Lin 5/16/18 Transcript) at 105-06.

3. TRMP was owned by Lin's family. *See* ECF 400-12 (Meili Lin 5/23/18 Transcript) at 69-70; ECF 400-13 (PK Lin 5/18/18 Transcript) at 106-07. Beginning on December 8, 2004, Lin herself had a 46.16% ownership interest in TRMP; her interest increased to 51.67% on January 18, 2006. ECF 405-6 (Trial Exhibit 802).

4. Reijin operated from at least 1999 until at least 2009. *See, e.g.*, ECF 384 (Heitmeir 5/9/18 Transcript) at 8-10.

5. Reijin was an unincorporated "Sole Proprietorship" prior to 2007 and Lin was the proprietor. ECF 400-2 (Campbell 5/15/18 Transcript) at 30-31; ECF 400-6 (Garrison 5/8/18 Transcript) at 64-67; *e.g.*, ECF 401-1 (Trial Exhibit 1, 2006 Form 1040) at 12.

6. As such, Reijin was not a separate legal entity; instead, its profits were to be reported in Schedule C of Horng and Lin's joint Form 1040 and thus flow to Horng and Lin's Total Income (Line 22). *See* ECF 400-2 at 30-31; ECF 400-3 (Carl 5/25/18 Transcript) at 166-67; ECF 400-6 at 64-67.

7. In 2007, Horng and Lin incorporated Reijin as an "S Corporation," also known as a "flow-through" corporation. ECF 402-9 (Trial Exhibit 191, Articles of Incorporation); ECF 401-4 (Trial Exhibit 7) at 10-11.

8. Horng and Lin were Reijin's only shareholders, ECF 401-4 (Trial Exhibit 7) at 10-11, and were thus required to include Reijin's profits as income on their Form 1040 from at least 2007 to 2009. ECF 400-3 at 167-68; ECF 400-4 (Eckley 5/14/18 Transcript) at 13-14.

9. Horng and Lin failed to accurately report Reijin's profits and, consequently, their total income, on their joint Forms 1040 from 1999 to 2009. In 2009, Horng and Lin did not file a federal tax return. Campbell Decl. ¶ 16.

10. Their false statements resulted in a significant tax loss.

11. Specifically, the Court makes the following findings as to (a) the approximate profit Reijin earned in each year, (b) the amount of tax that would have been due if Defendant had accurately stated Reijin's profits, (c) the amount of tax Defendant owed, according to the tax return he filed for that year (if any), and (d) and the resulting tax loss:

| Year | (a) Profit | Source | (b) Tax Due | (c) Amount Taxed by Return | (d) Tax Loss |
|---|---|---|---|---|---|
| 1999 | $896,721 | Ledger Analysis | $366,277 | $241.00 | $366,036.00 |
| 2000 | $1,513,608 | Ledger Analysis | $641,246 | $5,127.00 | $636,119.00 |
| 2001 | $1,133,577 | Ledger Analysis | $479,582 | $6,651.00 | $472,931.00 |
| 2002 | $1,470,595 | Ledger Analysis | $613,890 | $7,592.00 | $606,298.00 |
| 2003 | $1,625,664 | Ledger Analysis | $628,572 | $13,554.00 | $615,018.00 |
| 2004 | $2,304,043 | Ledger Analysis | $862,445 | $1,674.00 | $860,771.00 |
| 2005 | $2,690,118 | Ledger Analysis | $990,695 | $11,086.00 | $979,609.00 |
| 2006 | $2,177,468 | Bank Records Analysis, Modified (*see* Parts II.C.iii-iv) | $933,935.04[4] | $39,417.00 | $894,518.04 |
| 2007 | $810,015 | Bank Records Analysis, Modified (*see* Parts II.C.iii-iv) | $211,520.20[5] | $5,775.00 | $205,745.20 |
| 2008 | $315,421 | Ledger Analysis | $0 | $0.00 | $0.00 |
| 2009 | $95,039 | Ledger Analysis | $16,689 | $0.00 | $16,689.00 |
| **TOTAL** | | | | | **$5,653,734.24** |

12. Defendant's base offense level pursuant to U.S.S.C. §§ 2T1.1 and 2T4.1 is therefore 24.

Dated: February 12, 2020

/s/ Beth Labson Freeman
BETH LABSON FREEMAN
United States District Judge

---

[4] To calculate the modified Tax Due, the Court reduced the Tax Due calculated by the Government by the amounts calculated in Parts II.C.iii-iv. That is, ($1,276,244) – ($241,519.60) – ($100,789.36) = $933,935.04.

[5] To calculate the modified Tax Due, the Court reduced the Tax Due calculated by the Government by the amount calculated in Part II.C.iii. That is, ($267,516) – ($55,995.80) = $211,520.20.